**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELVIS RUSNAK, *et al.*,<br><br>      *Plaintiffs*,<br><br>   v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>      *Defendants*. | Civil Action No. 25 - 292 (LLA) |
| GLENN TYLER CHRISTIE, *et al.*,<br><br>      *Plaintiffs*,<br><br>   v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>      *Defendants*. | Civil Action No. 25 - 932 (LLA) |

**<u>MEMORANDUM OPINION</u>**

Plaintiffs in the above-captioned cases are victims of the 1996 bombing of the Khobar Towers housing complex in Saudi Arabia and the immediate family members of individuals injured in the attack. *Rusnak*, ECF No. 1; *Christie*, ECF No. 1. Plaintiffs bring this action against the United States of America, the U.S. Department of Justice ("DOJ"), Acting Comptroller General Orice Williams Brown in her official capacity, and U.S. Victims of State Sponsored Terrorism Fund Special Master Mary Patrice Brown in her official capacity, alleging that Defendants have unlawfully withheld payments owed to them from the U.S. Victims of State Sponsored Terrorism

Fund in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*[1]
Defendants have filed a consolidated motion to dismiss Plaintiffs' complaints for lack of
subject-matter jurisdiction and for failure to state a claim. *Rusnak*, ECF No. 22; *Christie*, ECF
No. 16. For the reasons explained below, the court will grant Defendants' motion to dismiss.

## I.    STATUTORY BACKGROUND

### A.    The U.S. Victims of State Sponsored Terrorism Fund

The Foreign Sovereign Immunities Act permits individuals to sue a foreign state sponsor
of terrorism for injury or death caused by certain acts of terror. *See* 28 U.S.C. § 1605A(a).
In 2015, Congress established the U.S. Victims of State Sponsored Terrorism Fund ("USVSSTF"
or the "Fund") to help compensate those who have obtained judgments against foreign state
sponsors of terrorism. *See* Justice for U.S. Victims of State Sponsored Terrorism Act, Pub. L.
No. 114-113, § 404, 129 Stat. 3007 (2015) (codified at 34 U.S.C. § 20144). Congress initially
appropriated $1.025 billion to the Fund, 34 U.S.C. § 20144(e)(5), and provided that "future
funding [would] come from certain forfeiture proceeds, penalties, and fines from federal civil and
criminal matters involving state sponsors of terrorism," *O'Neill v. Garland*, No. 21-CV-1288,
2022 WL 17415057, at *1 (D.D.C. Dec. 5, 2022); *see* 34 U.S.C. § 20144(e)(2).

The USVSSTF is administered by a Special Master, 34 U.S.C. § 20144(b)(1)(A), who is
appointed by the Attorney General and tasked with "specifying the procedures necessary for
United States persons to apply and establish eligibility for payment," *id.* § 20144(b)(2)(A). To be
eligible for payments from the Fund, a claimant must (1) be "a United States person," (2) hold a

---

[1] Plaintiffs named former Comptroller General Gene L. Dorado as a Defendant, but the current
Acting Comptroller General is "automatically substituted" as a party pursuant to Federal Rule of
Civil Procedure 25(d).

valid federal-court judgment against a state sponsor of terrorism, and (3) comply with the statute's

relevant deadlines, although the Special Master may "grant a claimant a reasonable extension" of

any application-related deadlines for "good cause." *Id.* § 20144(c). If the Special Master

determines that a claimant is eligible, she "shall order payment" from the USVSSTF to the

claimant or the claimant's estate. *Id.* § 20144(d)(1). After accounting for statutorily prescribed

caps on recovery and the allocation of monies in the Fund, payments are made "on a pro rata basis,

based on the amounts outstanding and unpaid on eligible claims," *id.* § 20144(d)(3)(A)(i), and

distributed in rounds, *see Holland v. Bondi*, No. 24-CV-2687, 2025 WL 2674768, at *2 & n.3

(D.D.C. Sep. 18, 2025), *appeal docketed*, No. 25-5373 (D.C. Cir. Oct. 21, 2025).[2]

Importantly, "[a]ll decisions made by the Special Master with regard to compensation from

the Fund [are] not subject to . . . judicial review." 34 U.S.C. § 20144(b)(3). Instead, "a claimant

whose claim is denied in whole or in part . . . may request a hearing before the Special Master."

---

[2] To date, there have been six rounds of distributions:

- December 2016, roughly $1.1 billion to 2,332 claimants, *see* USVSSTF, *Supplemental Report from the Special Master* 11 (Aug. 2017), https://perma.cc/GU7U-GY26;

- December 2018, roughly $1.1 billion to 5,124 claimants, *see* USVSSTF, *Special Master's Report Regarding Second Distribution* 2, 9 (Feb. 2019), https://perma.cc/8YJP-NCCV;

- May 2020, roughly $1.1 billion to 13,317 claimants, *see* USVSSTF, *Supplemental Report Regarding the Third Distribution* 3, 10 (Dec. 2022), https://perma.cc/5FBL-3TBE;

- December 2022, roughly $100 million to 15,769 claimants, *see* USVSSTF, *Special Master's Report Regarding the Fourth Distribution* 3, 11 (Jan. 2023), https://perma.cc/YCR3-WJE3;

- December 2024, roughly $1 billion to 20,351 claimants, *see* USVSSTF, *Special Master's Report Regarding the Fifth Distribution* 4 (Jan. 2025), https://perma.cc/8CWF-KYFC;

- January 2026, roughly $2.8 billion to 21,723 claimants, *see* USVSSTF, *Special Master's Report Regarding the Sixth Distribution* 7-8 (Jan. 2026), https://perma.cc/6SNN-YR8P.

The Fund is scheduled to make its final distribution by January 2, 2039. 34 U.S.C. § 20144(e)(6).

*Id.* § 20144(b)(4)(A).  The Special Master shall thereafter "issue a final written decision affirming or amending the original decision," which is nonreviewable.  *Id.* § 20144(b)(4)(B).

**B.      Amendments to the USVSSTF Act, Including the Fairness for 9/11 Families Act**

Congress has amended the USVSSTF Act several times since the Fund's creation, including several amendments related to those affected by the September 11, 2001 attacks.  *See* U.S. Victims of State Sponsored Terrorism Fund Clarification Act ("Clarification Act"), Pub. L. No. 116-69, § 1701, 133 Stat. 1140 (2019).  In 2020, Congress authorized lump sum "catch-up" payments for certain 9/11 victims, spouses, and dependents.  *See* Sudan Claims Resolution Act, Pub. L. No. 116-260, § 1705(b), 134 Stat. 3291, 3293-94 (2020).  These payments were designed to ensure that 9/11 victims, spouses, and dependents who had previously been excluded from participating in the Fund would receive an equal share of payments as other 9/11 family members. *Id.*  Congress directed the Comptroller General to determine the amount of these "catch-up" payments for each 9/11 victim, spouse, and dependent who had submitted an application.  *Id.* § 1705(b)(2), 134 Stat. at 3293-94.

On December 29, 2022, Congress enacted the Fairness for 9/11 Families Act (the "Fairness Act"), which amended the USVSSTF's governing statute in several ways.  *See* Fairness for 9/11 Families Act, Pub. L. No. 117-328, 136 Stat. 6106 (2022).  Congress first appropriated $3 billion for the 9/11-related claimants' lump sum catch-up payments and directed the Special Master to "authorize lump sum catch-up payments in amounts equal to the amounts described in the [Comptroller General's report]."  *Id.* § 101(b)(3)(B), 136 Stat. at 6106-09.  And, as relevant here, Congress authorized lump sum catch-up payments for victims of the 1983 Beirut barracks and 1996 Khobar Towers bombings to ensure that these victims would receive an equal share of

payments as other non-9/11 victims. *Id.* § 101(b)(3)(B)(iii), 136 Stat. at 6108-09.[3] Congress established a reserve fund within the USVSSTF for the allocation of these lump sum catch-up payments. *Id.*

The Fairness Act directed the Comptroller General to calculate the amount of lump sum catch-up payments for Beirut barracks and Khobar Towers bombing victims. *See id.* Specifically, it required the Comptroller General to "conduct an audit and publish in the Federal Register a notice of proposed lump sum catch-up payments to the 1983 Beirut barracks bombing victims and the 1996 Khobar Towers bombing victims who have submitted applications [for payment from the Fund] on or after [the December 29, 2022] date of enactment." *Id.* Following a public comment period, the Comptroller General was required to submit "a report that includes [her] determination . . . [on] the amount of the proposed lump sum catch-up payment for each 1983 Beirut barracks bombing victim" and "each 1996 Khobar Towers bombing victim." *Id.* Congress then directed the Special Master to "authorize lump sum catch-up payments from the reserve fund . . . in amounts equal to the amounts described in [the Comptroller General's report]." *Id.* (providing that the Special Master "shall authorize" such payments "[n]ot earlier than 90 days after the date on which the Comptroller General submits the report" but "not later than 1 year after such date").

The Fairness Act also changed the application period for victims of the Beirut barracks and Khobar Towers bombings to submit applications for payment from the Fund, setting a deadline of

---

[3] A "1996 Khobar Towers bombing victim" is defined as "a plaintiff, or estate or successor in interest thereof, who has an eligible claim under subsection (c) that arises out of the June 25, 1996 bombing of the Khobar Tower housing complex in Saudi Arabia." 34 U.S.C. § 20144(j)(16)(a). Under subsection (c), the Special Master determines if a claimant has an eligible claim based on certain statutory criteria. *See id.* § 20144(c).

"180 days from the [December 29, 2022] date of enactment"—June 27, 2023. *Id.* § 101(b)(2), 136 Stat. at 6106-07.[4]  It further provided that, within thirty days after the date of enactment, "the Special Master shall update, as necessary as a result of the enactment of such Act, such procedures and other guidance previously issued by the Special Master." *Id.* § 101(b)(1)(B), 136 Stat. at 6106.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following factual allegations drawn from the complaints, *Rusnak*, ECF No. 1; *Christie*, ECF No. 1, are accepted as true for the purpose of evaluating the motion before the court, *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Co.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  The court further takes judicial notice of documents incorporated by reference into Plaintiffs' complaints.  *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("A district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment.").

### A.     Implementation of the Fairness Act

The USVSSTF permits individuals to submit one application for each claim.  *Rusnak*, ECF No. 1 ¶ 45; *Christie*, ECF No. 1 ¶ 47; *see* Justice for U.S. Victims of State Sponsored Terrorism Act, 81 Fed. Reg. 45535, 45537 (July 14, 2016) ("Only one application may be submitted for each claim.").  The Special Master did not change the procedures for applying to the Fund following the enactment of the Fairness Act.  *Rusnak*, ECF No. 1 ¶ 46; *Christie*, ECF No. 1 ¶ 48; *see Rusnak*, ECF No. 25-3, at 13.

---

[4] Generally, individuals must submit applications to the Fund within ninety days of obtaining a final judgment against a state sponsor of terrorism.  *See* 34 U.S.C. § 20144(c)(3)(A)(ii).  If an individual obtained a final judgment before the Special Master established procedures for applying to the Fund, he had ninety days from the Special Master's issuance of such procedures to apply. *See id.* § 20144(c)(3)(A)(i).

In December 2023, GAO published its first notice in the Federal Register proposing its methodology for calculating lump sum catch-up payments for victims of the Beirut barracks and Khobar Towers bombings. *Rusnak*, ECF No. 1-7, at 3; *Christie*, ECF No. 1 ¶ 25; *see* Notice of Planned Methodology for Estimating Lump Sum Catch-Up Payments to Eligible 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims, 88 Fed. Reg. 89693 (Dec. 28, 2023).    GAO published a second notice in July 2024, in which it modified its methodology in response to public comments. *Rusnak*, ECF No. 1-7, at 3; *Christie*, ECF No. 1 ¶ 25; *see* Notice of Estimated Lump Sum Catch-Up Payments to Eligible 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims and Planned Methodology, 89 Fed. Reg. 56376 (July 9, 2024) ("July 2024 GAO Notice").[5]

In its July 2024 notice, GAO interpreted the Fairness Act as directing it to calculate lump sum catch-up payments for victims who had "submitted an application during the 180-day period from the date of enactment of the Fairness Act."  July 2024 GAO Notice, 89 Fed. Reg. at 56379 n.33; *see Christie*, ECF No. 1 ¶ 26 ("[F]or the first time, the GAO articulated its understanding that the Fairness Act only directed [it] 'to estimate catch-up payments for those who submitted eligible applications to the Fund between the date of enactment (Dec. 29, 2022), and June 27, 2023, which is the date by which claimants must have applied to the Fund to be considered for catch-up payments.'" (quoting July 2024 GAO Notice, 89 Fed. Reg. at 56376 n.3)); *Rusnak*, ECF No. 1-7, at 4.  GAO's notice also stated that, in February 2023, the Special Master had added guidance to

---

[5] While the Fairness Act provided for only one round of notice and comment, GAO stated in its second notice that it believed it "need[ed] to issue [another] notice to ensure an accurate and transparent methodology for claimants to receive the correct amounts of lump sum catch-up payments" and to consider certain claimant data that had not been previously available.  July 2024 GAO Notice, 89 Fed. Reg. at 56378 n.22.  GAO also acknowledged that it had not met the Fairness Act's deadline for submitting a report to congressional committees and the Special Master.  *Id.*

the Fund website's "Frequently Asked Questions" section stating that claimants who had previously been found eligible for the Fund were not eligible to receive lump sum catch-up payments.  July 2024 GAO Notice, 89 Fed. Reg. at 56378 n.29.

GAO subsequently provided a draft report of its catch-up payment calculations to DOJ, which supports the Fund's administration.  *Rusnak*, ECF No. 1 ¶ 5; *Christie*, ECF No. 1 ¶ 35; *see* 34 U.S.C. § 20144(b)(1)(B) (providing for DOJ personnel to support the Special Master).  DOJ responded with a memorandum largely disagreeing with GAO's approach.  *Rusnak*, ECF No. 1 ¶ 5; *Christie*, ECF No. 1 ¶ 36; *see Rusnak*, ECF No. 25-2.[6]  Specifically, DOJ objected to GAO's position that claimants who had already been deemed eligible for the Fund were required to submit a duplicate, or successive, application during the Fairness Act's 180-day application window.  *See Rusnak*, ECF No. 25-2, at 6-7.  DOJ argued that the statute did not establish this new application requirement, which "contravened long-standing Fund procedures" permitting a single application for each claim and prohibiting duplicate applications.  *See id.*[7]  DOJ further criticized GAO's failure to give claimants notice of this successive-application requirement until July 2024, more than one year after the application window had closed.  *Id.*  Moreover, DOJ noted, the duplicate

---

[6] When citing ECF No. 25-2, the court refers to the CM/ECF-generated page numbers at the top of each page rather than any internal pagination.

[7] DOJ also criticized GAO's approach as being inconsistent with its methodology for calculating 9/11 victims' lump sum catch-up payments.  *See Rusnak*, ECF No. 25-2, at 6-7.  As noted, Congress established a parallel process directing the Special Master to authorize lump sum catch-up payments to 9/11 victims, spouses, and dependents.  *See* § 1705(b), 134 Stat. at 3293-94.  For those 9/11-related claimants, GAO concluded that individuals who had already been "found eligible by the Fund . . . were not required to re-submit applications to be considered for the lump sum catch-up payments."  USVSSTF, *Special Master's Report Regarding Lump Sum Catch Up Payments to 9/11 Victims, Spouses, and Dependents* 1, 2 (2023), https://perma.cc/F5SZ-Y7P4.  GAO justified its contrary approach by pointing to differences in the statutory provisions governing each program.  *See Rusnak*, ECF No. 25-3, at 21-22; *see also Rusnak*, ECF No. 1-7, at 10-11 (critiquing inconsistent approaches).

8

applications that GAO had required did not provide any information that GAO needed to calculate catch-up payments for the claimants—indeed, GAO had already proposed amounts for claimants who had not submitted a successive application. *Id.* at 7 & n.10.

### B.    GAO's Final Report

In November 2024, GAO submitted its final report to Congress and the Special Master. *Rusnak*, ECF No. 25-3; *see* U.S. Gov't Accountability Off., GAO-25-107564, U.S. Victims of State Sponsored Terrorism Fund: 1983 Beirut Barracks and 1996 Khobar Towers Bombing Claimants Due $614 Million 1 (2024).[8]  While GAO's final report responded to DOJ's criticisms, it maintained the positions outlined in its draft report.  First, GAO reiterated its view that the Fairness Act required victims of the Beirut barracks and Khobar Towers bombings—including those who had already been deemed eligible for the Fund—to submit applications to the Fund "within the [180-day] statutory application time frame" in order to receive lump sum catch-up payments. *Rusnak*, ECF No. 25-3, at 5, 12.  GAO took the view that the Fairness Act did "not disqualify claimants who previously applied to the Fund and then subsequently submitted successive applications during the statutory application time frame in order to apply for lump sum catch-up payments." *Id.* at 10 & n.32.

GAO reported that 2,081 claimants had submitted applications for lump sum catch-up payments during the "statutory application time frame." *Id.* at 10.  As relevant here, GAO concluded that 786 victims of the Beirut barracks and Khobar Towers bombings had previously been found eligible to participate in the Fund's regular payment distribution rounds. *Id.* at 16-17. GAO noted that, in February 2023, the Fund had conveyed to those claimants that they were not

---

[8] *Available at* https://perma.cc/8NHB-87FY.

eligible for lump sum catch-up payments and that the Fund could not accept successive applications. *Id.*; *see id.* at 13-15 & n.43 ("Victims of [the Beirut barracks and Khobar Towers bombings] who are not eligible for lump sum catch-up payments under the Fairness Act, *such as USVSST Fund claimants previously found eligible*, may still be eligible for compensation in the USVSST Fund's other statutory distributions." (emphasis added)).    Notwithstanding that guidance, 512 of the 786 claimants who had already been deemed eligible for the Fund submitted a successive application during the 180-day application window. *Id.* at 22-23.    The Fund administratively closed those 512 applications because it considered them successive applications. *Id.* at 17-18; *see Rusnak*, ECF No. 1 ¶ 47 ("The Special Master refused to accept second applications submitted by 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims in response to the lump sum catch-up provisions of the Fairness Act.").    GAO nevertheless concluded that the 512 claimants were still eligible for catch-up payments because they had met the Fairness Act's requirements. *Rusnak*, ECF No. 25-3, at 17-18; *see id.* at 19 n.46 (noting that because the Fairness Act "d[id] not prescribe the form of an application," GAO "included any claimant who had submitted an application to DOJ during the statutory application time frame, even if it was closed by DOJ as duplicative").[9]    As for the remaining 274 claimants who had previously been found eligible for the Fund but had not submitted successive applications, GAO concluded that they were not eligible for catch-up payments. *Id.* at 18-19.    GAO estimated that payments for these 274 claimants would have been about $116 million. *Id.* at 19.

---

[9] In addition to claimants who had submitted an application during the application window, GAO included claimants who had expressed "a clear statement of intent to apply" for lump sum catch-up payments. *Rusnak*, ECF No. 25-3, at 19 n.46.  For example, GAO included claimants who had submitted to DOJ "formal submission[s] . . . stating the specific intent to apply for a catch-up payment," but GAO did not consider "questions or requests for advice from the Fund" to satisfy the application requirement. *Id.*

In GAO's view, the Fairness Act "*permitted* Beirut barracks bombing and Khobar Towers bombing victims who had previously applied and been deemed eligible for regular distribution payments from the Fund to submit duplicate or successive applications to the Fund in order to apply for these catch-up payments." *Id.* at 6 (emphasis added).  While GAO acknowledged that the Fund's contrary position may have dissuaded claimants from submitting applications, it concluded that the Comptroller General lacked the authority to include the 274 claimants in its determination of catch-up payments because those claimants had not complied with the Fairness Act's application deadline. *Id.* at 18-19.  Accordingly, GAO recommended that Congress amend the statute to require the Special Master to authorize catch-up payments to "those among the 274 claimants who did not submit applications . . . because of Fund guidance." *Id.* at 20.  GAO's report included calculations for those 274 claimants' catch-up payments "[t]o ensure that the Fund can identify these claimants and make payments if the statute is amended." *Id.*

### C.    Plaintiffs' Actions

Plaintiffs are victims of the June 25, 1996 bombing of the Khobar Towers complex in Khobar, Saudia Arabia and their immediate family members.  *Rusnak*, ECF No. 1 ¶ 2; *Christie*, ECF No. 1 ¶ 5.  They are among the 274 claimants whom GAO identified as being ineligible to receive lump sum catch-up payments for failure to submit an application by the statutory deadline, despite having previously been deemed eligible to participate in the Fund.  *Rusnak*, ECF No. 1 ¶ 43; *Christie*, ECF No. 1 ¶¶ 39-40.  The *Rusnak* Plaintiffs and *Christie* Plaintiffs filed their actions in January and March 2025, respectively, alleging that Defendants unlawfully withheld lump sum catch-up payments from them based on GAO's erroneous interpretation of the Fairness Act. *Rusnak*, ECF No. 1 ¶¶ 60-84; *Christie*, ECF No. 1 ¶¶ 64-88.

### 1.   *Rusnak* Plaintiffs

Plaintiffs Elvis Rusnak and Clayton Zook are U.S. Air Force veterans who were injured in the 1996 Khobar Towers bombing.  *Rusnak*, ECF No. 1 ¶ 2.  Both won default judgments against Iran for its role in the attack.  *Id.* ¶¶ 32-33; *see* Order, *Schooley v. Islamic Republic of Iran*, No. 17-CV-1376 (D.D.C. June 27, 2019), ECF No. 279; Order, *Christie v. Islamic Republic of Iran*, No. 19-CV-1289 (D.D.C. July 2, 2020), ECF No. 44.  The *Rusnak* Plaintiffs submitted timely applications to the USVSSTF before the Fairness Act was enacted, and the Special Master determined that they were eligible for compensation from the Fund.  *Rusnak*, ECF No. 1 ¶¶ 2, 34-35.  The Special Master issued them "notice[s] of eligibility for payments from the Fund," each of which reflected a total eligible claim amount of $7 million.  *Id.* ¶ 36.  When the Fairness Act was enacted in December 2022, Mr. Rusnak had received one regular distribution from the Fund totaling about 5.84% of his claim, and Mr. Zook had not yet received a distribution.  *Id.* ¶ 38.  They subsequently received a fourth-round distribution from the Fund and were notified that they would receive fifth-round distributions in 2025.  *Id.*

On January 14, 2025, the *Rusnak* Plaintiffs, through counsel, sent a letter to the Special Master, DOJ, and the Comptroller General, urging the Fund and GAO to "resolve their differences and adopt the correct interpretation of the Fairness Act" by authorizing lump sum catch-up payments to them in the amounts computed by the Comptroller General.  *Id.* ¶ 41; *see Rusnak*, ECF No. 1-7.  They did not receive a "substantive response" to this letter and have not received catch-up payments.  *Rusnak*, ECF No. 1 ¶¶ 41-42.  On January 31, 2025, the *Rusnak* Plaintiffs filed this action.  *Id.* at 21.

The *Rusnak* Plaintiffs allege that Defendants have unlawfully withheld lump sum catch-up payments from them based on GAO's erroneous interpretation of the Fairness Act as requiring

12

already-eligible claimants to submit successive applications within 180 days after enactment. *Id.* ¶¶ 60-64. They describe "a Kafkaesque situation" in which an "intra-government disagreement over bureaucratic procedure and statutory interpretation has led to substantive statutory violations that are harming Congress's intended beneficiaries." *Id.* ¶ 11. The *Rusnak* Plaintiffs seek a declaration that the Fairness Act requires the Special Master to authorize lump sum catch-up payments to them and that GAO's interpretation of the Act "does not limit the scope of the Special Master's statutory obligation to authorize catch[-]up payments." *Id.* ¶ 68; *see id.* ¶¶ 60-73. They also seek an order compelling the Special Master to authorize payments to them in the amounts computed by the Comptroller General. *Id.* ¶¶ 64, 73. In the alternative, the *Rusnak* Plaintiffs allege that the Special Master violated the APA by failing to update Fund procedures and guidance to allow for the submission of successive applications. *Id.* ¶¶ 74-77. Finally, as the Fairness Act directs the Special Master to terminate the lump sum catch-up payment fund within a year after dispersing all payments, the *Rusnak* Plaintiffs seek an order to "preserve the availability of funds necessary to disburse their catch-up payments should they prevail in this case." *Id.* ¶ 84; *see id.* ¶¶ 78-84.

### 2.      *Christie* **Plaintiffs**

The *Christie* Plaintiffs are thirty-four U.S. Armed Forces veterans who were injured in the 1996 Khobar Towers bombing and their immediate family members. *Christie*, ECF No. 1, at 1-4, ¶ 5. In 2020, they won default judgments against the Islamic Republic of Iran for its material support and planning of the attack. *Id.* ¶ 11; *see* Order, *Christie v. Islamic Republic of Iran*, No. 19-CV-1289 (D.D.C. July 2, 2020), ECF No. 44. Like the *Rusnak* Plaintiffs, they submitted timely claims to receive compensation from the Fund before the Fairness Act was enacted. *Christie*, ECF No. 1 ¶¶ 6, 20. The *Christie* Plaintiffs are also among the 274 claimants whom

13

GAO identified as being ineligible to receive lump sum catch-up payments due to their failure to submit successive applications. *Id.* ¶¶ 39-40. They argue that, because of GAO's position that it could not include the 274 claimants in their determination of catch-up payments, the Special Master has "mistakenly withheld authorization of [c]atch-[u]p payments" owed to them. *Id.* ¶ 45.

The *Christie* Plaintiffs filed suit in March 2025. *Id.* at 22. They raise identical claims as the *Rusnak* Plaintiffs, seeking to compel the Special Master to authorize catch-up payments to them, or, in the alternative, to require Defendants to modify Fund procedures to allow them to submit additional applications and to extend the application deadline. *Compare id.* ¶¶ 64-88, *with Rusnak*, ECF No. 1 ¶¶ 60-84.

### D.    Procedural History

The same day the *Rusnak* Plaintiffs filed their action, the Special Master announced that she had begun authorizing lump sum catch-up payments to eligible recipients. *Rusnak*, ECF No. 12, at 2-3; *see* USVSSTF, *Special Master's Announcement Regarding Authorization of Lump Sum Catch-Up Payments for Certain Victims of the 1983 Beirut Barracks Bombing and 1996 Khobar Towers Bombing* (Jan. 31, 2025).[10] In late February 2025, the Special Master began distributing catch-up payments on a rolling basis. *Rusnak*, ECF No. 15 ¶ 6; *see* USVSSTF, *Special Master's Announcement Regarding Start of Rolling Lump Sum Catch-Up Payments for Certain Victims of the 1983 Beirut Barracks Bombing and 1996 Khobar Towers Bombing* (Feb. 28, 2025).[11] The Special Master did not authorize payments to the 274 claimants whom the Comptroller General identified as having failed to comply with the successive-application

---

[10] *Available at* https://perma.cc/JN2G-Q8JP.

[11] *Available at* https://perma.cc/6GHV-JKUN.

requirement.  *See* USVSSTF, *Special Master's Report Regarding Lump Sum Catch-Up Payments to Victims of the 1983 Beirut Barracks Bombing and 1996 Khobar Towers Bombing* 1, 3 n.8 (2025) ("Special Master's Report");[12] *see also Rusnak*, ECF No. 1 ¶¶ 40-42; *Christie*, ECF No. 1 ¶ 45.

After completing her authorization of lump sum catch-up payments, the Special Master submitted a report to Congress in March 2025.  Special Master's Report, at 2; *see* 34 U.S.C. § 20144(i) (requiring the Special Master to submit a report to Congress "[w]ithin 30 days after authorizing the payment of compensation of eligible claims").  The Special Master also announced that she had "taken the necessary steps to terminate the Beirut barracks / Khobar Towers reserve fund."  USVSSTF, *Special Master Announces that at Least $2 Billion Will Be Available for the Sixth Distribution of Victim Payments from the USVSST Fund* (Mar. 25, 2025);[13] *see Rusnak*, ECF No. 13, at 3.

In April 2025, the parties in both *Rusnak* and *Christie* entered joint stipulations providing that: (1) Defendants would ensure "amounts sufficient to meet the payment amounts which Plaintiffs seek through this lawsuit will be held in reserve for the duration of the litigation," and (2) Defendants would give at least twenty-one days' notice "before taking any action that would leave less than the amount which Plaintiffs seek in this lawsuit remaining available for payment to Plaintiffs, in order to give Plaintiffs sufficient time to move the Court for appropriate injunctive relief if necessary." *Rusnak*, ECF No. 15 ¶¶ 8-9; *Christie*, ECF No. 12 ¶¶ 5, 8-9.  Defendants also agreed that the Special Master's recent steps toward terminating the reserve fund did not moot Plaintiffs' claims. *Rusnak*, ECF No. 15 ¶ 8; *Christie*, ECF No. 12 ¶ 8.

---

[12] *Available at* https://perma.cc/T8SR-9273.

[13] *Available at* https://perma.cc/EH6Z-7TYF.

In May 2025, Defendants filed a motion to consolidate briefing in the two cases, *see Rusnak*, ECF No. 17; *Christie*, ECF No. 14, which only the *Rusnak* Plaintiffs opposed, *see Rusnak*, ECF No. 18; *Christie*, ECF No. 14, at 2. The court granted Defendants' motion and set a consolidated briefing schedule. *See Rusnak*, May 21, 2025 Minute Order; *Christie*, May 21, 2025 Minute Order. Defendants filed a consolidated motion to dismiss both complaints for lack of subject-matter jurisdiction and for failure to state a claim. *Rusnak*, ECF No. 22; *Christie*, ECF No. 16. The motion is fully briefed. *Rusnak*, ECF Nos. 22, 25, 27, 29, 30; *Christie*, ECF Nos. 16, 19, 21.

In August 2025, the Special Master terminated the reserve fund, and "[a]ll amounts that remained in the lump sum catch-up payment reserve fund in excess of lump sum catch-up payments calculated for certain Beirut barracks and Khobar Towers bombing victims were deposited into the USVSST Fund." USVSSTF, *Frequently Asked Questions* § 7.4;[14] *see* 34 U.S.C. § 20144(d)(4)(D)(iv)(IV)(aa) (directing the Special Master to terminate the fund within one year after authorization of catch-up payments is complete).

### III.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(1)

"Federal courts are courts of limited jurisdiction," and it is generally presumed that "a cause lies outside [of] this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Under Federal Rule of Civil Procedure 12(b)(1), the court must dismiss an action unless the plaintiff can establish, by a preponderance of the evidence, that the court possesses subject-matter jurisdiction. *Green v. Stuyvesant*, 505 F. Supp. 2d 176, 177-78 (D.D.C. 2007). In

---

[14] *Available at* https://perma.cc/CF83-NMMY.

reviewing such a motion, the court "is not limited to the allegations set forth in the complaint" and

"'may consider materials outside the pleadings.'" *Morrow v. United States*, 723 F. Supp. 2d 71,

76 (D.D.C. 2010) (quoting *Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d

1249, 1253 (D.C. Cir. 2005)).    Additionally, when reviewing a motion to dismiss pursuant to

Rule 12(b)(1), the court is required to "assume the truth of all material factual allegations in the

complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that

can be derived from the facts alleged.'" *Am. Nat'l Ins. Co.*, 642 F.3d at 1139 (quoting *Thomas v.*

*Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

### B.    Federal Rule of Civil Procedure 12(b)(6)

Under Rule 12(b)(6), the court will dismiss a complaint that does not "contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*    In

evaluating a motion under Rule 12(b)(6), a court accepts all well-pleaded factual allegations in the

complaint as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Atherton*

*v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009).    Although the plausibility standard does

not require "detailed factual allegations," it "requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Nor will "'naked assertion[s]' devoid of 'further factual enhancement'" suffice. *Iqbal*, 556 U.S.

at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

In determining whether a complaint fails to state a claim, a court may consider only the

facts alleged in the complaint and "any documents either attached to or incorporated in the

17

complaint and matters of which [the court] may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alteration in original) (quoting *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017)).

## IV.    DISCUSSION

In their consolidated motion to dismiss, Defendants raise two primary challenges to the court's jurisdiction over Plaintiffs' claims. *See Rusnak*, ECF No. 22-1; *Christie*, ECF No. 16-1 ("Defs.' Mot. to Dismiss"). First, they contend that the Acting Comptroller General, in her official capacity as the head of GAO, is immune from suit, *see* Defs.' Mot. to Dismiss, at 9-11; and second, they contend that the Special Master's decisions with regard to compensation are precluded from judicial review, *see id.* at 16-20. Defendants also argue that Plaintiffs have failed to state a claim as to each count of their complaints. *See id.* at 12-16, 21-23. The court will dismiss Plaintiffs' claims against the Acting Comptroller General for lack of jurisdiction,[15] dismiss Counts I, II, and III against the Special Master for lack of jurisdiction, and dismiss Counts IV and V for failure to state a claim.

### A.    Claims Against the Acting Comptroller General

Defendants first argue that Plaintiffs' claims against the Acting Comptroller General, who heads GAO, must be dismissed for lack of subject-matter jurisdiction because the APA's waiver

---

[15] While all counts of Plaintiffs' complaints are directed at "Defendants," it is not clear from the face of the complaints which claims run against which Defendants. Only Count I appears to seek relief from the Acting Comptroller General specifically, *see Rusnak*, ECF No. 1 ¶¶ 60-84; *Christie*, ECF No. 1 ¶¶ 64-88, but the *Rusnak* Plaintiffs state in their opposition that Count II "seeks a declaration that GAO's (incorrect) interpretation of the Fairness Act's eligibility requirements 'does not limit the scope of the Special Master's statutory obligation to authorize catch[-]up payments,'" *Rusnak*, ECF No. 25, at 24 n.14 (quoting *Rusnak*, ECF No. 1 ¶ 68). Because the Acting Comptroller General is immune from suit as to both counts, the court will assume that both Counts I and II are directed at her.

18

of sovereign immunity does not apply to GAO. *Id.* at 9-12. Plaintiffs counter that Congress has defined GAO as an "Executive agency" subject to the APA, *Rusnak*, ECF No. 25, at 13-17; *Christie*, ECF No. 19, at 12-15; *see* 5 U.S.C. §§ 104, 105. Plaintiffs further contend that the court may consider their claims against the Acting Comptroller General through *ultra vires* review. *Rusnak*, ECF No. 25, at 17; *Christie*, ECF No. 19, at 10-12. The court considers each argument in turn.

### 1.     APA review

"Absent a waiver of sovereign immunity, the Federal Government is immune from suit." *Loeffler v. Frank*, 486 U.S. 549, 554 (1988). The APA waives the federal government's sovereign immunity with respect to non-monetary claims against an "agency" as defined in 5 U.S.C. § 701. *See* 5 U.S.C. § 702. Section 701 defines an "agency" as "each authority of the Government of the United States," excluding "the Congress" and other enumerated entities. *Id.* § 701(b)(1). The parties dispute whether GAO, which is part of the legislative branch, falls within the APA's exception for "the Congress." Defendants argue that the exception applies to the entire legislative branch, Defs.' Mot. to Dismiss, at 10, while Plaintiffs assert that GAO is "executive" for purposes of the APA based on how it is defined in another part of Title 5 of the U.S. Code, *Rusnak*, ECF No. 25, at 14-15; *Christie*, ECF No. 19, at 12-13. Specifically, Plaintiffs assert that Congress "expressly mandated that GAO be subject to APA review in the same manner as the Executive departments" by defining GAO as an "Executive agency" in 5 U.S.C. § 105, which applies to all of Title 5, including the APA. *Rusnak*, ECF No. 25, at 14-15; *Christie*, ECF No. 19, at 12-13.

The court agrees with Defendants. The D.C. Circuit has long "interpreted the APA exemption for 'the Congress' to mean the entire *legislative* branch." *Wash. Legal Found. v. U.S. Sent'g Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir. 1994) (stating that the Library of Congress, which

is "part of the legislative branch but a separate entity from 'the Congress,' narrowly defined . . . is exempt from the APA because its provisions do not apply to 'the Congress'—that is, the legislative branch"); *see Maynard v. Architect of the Capitol*, 544 F. Supp. 3d 64, 79 (D.D.C. 2021) (concluding that the APA's waiver of sovereign immunity does not apply to the Architect of the Capitol, which "is considered part of the legislative branch" (quoting *Vanover v. Hantman*, 77 F. Supp. 2d 91, 100 (D.D.C. 1999))). Here, there can be no dispute that GAO is "constitutionally part of the legislative branch." *Glob. Health Council v. Trump*, 153 F.4th 1, 8-9 (D.C. Cir. 2025); *see Chennareddy v. Bowsher*, 935 F.2d 315, 319 (D.C. Cir. 1991) (noting that "GAO is a legislative branch agency"). The Supreme Court has described GAO as "an independent agency within the Legislative Branch that exists in large part to serve the needs of Congress." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 287 n.6 (2010) (quoting *Bowsher v. Merck & Co.*, 460 U.S. 824, 844 (1983)); *see Bowsher v. Synar*, 478 U.S. 714, 731 (1986) ("It is clear that Congress has consistently viewed the Comptroller General as an officer of the Legislative Branch."). Because "GAO is generally recognized as a part of the legislative branch, . . . [it is] thus exempt from many APA provisions." *Chen v. Gen. Acct. Off.*, 821 F.2d 732, 737 n.6 (D.C. Cir. 1987); *see, e.g.*, *Pond Constructors, Inc. v. U.S. Gov't Accountability Off.*, No. 17-CV-881, 2018 WL 3528309, at *1 (D.D.C. May 30, 2018) (dismissing APA claims against GAO for lack of subject-matter jurisdiction because "GAO—an entity within the legislative branch—is not an agency under the APA"); *Am. First Legal Found. v. U.S. Gov't Accountability Off.*, No. 25-CV-662, 2026 WL 71886, at *7 (D.D.C. Jan. 9, 2026), *appeal docketed*, No. 26-5052 (D.C. Cir. Feb. 11, 2026) (noting that "[b]ecause GAO is a legislative-branch agency, it is not subject to judicial review under . . . the APA").

20

Plaintiffs concede that "GAO may be part of the Legislative branch for certain other purposes," but they argue that it has a "dual status" and should be considered an executive-branch agency for purposes of the APA. *Rusnak*, ECF No. 25, at 15. As support, they point to 5 U.S.C. §§ 104 and 105, which together define an "Executive agency" to include GAO. *Id.* at 14-15; *Christie*, ECF No. 19, at 13; *see* 5 U.S.C. § 105 (providing that "Executive agency means . . . an independent establishment"); *see id.* § 104 (defining an "independent establishment" to include GAO). But Plaintiffs read too much into that definition. Sections 104 and 105 may apply generally to Title 5 of the U.S. Code, but in determining whether an entity is an "agency" under the APA, this court must look to how the *APA* defines that term. *See Ethnic Empls. of Lib. of Cong. v. Boorstin*, 751 F.2d 1405, 1416 n.15 (D.C. Cir. 1985) (concluding that the Library of Congress is not an agency under the APA based on the definition of an agency in 5 U.S.C. § 551(1)); *cf. Am. First Legal Found.*, 2026 WL 71886, at *5 ("[T]he definition of 'Executive agency' in § 105 has no bearing on whether an entity is subject to FOIA."). *But see Rusnak*, ECF No. 29 (arguing that *America First* was wrongly decided). As Defendants point out, in other parts of Title 5, Congress defined "agency" to incorporate the term "Executive agency," *see, e.g.*, 5 U.S.C. § 305, but it gave the term a distinct meaning in the APA, *see Rusnak*, ECF No. 27, at 5; *Christie*, ECF No. 22, at 5 ("Defs.' Reply").[16]

Plaintiffs also rely on *United States Institute of Peace v. Jackson*, 783 F. Supp. 3d 316 (D.D.C. 2025), *appeal docketed*, No. 25-5185 (D.C. Cir. May 22, 2025), for their "dual-status"

---

[16] The *Christie* Plaintiffs argue that it would be "absurd" to conclude that GAO is an "Executive agency" for Title 5 purposes "yet excluded from the definition of 'agency' for APA purposes contained within [T]itle 5." *Christie*, ECF No. 19, at 13. But there is nothing absurd about this conclusion given that Congress has defined "agency" differently throughout Title 5. Moreover, this court cannot ignore Congress's express carve-out for legislative-branch entities in the APA's definition of "agency." 5 U.S.C. § 701(b)(1)(A).

theory. *Rusnak*, ECF No. 25, at 15. They emphasize that the court in *Jackson* stated that "the definition of 'executive agency,' under 5 U.S.C. § 105, *which applies to the APA . . .* , explicitly includes GAO." 783 F. Supp. 3d at 353 (emphasis added). But the *Jackson* court made this observation to support the unrelated proposition that, "for *constitutional* separation-of-powers purposes," an entity like GAO "may be classified as legislative for one purpose but treated as executive for others." *Id.* (emphasis added). The court was not considering whether GAO is an "agency" for purposes of the APA.[17] Moreover, even if GAO could be characterized as carrying out both "executive" and "legislative" functions, the agency is nevertheless "part of the legislative branch," *Glob. Health Council*, 153 F.4th at 8-9, and "the case law is clear that . . . the exemption for 'the Congress' applies to 'the entire legislative branch,'" *Maynard*, 544 F. Supp. 3d at 80 (quoting *Wash. Legal Found.*, 17 F.3d at 1449); *see Green v. U.S. Dep't of Just.*, 392 F. Supp. 3d 68, 99 (D.D.C. 2019) ("[P]laintiffs have pointed to nothing in the text of the APA, its legislative history, or legal precedent that suggests that Congress did not intend to include the Library of Congress *when engaging in Executive Branch functions* in 'the Congress' that it exempted from

---

[17] Meanwhile, another judge on this court has squarely addressed the question and found that the APA's waiver of sovereign immunity does not apply to GAO. *See Pond Constructors*, 2018 WL 3528309, at *1. Plaintiffs argue that *Pond Constructors* is an unpublished decision that "rel[ied] on *dicta* [from the D.C. Circuit] characterizing GAO as part of the Legislative branch for different purposes." *Rusnak*, ECF No. 25, at 16; *see Christie*, ECF No. 19, at 12-13 (arguing the plaintiff in that case did not brief the issue). While the court acknowledges that the D.C. Circuit may not have decided the question whether GAO is subject to APA, the Circuit *has* instructed that the APA's exception for "the Congress" encompasses *all* legislative-branch entities, *see Wash. Legal Found.*, 17 F.3d at 1449. That instruction is directly on point here. And to the extent that the *Pond Constructors* court "failed to consider the conclusive definition [of "Executive agency"] in Title 5," *Rusnak*, ECF No. 25, at 16; *see Christie*, ECF No. 19, at 13, this court has already rejected that argument.

the APA's definition of 'agency.'" (emphasis added)); [18] *see also Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1112 (D.C. Cir. 1974) (explaining that the Probation Service's exemption from the APA was "warranted not by the functions it performs . . . but by its status as an auxiliary of the courts"). Accordingly, the APA does not waive the Acting Comptroller General's sovereign immunity.

### 2. *Ultra vires* review

Plaintiffs next contend that the court has jurisdiction over their claims against the Acting Comptroller General through *ultra vires* review. *Rusnak*, ECF No. 25, at 17; *Christie*, ECF No. 19, at 10-12. Defendants counter that Plaintiffs assert an *ultra vires* claim for the first time in their opposition briefs and that, "even if properly asserted, Plaintiffs fail to state such a claim." Defs.' Reply, at 5-6. The court agrees on both fronts. An *ultra vires* claim does not appear in either complaint—indeed neither set of Plaintiffs mentions the term "*ultra vires*." *See Rusnak*, ECF No. 1; *Christie*, ECF No. 1. Because Plaintiffs may not plead an *ultra vires* claim in their oppositions, this claim is forfeited. *See Masroor v. Noem*, No. 25-CV-256, 2025 WL 2439176, at *3 (D.D.C. Aug. 25, 2025) (explaining "it is axiomatic that a party may not amend his complaint through an opposition brief" (quoting *Sai v. Transp. Sec. Admin.*, 326 F.R.D. 31, 33 (D.D.C. 2018))).

---

[18] Plaintiffs attempt to distinguish the Library of Congress from GAO on the grounds that the Library of Congress is not defined as an "Executive agency" and its "organic legislation is located in Title 2 ('The Congress')." *Rusnak*, ECF No. 25, at 16; *see Christie*, ECF No. 19, at 13 (contrasting the Library of Congress from GAO, which is established in Title 31 ("Money and Finance")). These differences are immaterial, especially given that GAO's organic statute also defines it as "an instrumentality of the United States Government *independent of the executive departments*." 31 U.S.C. § 702(a) (emphasis added).

Case 1:26-cv-01262-JRR    Document 12-2    Filed 05/21/26    Page 24 of 47

Even if Plaintiffs had properly raised an *ultra vires* claim against the Acting Comptroller General, *ultra vires* review is unavailable. *Ultra vires* review is a "Hail Mary pass." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). It applies "only where (i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts 'in excess of its delegated powers and contrary to a specific prohibition in the' statute that is 'clear and mandatory.'" *Id.* (citations omitted) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)). "Because *ultra vires* review could become an easy end-run around the limitations of . . . judicial-review statutes," the Supreme Court has "strictly limited nonstatutory *ultra vires* review to the 'painstakingly delineated procedural boundaries of *Leedom v. Kyne*.'" *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)). Plaintiffs may not "dress up a typical statutory-authority argument as an *ultra vires* claim." *Id.* at 682.

Assuming that Plaintiffs could satisfy the first and second elements, Plaintiffs fall far short of satisfying the "especially demanding" third prong of the *ultra vires* reviewability test. *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). The USVSSTF Act expressly authorizes the Comptroller General to determine the amounts of lump sum catch-up payments to claimants. *See* 34 U.S.C. § 20144(d)(4)(i)-(iii). Even if GAO misinterpreted this statutory obligation, that is not the kind of extreme error amenable to *ultra vires* review. "[A]n agency violates a 'clear and mandatory' statutory command only when the error is 'so extreme that one may view it as jurisdictional or nearly so.'" *Changji Esquel Textile Co.*, 40 F.4th at 722 (quoting *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)). "Only error that is patently a misconstruction of [a statute], that disregards a specific and unambiguous statutory

24

directive, or that violates some specific command of a statute will support relief." *Id.* (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) ("*FedEx*")). Moreover, "challengers must show more than the type of routine error in 'statutory interpretation or challenged findings of fact' that would apply if Congress had allowed APA review." *FedEx*, 39 F.4th at 765 (quoting *Loc. 130, Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. McCulloch*, 345 F.2d 90, 95 (D.C. Cir. 1965)).

Here, Plaintiffs allege that only "the Special Master has exclusive statutory authority . . . to determine the eligibility of claimants to the Fund," *Christie*, ECF No. 19, at 11-12, so the Acting Comptroller General "exceeded [her] statutory authority under the Fairness Act" by determining that successive applications were required—effectively imposing an additional eligibility requirement, *Rusnak*, ECF No. 25, at 17. While Plaintiffs insist that the Fairness Act "*did not* authorize the Comptroller General to impose additional eligibility requirements beyond those set forth in subsection (c) of the statute," *Rusnak*, ECF No. 25, at 17, they point to no statutory prohibition in the USVSSTF Act or other statute that the Acting Comptroller General has violated "to an extreme and nearly jurisdictional degree," *Glob. Health Council*, 153 F.4th at 20. Rather, Plaintiffs allege that GAO committed various errors in interpreting the Fairness Act when it determined claimants were required to submit a successive application within 180 days after the law's enactment. *See Rusnak*, ECF No. 1 ¶ 43 (referring to the *Rusnak* Plaintiffs' letter in which "GAO's errors are explained—and the proper statutory interpretation is provided"); *Rusnak*, ECF No. 1-7, at 8 (Plaintiffs' letter explaining that "GAO's first error was to interpret the scope of the substantive 'shall authorize' payments provision by reference to an administrative audit-and-publish provision"); *id.* at 9-10 (explaining that GAO misinterpreted the phrase "on or after such date of enactment" in 34 U.S.C. § 20144(d)(4)(D)(i)); *see also Christie*, ECF No. 1

25

¶¶ 31-32 (explaining how GAO misinterpreted the Fairness Act's 180-day deadline).  Because

Plaintiffs have not identified more than a "routine error in statutory interpretation," *FedEx*, 39

F.4th at 765 (internal quotation marks omitted), the *ultra vires* doctrine does not provide an avenue

for judicial review of Plaintiffs' claims against the Acting Comptroller General.[19]

### B.      Claims Against the Special Master

Defendants move to dismiss Plaintiffs' claims against the Special Master for lack of

subject-matter jurisdiction (Counts I to III), Defs.' Mot. to Dismiss, at 16-20, and for failure to

state a claim (Count IV), *id.* at 21-23.  The court begins by addressing Plaintiffs' claims concerning

the Special Master's failure to authorize lump sum catch-up payments to them (Counts I to III),

*Rusnak*, ECF No. 1 ¶¶ 60-73; *Christie*, ECF No. 1 ¶¶ 64-77, and concludes that the USVSSTF Act

precludes review of those claims.  The court then turns to Plaintiffs' alternative claim challenging

the Special Master's failure to update Fund procedures (Count IV), *Rusnak*, ECF No. 1 ¶¶ 74-77;

*Christie*, ECF No. 1 ¶¶ 78-81, and concludes that Plaintiffs fail to state a claim.

---

[19] Plaintiffs' complaints also identified the Declaratory Judgment Act and Mandamus Act as potential bases for the court's jurisdiction.  *Rusnak*, ECF No. 1 ¶¶ 60-68; *Christie*, ECF No. 1 ¶¶ 64-72.  As Defendants point out, Plaintiffs do not defend these arguments in their opposition briefs.  *See* Defs.' Reply, at 5.  While the court may accordingly treat Defendants' arguments as conceded, *see Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004), it can easily dispense with both bases of jurisdiction.  The declaratory judgment statute, 28 U.S.C. § 2201, "is not an independent source of federal jurisdiction." *Metz v. BAE Sys. Tech. Sols. & Servs. Inc.*, 774 F.3d 18, 25 n.8 (D.C. Cir. 2014) (quoting *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011)).  Accordingly, "[r]esort to the Declaratory Judgment Act will not fill a gap in subject matter jurisdiction." *Lovitky v. Trump*, 949 F.3d 753, 758-59 (D.C. Cir. 2020) (alteration in original) (quoting 14 Helen Hershkoff, *Federal Practice & Procedure* § 3655 (4th ed. 2019)).  As for the Mandamus Act, 28 U.S.C. § 1361, Plaintiffs do not seek mandamus relief against the Acting Comptroller General.  *See Rusnak*, ECF No. 1 ¶¶ 60-68; *Christie*, ECF No. 1 ¶¶ 64-72.

**1.      The Special Master's failure to authorize lump sum catch-up payments**

Plaintiffs allege that the Fairness Act required the Special Master to "take the ministerial step of allocating payment to the Plaintiffs in the amounts determined by the Comptroller General," notwithstanding GAO's erroneous determination that Plaintiffs were ineligible for catch-up payments under its reading of the Fairness Act. *Rusnak*, ECF No. 1 ¶ 40; *see id.* ¶¶ 60-73; *Christie*, ECF No. 1 ¶¶ 64-77.    Defendants argue that Plaintiffs raise "claims of wrongful denial of compensation from the Fund," which are not subject to judicial review.   Defs.' Mot. to Dismiss, at 16.   Plaintiffs respond that they are challenging the Special Master's failure to comply with a non-discretionary obligation to authorize payments to them, which falls outside the scope of the USVSSTF Act's bar on judicial review.   *Rusnak*, ECF No. 25, at 26-35; *Christie*, ECF No. 19, at 16-19.   The court agrees with Defendants.

Because "Congress rarely intends to prevent courts from enforcing its directives to federal agencies," there is generally a "'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. Equal Emp't Opportunity Comm'n*, 575 U.S. 480, 486 (2015) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)).   This presumption applies even when a court is "determining the scope of statutory provisions specifically designed to limit judicial review." *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020).   A federal agency thus "bears a 'heavy burden' in attempting to show that Congress 'prohibit[ed] all judicial review' of the agency's" actions. *Mach Mining*, 575 U.S. at 486 (alteration in original) (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975)).

While this presumption is a formidable one, it is "rebuttable by a clear statement of congressional intent to preclude review." *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017).   Such intent can be divined "not only from [the statute's] express language, but

also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). When Congress precludes judicial review, a court lacks subject-matter jurisdiction to entertain the claim. *See Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1071 (D.C. Cir. 2018).

### a.    Statutory text

The court begins with the plain language of the statute. The relevant provision of the USVSSTF Act provides that:

> All decisions made by the Special Master with regard to compensation from the Fund shall be—
>
> (A) in writing and provided to the Attorney General, each claimant and, if applicable, the attorney for each claimant; and
>
> (B) final and, except as provided in paragraph (4), not subject to administrative or judicial review.

34 U.S.C. § 20144(b)(3). The only exception is found in the next paragraph, which establishes an administrative-review process permitting claimants to request a hearing before the Special Master. *Id.* § 20144(b)(4)(A). Once the Special Master holds a hearing and issues a written decision, that decision is "final and nonreviewable." *Id.* § 20144(b)(4)(B). The key question before the court is whether the phrase "decisions . . . with regard to compensation from the Fund" encompasses the actions Plaintiffs challenge here. The court concludes that it does. Plaintiffs' suits request that the court review the Special Master's failure to authorize lump sum catch-up payments to them. The Special Master's decision not to authorize such payments is plainly a "decision[] . . . with regard to compensation from the Fund," regardless of whether the Special Master had discretion to deviate from the Comptroller General's determination that Plaintiffs were ineligible for catch-up payments.

28

Plaintiffs do not dispute that the statute precludes judicial review of the Special Master's determinations regarding a claimant's eligibility to participate in the Fund and the amount of compensation awarded, including the Special Master's methodology for calculating payments. *Rusnak*, ECF No. 25, at 32-33; *Christie*, ECF No. 19, at 17-18; *see O'Neill*, 2022 WL 17415057, at *3-7. The *Rusnak* Plaintiffs instead contend that their claims do not challenge any such "decision" by the Special Master but rather her "inaction" and "failure to carry out her obligation to authorize payment of undisputed amounts determined by a different agency for claimants and claims she already determined to be eligible." *Rusnak*, ECF No. 25, at 26-28, 32 (arguing that Defendants "vaguely advert to . . . an unidentified phantom 'decision'"). The problem for Plaintiffs is that only the Special Master is statutorily authorized to distribute payments from the Fund. *See* 34 U.S.C. § 20144(b)(1)(A)(iii), (d)(4)(d)(iv)(II). It is thus of no moment that the Special Master's decision was based on the Comptroller General's determination, as the Special Master has the final word on which claimants receive catch-up payments. *See Christie*, ECF No. 19, at 18-19 (conceding that "[t]o the extent the Comptroller General has wrongly deemed Plaintiffs ineligible for catch up payments, that may be" a qualifying decision). The only reason "Plaintiffs have not been authorized lump sum catch-up payments in the amounts computed by the Comptroller General," is because the Special Master decided to authorize catch-up payments to certain claimants and not to Plaintiffs. *Rusnak*, ECF No. 1 ¶ 42; *see Christie*, ECF No. 1 ¶ 45 ("As a result of the GAO's position . . . , the Special Master mistakenly withheld authorization of Catch-Up Payments to the Excluded Eligible Claimants, including the Plaintiffs."). In other words, the Special Master—upon consideration of the Comptroller General's report—made a determination with respect to Plaintiffs' eligibility for catch-up payments. That determination— whether framed as "inaction" or a "failure to comply," *Rusnak*, ECF No. 25, at 26, 28; *Christie*,

29

ECF No. 19, at 16, 18—constitutes a "decision," *see Decision*, Black's Law Dictionary (10th ed. 2014) ("A judicial or agency determination after consideration of the facts and the law.").

This court recently addressed a similar "decision" made by the Special Master in the context of the USVSSTF Act's parallel scheme for lump sum catch-up payments to 9/11 victims, and it concluded that the jurisdiction-stripping provision applied. *See Holland*, 2025 WL 2674768, at \*4-11. In *Holland*, four groups of 9/11-related claimants sued under the APA to challenge the Special Master's administration of the Fund. *Id.* at \*4-6. Those plaintiffs had become eligible to receive compensation from the Fund in 2019, when Congress expanded the pool of 9/11-related claimants who could participate in the Fund through the Clarification Act. *See id.* at \*3-6. The Clarification Act required newly eligible individuals to submit applications to the Fund by February 2020, ninety days after its enactment. *Id.* at \*3; *see* § 1701(b)(1)(B)(ii), 133 Stat. at 1140. In 2020, Congress authorized lump sum catch-up payments for 9/11 victims, spouses, and dependents. *See* § 1705(b), 134 Stat. at 3293-94. As here, Congress directed the Comptroller General to calculate payment amounts, *id.*, and directed the Special Master to authorize catch-up payments "in amounts equal to the amounts described in the [Comptroller General's report]," *see* § 101(b)(3)(B), 136 Stat. at 6106-09.

One group of plaintiffs in *Holland*, the "Nunc-Pro-Tunc Plaintiffs," had sought default judgment against the Islamic Republic of Iran but had not obtained final judgments by the Clarification Act's February 2020 deadline for submitting claims. *Holland*, 2025 WL 2674768, at \*5. They submitted claims to the Fund in anticipation of securing those judgments and requested extensions of time to submit their applications, which the Special Master denied. *Id.* A few weeks after the deadline, a federal court granted their motions for default judgment and backdated the judgments to the date that Fund applications were due. *Id.* Despite this, the Special Master denied

the Nunc-Pro-Tunc Plaintiffs payments that were distributed to claimants who had met the February 2020 deadline. *Id.* The Special Master also denied them lump sum catch-up payments, which were based on those same applications. *Id.* The Nunc-Pro-Tunc Plaintiffs alleged that the Fund's failure to recognize their applications as timely violated the APA. *Id.* They did not dispute that a "decision" of the Special Master was being challenged, instead arguing that their suit raised constitutional and statutory challenges that were reviewable notwithstanding the preclusion provision. *See* Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss at 28-29, *Holland*, 2025 WL 2674768, ECF No. 23.

This court concluded that the "decisions" at issue fell within the jurisdiction-stripping provision. *Holland*, 2025 WL 2674768, at *7-11. Like Plaintiffs here, the Nunc-Pro-Tunc Plaintiffs had not received any "written decision" formally denying them lump sum catch-up payments. *See* Compl. ¶ 212, *Holland*, 2025 WL 2674768, ECF No. 1 ("When the USVSST Fund issued Notices of Allocated Payment Amount letters to eligible recipients of lump sum catch-up payments, the Nunc Pro Tunc Plaintiffs were not included."). Nevertheless, the relevant "decision" at issue was the Special Master's decision to disregard the backdated judgments and conclude that the claimants had not met the Clarification Act's deadline. *See Holland*, 2025 WL 2674768, at *5. The court went on to explain that "deadlines . . . dictate eligibility, which in turn dictates compensation." *Id.* at *8. Citing *O'Neill*, a case challenging the Special Master's payment methodology for 9/11-related claimants, the court stated that "[t]he placement of the [jurisdiction-stripping] provision—titled 'Decisions of the Special Master'—in the larger subsection entitled 'Administration of the [USVSSTF]' gave the provision its broadest possible reach." *Id.* at *7 (internal quotation marks omitted) (quoting *O'Neill*, 2022 WL 17415057, at *5); *see* 34 U.S.C. § 20144(b). Accordingly, the bar on judicial review applied not only to decisions

31

regarding individual claimants but also to "so-called 'programmatic' challenges" that boiled down to disputes over the amount of compensation. *Id.* at \*7-9 ("Deciding whether an individual fits into a particular class of claimants or has properly and timely submitted an application is part of the compensation process.").

The logic of *Holland* applies to Plaintiffs' claims here, which similarly challenge the Special Master's denial of lump sum catch-up payments. Plaintiffs resist this reading of the statute by arguing that the Comptroller General, not the Special Master, made the relevant decision regarding their eligibility—the only "decision" made by Special Master here was the initial determination that Plaintiffs were eligible for the Fund.[20] *See Rusnak*, ECF No. 25, at 26-27; *Christie*, ECF No. 19, at 16-18. But this court in *Holland* and the court in *O'Neill* rejected such a cramped reading of the term "decision." As noted, the Special Master has the final word on eligibility and the sole authority to authorize lump sum catch-up payments. *See* 34 U.S.C. § 20144(b)(1)(A)(iii), (d)(4)(D)(iv)(II). Accordingly, as in *Holland*, the Special Master's

---

[20] The court acknowledges that *Holland* was decided during the pendency of this litigation, so Plaintiffs have not had an opportunity to address its application. Nevertheless, Plaintiffs fail to distinguish *O'Neill*, which this court relied on and expanded upon in *Holland*. Plaintiffs merely assert that *O'Neill* involved "decisions made by the Special Master," whereas "no such decisions are at issue here." *Rusnak*, ECF No. 25, at 33; *see Christie*, ECF No. 19, at 17-18. But Plaintiffs do not meaningfully respond to the reasoning that supported the *O'Neill* court's conclusion and is equally applicable here.

determinations regarding Plaintiffs' eligibility for lump sum catch-up payments constitute "decisions" within the meaning of 34 U.S.C. § 20144(b)(3).[21]

Plaintiffs' argument that a "decision" must involve an exercise of discretion also fails. *See Rusnak*, ECF No. 25, at 27-28; *Christie*, ECF No. 19, at 16-17. The statute expressly precludes judicial review of "*[a]ll* decisions made by the Special Master with regard to compensation from the Fund"—not merely discretionary decisions. 34 U.S.C. § 20144(b)(3) (emphasis added). Plaintiffs' reading is inconsistent with how this court and others have interpreted the preclusion provision. As Defendants point out, various aspects of the Special Master's role can be characterized as non-discretionary, such as the timing of payments and the pro rata formula for calculating regular distribution awards. Defs.' Reply, at 13; *see* 34 U.S.C. § 20144(d)(2)-(4). Plaintiffs' logic, however, would place those actions outside the scope of Congress's broad preclusion provision, even though they clearly concern "compensation from the Fund." *See O'Neill*, 2022 WL 17415057, at *4-6. The court thus cannot accept Plaintiffs' sweeping assertion that an action executed without discretion cannot be considered a "decision made by the Special Master with regard to compensation from the Fund." 34 U.S.C. § 20144(b)(3).

---

[21] The *Christie* Plaintiffs also contend that there is "no decision to challenge" because the Special Master has not issued a "written decision" to them, even though the Special Master's decisions must be "in writing" under 34 U.S.C. § 20144(b)(3)(A). *See Christie*, ECF No. 19, at 17-18. This argument also lacks merit. Even if the Special Master's decision was not communicated to Plaintiffs "in writing," that does not render her decision reviewable. Consider the structure of Section 20144(c)(3), which contains two provisions relating to "[a]ll decisions made by the Special Master with regard to compensation from the Fund." First, under provision (A), those decisions must be "in writing and provided to the Attorney General, each claimant, and, if applicable, the attorney for each claimant." 34 U.S.C. § 20144(b)(3)(A). And under provision (B), those decisions are "final and, except as provided in [the administrative-review process], not subject to . . . judicial review." *Id.* § 20144(b)(3)(B). The section therefore sets out two independent requirements of the Special Master's "decisions." The Special Master's failure to comply with provision (A) would not render the Special Master's decision no longer a "decision" for purposes of provision (B).

Plaintiffs' remaining arguments are similarly unavailing. Plaintiffs point to *Schneider v. Feinberg*, 345 F.3d 135 (2d Cir. 2003) (per curiam), to argue that the court must take an "issue-by-issue approach" when evaluating its jurisdiction to review the Special Master's decisions. *See Rusnak*, ECF No. 25, at 34-35; *Christie*, ECF No. 19, at 18. But the Second Circuit's holding that it had jurisdiction to review regulations promulgated by the Attorney General, in consultation with the Special Master of the September 11th Victim Compensation Fund, is inapposite here. *See* 345 F.3d at 145-48. And this court's conclusion that decisions regarding compensation from the Fund are nonjusticiable is entirely consistent with the "issue-by-issue approach" endorsed by the court in *Schneider*. Likewise, the district court's resolution of *Englehardt v. Garland*, 759 F. Supp. 3d 112 (D.D.C. 2024), *appeal docketed*, No. 24-5297 (D.C. Cir. Dec. 31, 2024), on the merits also does little to advance Plaintiffs' claims. *See Rusnak*, ECF No. 25, at 34. That case concerned a challenge to DOJ's allocation of certain penalties, fines, and forfeitures to the USVSSTF, which did not implicate the Special Master's administration of the Fund. *See Englehardt*, 759 F. Supp. 3d at 114-15. Indeed, the plaintiffs in *Engelhardt* did not even name the Special Master as a defendant. *See* Compl. at 1, *Englehardt v. Garland*, No. 24-CV-1865 (D.D.C. June 27, 2024), ECF No. 1.[22]

---

[22] Plaintiffs also point to *Campuzano v. United States*, No. 24-CV-1652 (D.D.C.), a case pending before this court, in which the government has not argued non-justiciability. *See Rusnak*, ECF No. 25, at 34. That case, which is currently stayed pending the appeal in *Englehardt*, also concerns the allocation of funds into the Fund, which falls outside the Special Master's purview. *See* Am. Compl. ¶ 4, *Campuzano*, No. 24-CV-1652 (D.D.C. July 12, 2024), ECF No. 9; *see also* 34 U.S.C. § 20144(e)(2) (prescribing the deposit and transfer of funds into the USVSSTF).

*b.        Requested relief*

The nature of Plaintiffs' requested relief also confirms that "at bottom this case concerns [the Special Master's] compensation decisions." *O'Neill*, 2022 WL 17415057, at \*5; *see Heckler v. Ringer*, 466 U.S. 602, 614 (1984) (indicating that a court should look beyond a plaintiff's own characterization of his complaint when resolving questions of preclusion). Plaintiffs seek a declaration that "the Fairness Act requires the Special Master to authorize lump sum catch-up payments for each 1983 Beirut barracks bombing victim and 1996 Khobar Towers bombing victim, as those terms are defined by the Fairness Act in amounts set forth in the Comptroller General's Report," *Rusnak*, ECF No. 1 ¶ 63; *Christie*, ECF No. 1 ¶ 67; *see Rusnak*, ECF No. 1 ¶ 72; *Christie*, ECF No. 1 ¶ 76, and that "the audit-and-publish provision of the Fairness Act does not limit the scope of the Special Master's statutory obligation to authorize catch[-]up payments," *Rusnak*, ECF No. 1 ¶ 68; *Christie*, ECF No. 1 ¶ 72. They also seek an "order [compelling] the Special Master to authorize catch-up payments for Plaintiffs in the amounts computed by the Comptroller General." *Rusnak*, ECF No. 1 ¶¶ 64, 73; *Christie*, ECF No. 1 ¶¶ 68, 77. "[T]he transparent goal of such relief is to alter the amount of [Plaintiffs'] compensation." *Holland*, 2025 WL 2674768, at \*11.

While Plaintiffs insist that their challenge is directed at the Comptroller General's interpretation of the Fairness Act—and no decision of the Special Master at all—they cannot obtain the relief they request without disturbing the Special Master's decision not to authorize catch-up payments to them. *See Rusnak*, ECF No. 1 ¶ 40 ("The Special Master's failure to act has caused Plaintiffs to suffer legal wrong. Plaintiffs seek an order compelling this agency action, which has been unreasonably and unlawfully withheld."); *Christie*, ECF No. 1 ¶ 45 ("As a result of the GAO's position that they could not include the Excluded Eligible Claimants in their

35

determination of Catch-Up Payments, the Special Master mistakenly withheld authorization of Catch-Up Payments to . . . Plaintiffs."). Put differently, the "end result and the relief they seek is the same as if" a claimant who received a lump sum catch-up payment in the wrong amount sought judicial review of that award. *O'Neill*, 2022 WL 17415057, at *6. And this court recently dismissed exactly such a claim. *See Holland*, 2025 WL 2674768, at *4-5, *11 (dismissing claims brought by the "Supplemental-Value Plaintiffs" alleging that their 9/11 lump sum catch-up payments were too low, where the Special Master had authorized payments based on the Comptroller General's calculations).

Plaintiffs also contend that Defendants' reading of the preclusion provision is overly broad and would preclude most, if not all, claims against the Special Master, even though Congress limited the scope of preclusion to certain decisions. *See Rusnak*, ECF No. 25, at 29-30. They point to *Ringer* to support their argument, but this too fails. *Ringer* concerned a provision of the Medicare statute requiring administrative exhaustion before plaintiffs could seek judicial review of any "claim arising under" the statute. 466 U.S. at 605-06. The Court held that the phrase "claim arising under" encompassed "any claims in which 'both the standing and the substantive basis for the presentation' of the claims" was the Medicare Act. *Id.* at 615. Applied here, Plaintiffs argue that *Ringer* shows Congress "knows how to write . . . a provision when it intends the result that Defendants seek here"—that is, preclusion of all claims "arising under" the USVSSTF Act—but chose not to do so for claims against the Special Master. *Rusnak*, ECF No. 25, at 29.

The trouble for Plaintiffs is twofold. First, Defendants do not advocate for a reading of the USVSSTF Act's jurisdiction-stripping provision as expansive as the provision in *Ringer. See* Defs.' Reply, at 15. Second, and more importantly, the *Ringer* Court's reasoning cuts against Plaintiffs' position. In *Ringer*, plaintiffs seeking Medicare reimbursement challenged a policy

adopted by the Secretary of Health and Human Services pursuant to the Medicare statute. 466 U.S. at 607-08. The plaintiffs argued that the statute's exhaustion requirement did not apply to their claims because they were "seeking to invalidate the Secretary's *procedure* for determining entitlement to benefits." *Id.* at 612 (emphasis added). The Court concluded, however, that the district court lacked jurisdiction to review the plaintiffs' claims because they were, "at bottom, . . . claim[s] that they should be paid" for their particular expenses. *Id.* at 614. "In so holding, the Court emphasized that plaintiffs' claims were neither separate from nor collateral to their individual Medicare determinations: the relief they sought 'to redress their supposed "procedural" objections' included 'a "substantive" declaration . . . that the expenses of [their] surgeries were] reimbursable under the Medicare Act.'" *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 126 (D.C. Cir. 2010) (quoting *Ringer*, 466 U.S. at 614). The Court therefore focused on the relief being sought by the plaintiffs to determine whether judicial review was permitted. *Ringer*, 466 U.S. at 612-14; *see O'Neill*, 2022 WL 174515057, at *6 (applying *Ringer*'s logic to a claim challenging the Special Master's payment-calculation formula). Here, Plaintiffs expressly ask the court to order that they receive catch-up payments from the Fund. It therefore "makes no sense to construe [Plaintiffs'] claims . . . as anything more than, at bottom, a claim that they should be paid . . . [from the Fund]." *Ringer*, 466 U.S. at 613-14.

Plaintiffs next point to *Hekmati v. United States Department of Justice*, No. 23-CV-3774 (D.D.C.), a case concerning the Special Master's procedures in administrative-review hearings, but that also misses the mark. *See Rusnak*, ECF No. 25, at 32-33. In *Hekmati*, the Special Master revoked the plaintiff's eligibility for the Fund based on "false, anonymous, hearsay allegations." Compl. ¶ 2, *Hekmati v. U.S. Dep't of Just.*, No. 23-CV-3774 (D.D.C. Dec. 19, 2023), ECF No. 1. After an adjudicatory hearing, the Special Master affirmed the revocation, and the plaintiff

challenged that decision in the U.S. Court of Federal Claims. The Court of Federal Claims dismissed for lack of jurisdiction, and the Federal Circuit affirmed. *Hekmati v. United States*, 153 Fed. Cl. 800, 810-13 (2021), *aff'd*, 51 F.4th 1066 (Fed. Cir. 2022). The plaintiff then filed suit in this court, alleging that the Fund's "denial of [his] eligibility without affording [him] an opportunity to confront and cross-examine the witnesses against him violated [his due process] rights under the Fifth Amendment" and violated the APA. Compl. ¶ 86, *Hekmati*, No. 23-CV-377, ECF No. 1; *see id.* ¶¶ 87-94. The government has not contested jurisdiction in that case. *See* Defs.' Mot. to Dismiss, *Hekmati*, No. 23-CV-377, ECF No. 21.

Plaintiffs emphasize that the *Hekmati* plaintiff's "ultimate goal, of course, is to receive compensation from the Fund." *Rusnak*, ECF No. 25, at 33. But Plaintiffs' claims are not precluded simply because their general objective is to receive compensation; after all, most claims arising under the USVSSTF Act, by their nature, concern compensation in the abstract. Instead, "when the text of the statute precludes judicial review, the Court must look beyond Plaintiffs' characterization of their challenge and view their claim through the perspective of the *relief sought*." *O'Neill*, 2022 WL 17415057, at *5 (emphasis added). The relief sought in *Hekmati* makes clear that the decision being challenged is not a decision "with regard to compensation." The plaintiff in that case seeks certain procedural safeguards in the hearing process, including the opportunity to cross-examine the witnesses against him. Compl. ¶ 88-89, *Hekmati*, No. 23-CV-377, ECF No. 1; *see Rusnak*, ECF No. 25, at 33 (explaining that "Hekmati refiled in district court under the APA to challenge the *sufficiency of the procedures* that the Special Master afforded him during his administrative hearing"). If granted this relief, the plaintiff may be entitled to a new hearing, but the outcome of his procedural claims would have no bearing on his substantive eligibility for compensation from the Fund. Here, by contrast, granting Plaintiffs'

38

relief would compel the Special Master to authorize payments to them, all but guaranteeing they receive additional compensation from the Fund. That is precisely the type of situation Congress intended to exclude from judicial review. *See Holland*, 2025 WL 2674768, at *11 ("Plaintiffs' claims seek to change the amount of their distributions from the Fund [and, p]roperly contextualized, such claims are not subject to judicial review."); *Agyeman v. Bondi*, 804 F. Supp. 3d 132, 138 (D.D.C. 2025) (finding that the USVSSTF Act precludes judicial review of claims that "directly concern[ed] whether plaintiffs were permitted to receive [Fund] payments" (internal quotation marks omitted)), *appeal docketed*, No. 25-5360 (D.C. Cir. Oct. 10, 2025).

### c. Policy and purpose

As a final consideration, Defendants' reading of the preclusion provision is consistent with congressional intent and attendant policy considerations. "Congress's manifest intent was that the Fund . . . compensate [claimants] efficiently and quickly." *O'Neill*, 2022 WL 17415057, at *6. That is why Congress "exempted the Fund's procedural rules from lengthy notice-and-comment rulemaking," *id.*, instructed the Special Master to authorize lump sum catch-up payments within a year after the Comptroller General's report, *see* 34 U.S.C. § 20144(d)(4)(D)(iv)(II), and directed that the lump sum catch-up payment reserve fund be terminated within a year after the Special Master's distributions, *see id.* § 20144(d)(4)(D)(iv)(IV)(aa). As this court noted in *Holland*, "exposing the Special Master's countless administrative decisions to judicial scrutiny would gum up the compensation process for a program that is designed to expeditiously distribute funds to victims of state-sponsored terrorism." 2025 WL 2674768, at *11.

The court acknowledges that Plaintiffs' claims do not implicate some of the policy concerns raised in other cases involving the Special Master's decisions. Specifically, Congress appropriated sufficient funds for all lump sum catch-up payments to victims of the Beirut barracks

and Khobar Towers bombings. *See* Special Master's Report, at 3 ("The appropriation to the Fund for the lump sum catch-up payments provides sufficient funds for the full amount of these payments."). Accordingly, ordering the Special Master to authorize Plaintiffs' payments would not affect other catch-up payment recipients. *See Rusnak*, ECF No. 1 ¶ 14 ("Adjudication of Plaintiffs' claims in this case is entirely independent of—and will have no effect on—the timing and amount of catch-up payments to be made to other [lump sum catch-up payment recipients]."); *Christie*, ECF No. 1 ¶ 51 (same); *cf. Holland*, 2025 WL 2674768, at *11 (explaining that, "because every compensation and distribution decision by the Special Master must be made on a pro rata basis across multiple subgroups of 9/11-related and non-9/11-related claimants, *see* 34 U.S.C. § 20144(d)(3), retroactive modification of payment amounts would create an administrative quagmire"). On the other hand, Congress also provided that, upon termination of the lump sum catch-up payment reserve fund, all remaining amounts "shall be deposited into the Fund." 34 U.S.C. § 20144(d)(4)(D)(iv)(IV)(bb). Since the general Fund is "a single pool of funds, the Special Master's decisions with respect to one claimant or group of claimants necessarily affects thousands of others." *Holland*, 2025 WL 2674768, at *9. As a practical matter, then, the Special Master's decisions with respect to lump sum catch-up payment recipients affect other claimants' compensation from the Fund.

"Far from leaving Plaintiffs with no recourse to air their grievances," the USVSSTF Act "contemplates that Congress will directly oversee the Special Master and her operation of the Fund including payments." *O'Neill*, 2022 WL 17415057, at *7. Indeed, "Congress has in fact been responsive to concerns about inequities in payments," such as by expanding eligibility for 9/11-related claimants, extending the life of the Fund, and twice authorizing lump sum catch-up payments to certain classes of claimants. *Id.* While this court lacks jurisdiction to review the

40

Special Master's decisions with regard to Plaintiffs' lump sum catch-up payments, it is well within Congress's power to address the inequities Plaintiffs allege. *See Rusnak*, ECF No. 25-3, at 20 (GAO's report recommending that Congress amend the Fund's governing statute to permit lump sum catch-up payments to the 274 claimants deemed ineligible).[23]

### 2. The Special Master's failure to modify Fund procedures to permit successive applications

In Count IV, Plaintiffs plead in the alternative that, if the Special Master was bound by GAO's conflicting interpretation of the Fairness Act, the Special Master violated the APA by failing to update Fund procedures to allow claimants to submit successive applications. *Rusnak*, ECF No. 1 ¶¶ 74-77; *Christie*, ECF No. 1 ¶¶ 78-81. Defendants contend that the court "cannot exercise jurisdiction over any of the Defendants and therefore cannot even consider the alternate claim." Defs.' Reply, at 19; *see* Defs.' Mot. to Dismiss, at 21-22. While the parties debate whether the USVSSTF Act's bar on judicial review applies to Plaintiffs' claims challenging the Special Master's failure to authorize catch-up payments, they do not meaningfully address whether it also precludes review of the Special Master's failure to modify Fund procedures. Plaintiffs simply assert that the Special Master's obligation to update Fund procedures was non-discretionary, meaning no "decision" was made by the Special Master. *See Rusnak*, ECF No. 25, at 39; *Christie*, ECF No. 19, at 19 (also arguing that no written decision was made). The court has already rejected this line of reasoning. *See supra* p. 33. Plaintiffs also point again to *Hekmati*, "in which [the government] defended [F]und procedures on the merits and did *not* argue that such a challenge

---

[23] Because the court finds that it lacks subject-matter jurisdiction over Plaintiffs' claims challenging the Special Master's failure to authorize catch-up payments to them, it need not reach Defendants' argument that Plaintiffs lack Article III standing to bring Counts I and III. Defs.' Mot. to Dismiss, at 16, 20.

Case 1:26-cv-01262-JRR   Document 12-2   Filed 05/21/26   Page 42 of 47

was precluded." *Rusnak*, ECF No. 25, at 39.   At first blush, the court is skeptical that the procedural issues raised in *Hekmati* are analogous to those raised here, as Plaintiffs' alternative claim appears to seek the same relief they cannot obtain through their other claims. *See Rusnak*, ECF No. 1 ¶ 77 (requesting that the court "order the Special Master to . . . accept additional applications for catch-up payments"); *Christie*, ECF No. 1 ¶ 81 (same).   At the same time, the Special Master's inaction with respect to Fund procedures is not obviously a "decision . . . with regard to compensation from the Fund."  34 U.S.C. § 20144(b)(3).

The parties focus on the merits of Plaintiffs' alternative claim and have not fully briefed the preclusion issue as to Count IV, which this court considers a closer question than the reviewability of Plaintiffs' other claims.   Accordingly, the court will "sidestep [preclusion] questions and move to the merits."   *Braun v. United States*, 531 F. Supp. 3d 130, 136 (D.D.C. 2021), *aff'd*, 31 F.4th 793 (D.C. Cir. 2022); *see Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1246 (D.C. Cir. 2020) ("The law of our circuit allows a court to assume hypothetical *statutory* jurisdiction even if we cannot assume Article III jurisdiction.").   The court will therefore proceed as if judicial review were not precluded and dismiss Count IV under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

Under Section 706 of the APA, a court may review two types of claims: those seeking to compel certain required agency actions not yet taken, 5 U.S.C. § 706(1), and those seeking to set aside "agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2).   Here, Plaintiffs allege that the Special Master "acted unlawfully, arbitrarily, and capriciously," and abused her discretion, invoking Section 706(2) of the APA.   *Rusnak*, ECF No. 1 ¶¶ 48, 75; *Christie*, ECF No. 1 ¶¶ 52, 79.   The complaints and briefing, however, suggest that Plaintiffs are challenging the Special Master's failure to act, which

is governed by Section 706(1).  *See Blancett v. U.S. Bureau of Land Mgmt.*, No. 04-CV-2152, 2006 WL 696050, at *3 n.3 (D.D.C. Mar. 20, 2006); *see also O.M.G. v. Wolf*, No. 20-CV-786, 2020 WL 7264049, at *4 (D.D.C. Dec. 10, 2020) (noting that "[S]ection 706(1) of the APA is the more typical source of failure-to-act claims, as it provides for review of actions unlawfully withheld").  Indeed, Plaintiffs emphasize that the Special Master had a "non-discretionary statutory obligation" to change her procedures, *Christie*, ECF No. 19, at 19, and that this "mandatory action to change her procedures and guidance was unlawfully withheld and unreasonably delayed," *Rusnak*, ECF No. 25, at 39 (citing 5 U.S.C. § 706(1)).

Whether their claim is construed as arising under Section 706(1) or 706(2), Plaintiffs "must first clear the hurdle of § 701(a)." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985).  Section 701(a) of the APA bars judicial review of agency action if an applicable statute precludes judicial review or if the agency action at issue is "committed to agency discretion by law."  5 U.S.C. § 701(a)(1)-(2).  Here, Defendants invoke the second exception to judicial review, arguing that the USVSSTF Act commits the decision to update Fund procedures following the Fairness Act's enactment to the Special Master's discretion.  The court agrees.

An action is "committed to agency discretion" if "the [governing] statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830.  This "very narrow exception" to judicial review applies only "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (internal quotation marks omitted).  "In such circumstances, the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion.'" *Drake v. Fed. Aviation Admin.*, 291 F.3d 59, 70

43

(D.C. Cir. 2002).  In determining whether this exception applies, courts "consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action."  *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011) (quoting *Sec'y of Lab. v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006)).

Defendants argue that Section 20144(b)(2)(A) provides "no standard against which the Court can judge the necessity of changing the procedures."  Defs.' Reply, at 21.  The relevant provision states that "[n]ot later than 30 days after the date of enactment of the [Fairness Act] . . . , the Special Master shall update, as necessary as a result of the enactment of such Act, such procedures and other guidance previously issued by the Special Master."    34 U.S.C. § 20144(b)(2)(A).  Plaintiffs argue that the phrase "shall update" "signals a mandatory duty on behalf of the Special Master to make updates" if certain conditions are satisfied.  *Rusnak*, ECF No. 25, at 36.  Because GAO's interpretation created a "clear conflict" with the Special Master's long-standing procedure prohibiting claimants from submitting duplicative applications, Plaintiffs argue that it was "necessary" for the Special Master to update Fund procedures to allow for successive applications.  *Id.* at 37-38; *see Christie*, ECF No. 19, at 19.  The court concludes that Defendants have the better reading of the statute.

The D.C. Circuit confronted a similar statute in *Sierra Club*.  There, the Court interpreted a provision of the Clean Air Act stating that "[t]he [Environmental Protection Agency] Administrator shall . . . take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility . . . proposed to be constructed."  648 F.3d at 851 (quoting 42 U.S.C. § 7477).  The plaintiffs challenged the Administrator's inaction with respect to the construction of new

44

pollution-emitting facilities and, as here, argued that the mandatory language "shall" in the statute conferred a mandatory duty upon the Administrator that was reviewable under the APA. *Id.* at 855-56. The Court nevertheless found that the statute contained "no guidance to the Administrator or to a reviewing court as to what action is 'necessary.'" *Id.* at 856. The Court explained that "Congress can limit an agency's discretion 'either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue.'" *Id.* (quoting *Chaney*, 470 U.S. at 831). Notwithstanding the statute's directive to take measures "as necessary to prevent the construction or modification of a major emitting facility," the Court concluded that the statute "leaves it to the Administrator's discretion to determine what action is 'necessary.'" *Id.*

So too here. The USVSSTF Act provides the court no meaningful standard against which to judge the Special Master's exercise of discretion to update Fund procedures "as necessary as a result of the [Fairness Act's] enactment." 34 U.S.C. § 20144(b)(2)(A). The provision confers upon the Special Master complete discretion to determine whether updates to existing procedures are necessary and, if so, what those updates ought to be. If the Special Master is satisfied with existing Fund procedures and guidance following the Fairness Act's enactment, then "she has apparently made the decision that no action is necessary." *Sierra Club*, 648 F.3d at 856; *see Bannister v. U.S. Parole Comm'n*, No. 18-CV-1397, 2020 WL 85229, at *2 (D.D.C. Jan. 7, 2020) ("Conferring authority upon agency heads to promulgate regulations 'as necessary' to carry out the [statute] imparts broad discretion on whether and how to act and offers no meaningful judicial standard by which to evaluate inaction."). Accordingly, the Special Master had "sufficient discretion to render her decision not to act nonjusticiable." *Sierra Club*, 648 F.3d at 856.

To be sure, the statute mandates that the Special Master act, as necessary, within thirty days after the Fairness Act's enactment. 34 U.S.C. § 20144(b)(2)(A). But, just as the provision's "use of the mandatory 'shall' is not sufficient to provide legal standards for judicial review of the [Special Master's] decision not to act," the statute's directive to act within thirty days does not give this court any more guidance as to what updates are "necessary." *Sierra Club*, 648 F.3d at 856. The court therefore has no basis upon which to review the Special Master's failure to update Fund procedures following the Fairness Act's enactment under 34 U.S.C. § 20144(b)(2)(A).

Even assuming that GAO's interpretation made it "necessary" for the Special Master to update Fund procedures, Plaintiffs do not plausibly allege that the statute mandated the Special Master to act. Plaintiffs argue that the statute requires the Special Master to act within thirty days after any "conflict between the Fairness Act and [F]und procedures and guidance" arises. *Rusnak*, ECF No. 25, at 38. This reading has no basis in the text. The Fairness Act directs the Special Master to update procedures "[n]ot later than *30 days after the date of enactment* of the [Fairness Act]." 34 U.S.C. § 20144(b)(2)(A) (emphasis added). Nothing in the statute imposes an ongoing duty to update Fund procedures. Defendants are therefore correct that, if the statute established any mandatory duty, that duty expired after the thirty-day window following the Fairness Act's enactment elapsed. Here, GAO first notified the public of its conflicting interpretation in July 2024, so the Special Master was not required to update Fund procedures in response to that interpretation, which was issued more one-and-a-half years after the Fairness Act was enacted. While Plaintiffs make much of the fact that the Special Master has updated her guidance since the thirty-day window passed, *see Rusnak*, ECF No. 25, at 38-39, Plaintiffs must show that Section 20144(b)(2)(A) *required* the Special Master to act after the alleged conflict arose, not that

46

it *permitted* her to act.  Accordingly, Plaintiffs cannot show that the statute mandates the specific action that they seek.

Because the court concludes that the statute does not impose a clear mandatory duty to update Fund procedures, Plaintiffs' related mandamus claim in Count IV also fails.  *See Citizens for Resp. & Ethics in Wash. v. Trump*, 924 F.3d 602, 606 (D.C. Cir. 2019) ("In order to obtain mandamus relief, a plaintiff must demonstrate (1) a 'clear and indisputable right to relief,' (2) that the government official has a 'clear duty to act,' and (3) that 'no adequate alternative remedy exists.'" (quoting *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016))).[24]

## V.   CONCLUSION

For the foregoing reasons, the court will grant Defendants' Motions to Dismiss, *Rusnak*, ECF No. 22; *Christie*, ECF No. 16.  A contemporaneous order will issue.

_____
LOREN L. ALIKHAN
United States District Judge

Date:   March 24, 2026

---

[24] Plaintiffs' final count (Count V) seeks the interim preservation of funds for the duration of this case.  *Rusnak*, ECF No. 1 ¶¶ 78-84; *Christie*, ECF No. 1 ¶¶ 82-88.  That count is mooted by the court's dismissal of Counts I through IV and the parties' joint stipulations, *see supra* p. 15.