**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| EVIS J. RUSNAK, | |
| Petitioner, | |
| v. | Civil Action No. 1:26-cv-1262-JRR |
| JOSHUA M. AMBUSH, LLC,<br>106 Old Court Road, Suite 303<br>Baltimore, Maryland 21208 | **REDACTED** |
| and | |
| JOSHUA M. AMBUSH<br>3402 Labyrinth Rd.<br>Baltimore, Maryland 21215 | |
| Respondents. | |

**<u>MOTION TO CONFIRM ARBITRATION AWARD</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................................ii

I.      INTRODUCTION ...................................................................................................... 1

II.     BACKGROUND .......................................................................................................... 1

        A.      Elvis Rusnak Retains Ambush to Obtain Compensation for Injuries
                Arising From the Khobar Towers Terrorist Attack. ................................................. 1

        B.      Ambush Fails to File for Catchup Claims, Which Are Subsequently
                Awarded to Hundreds of Similarly Situated Terrorism Victims. ........................... 3

        C.      Ambush and Mr. Rusnak Arbitrate Their Dispute ................................................... 7

III.    LEGAL STANDARD ................................................................................................. 16

IV.     DISCUSSION ............................................................................................................. 17

        A.      Ambush's Contingent Cross-Petition to Vacate Is Untimely .............................. 18

        B.      The Arbitrator Did Not Refuse to Hear Pertinent and Material Evidence
                Under 9 U.S.C. § 10(a)(3). ................................................................................... 19

                1.      The Court Opinion Did Not Exist During the Arbitration
                        Proceedings. ............................................................................................ 19

                2.      The AAA's Denial of Ambush's Request to Reopen Was Proper. .......... 21

                3.      The Evidence Was Cumulative of the Record. ....................................... 21

                4.      The Standard for § 10(a)(3) Misconduct Is Not Met. ............................. 22

        C.      The Arbitrator Did Not Exceed Her Powers Under 9 U.S.C. § 10(a)(4). ............. 22

                1.      The Arbitrator Interpreted and Applied the Governing Law. ................... 22

                2.      Disagreement with the Merits Is Not a Ground for Vacatur. ................... 23

        D.      The Arbitrator Did Not Act in Manifest Disregard of The Law. .......................... 25

                3.      The Alleged Legal Principle Is Not "Clearly Defined and Not
                        Subject to Reasonable Debate". ............................................................... 26

                4.      The Arbitrator Did Not "Refuse to Apply" Any Legal Principle. ............ 27

V.      CONCLUSION ........................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A.H. Robins Co., Inc.*,
 232 B.R. 855 (E.D. Va. 1999)..................................................................................20

*Apex Plumbing Supply, Inc. v. U.S. Supply Co.*,
 142 F.3d 188 (4th Cir. 1998) ...............................................................................16

*Collins v. Li*,
 933 A.2d 528 (Md. Ct. Spec. App. 2007) ............................................................12

*Conlux USA Corp. v. Dixie-Narco, Inc.*,
 929 F. Supp. 269 (N.D. Ohio 1996)......................................................................20

*First Kuwaiti General Trading & Contracting W.L.L. v. Kellogg Brown & Root
 International, Inc.*,
 141 F.4th 522 (4th Cir. 2025) ...............................................................................19

*Golden Temple of Or., LLC v. Puri*,
 774 F. App'x 1044 (9th Cir. 2019) ........................................................................20

*Hall Street Assocs., LLC v. Mattel, Inc.*,
 552 U.S. 576 (2008)...............................................................................................17

*Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas
 Loc. 901*,
 763 F.2d 34 (1st Cir. 1985).....................................................................................22

*Int'l Bhd. of Firemen & Oilers, Loc. #261 v. Great N. Paper Co.*,
 No. 82-CV-0239, 1984 WL 49074 (D. Me. Oct. 22, 1984)....................................20

*Marlow v. Cerino*,
 313 A.2d 505 (Md. Ct. Spec. App. 1974) .......................................................12, 24

*Opati v. Republic of Sudan*,
 590 U.S. 418 (2020)...................................................................................................3

*Owens v. Republic of Sudan*,
 864 F.3d 751 (D.C. Cir. 2017)..................................................................................3

*Oxford Health Plans LLC v. Sutter*,
 569 U.S. 564 (2013).................................................................................................23

*Pemrock, Inc. v. Essco Co.*,
    249 A.2d 711 (Md. 1969) ...................................................................................................14

*Raymond James & Assocs., Inc. v. Martin*,
    No. 21-CV-3096, 2022 WL 1104576 (D. Md. Apr. 13, 2022) ...............................................16

*Schooley, et al., v. Islamic Republic of Iran, et al.*,
    Case No. 17-cv-1376 (D.D.C.) ..............................................................................................2

*Shearson Hayden Stone, Inc. v. Liang*,
    653 F.2d 310 (7th Cir. 1981) ...............................................................................................20

*Somuah v. Flachs*,
    721 A.2d 680 (Md. 1998) ......................................................................................................7

*Stickley v. Chisholm*,
    765 A.2d 662 (Md. Ct. Spec. App. 2001) .........................................................................12, 24

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
    559 U.S. 662 (2010).........................................................................................................23, 27

*Taylor v. Nelson*,
    788 F.2d 220 (4th Cir. 1986) .............................................................................................16, 19

*Thomas v. Bethea*,
    718 A.2d 1187 (1998)...........................................................................................................27

*Three S Delaware, Inc. v. DataQuick Info. Sys., Inc.*,
    492 F.3d 520 (4th Cir. 2007) ............................................................................................22, 27

*United Paperworkers Int'l Union v. Misco, Inc.*,
    484 U.S. 29 (1987).................................................................................................................23

*Wachovia Sec., LLC v. Brand*,
    671 F.3d 472 (4th Cir. 2012) ...............................................................................................16

*Warfield v. ICON Advisers, Inc.*,
    26 F.4th 666 (4th Cir. 2022) ..............................................................................................26, 27

*Wash.-Balt. Newspaper Guild, Loc. 35 v. Wash. Post Co.*,
    442 F.2d 1234 (D.C. Cir. 1971) ............................................................................................20

**Statutes**

9 U.S.C. § 9.............................................................................................................................16

9 U.S.C. § 10........................................................................................................................19, 22, 23

9 U.S.C. § 12...........................................................................................................................18

34 U.S.C. § 20144(d)(4)(D) ...............................................................................................8

Fairness for 9/11 Families Act,
     Pub. L. No. 117-328, 136 Stat. 6106 (2022) .............................................................4

**Other Authorities**

Fed. R. Civ. P. 8(d)(3) ......................................................................................................14

Md. Rule 2-303(c) .............................................................................................................14

## I.    INTRODUCTION

Petitioner Elvis J. Rusnak files this Motion to Confirm an Arbitration Award against Respondents Joshua M. Ambush, LLC and Joshua M. Ambush (together, "Ambush") pursuant to 9 U.S.C. § 9.

Mr. Rusnak requests confirmation of a final arbitration award (the "Final Award") issued on February 20, 2026 in American Arbitration Association Case No. 01-25-0000-0363, *Joshua M. Ambush, LLC v. Rusnak* ("the Arbitration"). ECF No. 1-2. Arbitrator Honorable Irma S. Raker denied Ambush's claims against Mr. Rusnak. Justice Raker further entered a monetary award of $722,545.74, including pre-award interest and expenses, in favor of Mr. Rusnak and against Ambush, and ordered Ambush to deliver Mr. Rusnak's personal file to his new counsel.

Justice Raker also ordered that American Arbitration Association ("AAA") administrative fees, totaling $33,000.00, and arbitrator compensation, totaling $45,350.00, be borne jointly and severally by Ambush. Accordingly, the Arbitrator ordered Ambush to reimburse Mr. Rusnak $36,475.00, representing the portion of those fees previously incurred and paid by Mr. Rusnak. The Arbitrator further denied all of Ambush's claims against Mr. Rusnak.

Accordingly, Mr. Rusnak seeks a judgment from this Court confirming the Final Award, including the amount of $759,020.74, costs, and post-judgment interest.

## II.    BACKGROUND

### A. Elvis Rusnak Retains Ambush to Obtain Compensation for Injuries Arising From the Khobar Towers Terrorist Attack.

Chief Master Sergeant (ret.) Elvis Rusnak served in the United States Air Force, where he was a decorated soldier and recipient of the Air Force Commendation Medal (With Valor). While serving in the U.S. Air Force, Mr. Rusnak was stationed at the Khobar Towers housing complex in Dhahran, Saudi Arabia, when on June 25, 1996, a truck bomb was detonated by terrorists killing

19 U.S. Air Force personnel and injuring more than 498 others, including Mr. Rusnak. On February 21, 2017, Mr. Rusnak retained Ambush to bring a lawsuit on his behalf, to represent him in any administrative proceeding related to his claim, and to obtain recoveries from the U.S. Victims of State Sponsored Terrorism Fund (the "Fund") and other available sources, to the extent available.

The attorney-client relationship between Ambush and Mr. Rusnak was governed by a retainer agreement (the "Agreement"). ECF No. 1-4. That Agreement required that, "in the event there are any disputes concerning this agreement or the services rendered to [Mr. Rusnak], such disputes will be arbitrated in Baltimore, Maryland in accordance with the rules of the American Arbitration Association." Agreement ¶ 26. The Agreement further provided that "Any Award will be enforced in any court of competent jurisdiction." *Id.*

On July 13, 2017, Ambush filed a lawsuit against the Islamic Republic of Iran, on behalf of Rusnak and 192 other Khobar Towers bombing victims, initiating the case of *Schooley, et al., v. Islamic Republic of Iran, et al.*, Case No. 17-cv-1376 (D.D.C.) ("*Schooley v. Iran*"). *Schooley v. Iran*, ECF No. 1.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████1███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

1 ████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

Ambush also unilaterally withdrew the punitive damages claims of Mr. Rusnak and other *Schooley* plaintiffs on the ground that a court had recently decided that such damages were not available. In doing so, Ambush did not: (a) seek Mr. Rusnak's informed consent; (b) inform Mr. Rusnak that the plaintiffs in another case, *Owens* (subsequently called *Opati*), had petitioned for certiorari to challenge the lower-court ruling or that the Supreme Court had requested a brief from the Solicitor General;[2] or (c) inform Mr. Rusnak of the option to preserve his punitive damages claim and, if it were denied, to seek an appeal.[3] On May 18, 2020, in *Opati v. Republic of Sudan*, 590 U.S. 418 (2020), the Supreme Court of the United States vacated the D.C. Circuit's opinion in *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), holding that plaintiffs (like Mr. Rusnak) with § 1065A claims may seek punitive damages. Ex. R6.

On June 27, 2019, the Court ordered that Iran was liable to Mr. Rusnak, and awarded him $7 million in compensatory damages, but nothing on his withdrawn punitive damages claim. *See Schooley v. Iran*, ECF No. 279, 280. On July 18, 2019, Ambush submitted Rusnak's application to the Fund. Ex. J35.

**B. Ambush Fails to File for Catchup Claims, Which Are Subsequently Awarded to Hundreds of Similarly Situated Terrorism Victims.**

---

[2] Ex. 2, Hearing Tr. (Oct. 29, 2025) at 7:15-21 ([Braun] "you didn't tell your clients at the time that you were withdrawing their punitive damages claims that there was already a cert petition pending challenging the DC Circuit's decision in Owens under the name Opati, correct? [Ambush] A. Correct."); *Id.* at 13:2-6 ("[Braun] Q. You did not inform your clients that the Solicitor General had been invited to file a brief in this case expressing the views of the United States? [Ambush] A. Correct.").

[3] *See generally* Ex. 3, Hearing Tr. (Nov. 12, 2025) at 74:11-76-8 (reflecting Mr. Rusnak's hearing testimony on this issue).

3

On December 29, 2022, Congress enacted the Fairness for 9/11 Families Act ("Fairness Act"), which amended the Fund's governing statute to provide up to $3 billion for lump sum catch-up payments to certain 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims. Pub. L. No. 117-328, 136 Stat. 6106 (2022).

On November 1, 2024, the Government Accountability Office ("GAO") confirmed that, under the Fairness Act, Khobar Towers and 1983 Beirut Bombing victims who were similarly situated to the *Schooley* claimants were eligible to receive catch-up payments (regardless of whether they had previously submitted a USVSST application before December 29, 2022)—as long as they submitted an application during the December 29, 2022 to June 27, 2023 statutory eligibility period. GAO, GAO-25-107564, *U.S. Victims of State Sponsored Terrorism Fund: 1983 Beirut Barracks and 1996 Khobar Towers Bombing Claimants Due $614 Million* (2024) ("GAO Catchup Payment Report").

However, Ambush did not submit for Mr. Rusnak or his other *Schooley* clients applications to qualify for catch-up payments during the statutory eligibility period. Nor did Ambush advise his clients of the option to submit such applications or explain the risks and benefits of each approach.[4] Submitting applications during the statutory eligibility period would have required little

---

[4] Ex. 2, Hearing Tr. (Oct. 29, 2025) at 90:7-91:7 ("[Braun] Q. Did you tell your clients during this time period, "Hey, we've got a vague act. There's a lot of uncertainty here, and I can't get a definitive interpretation on whether I'm allowed to submit a successive application during the application period. Do you want us to take the protective step of submitting an application so that you can potentially qualify for hundreds of thousands of dollars in payments?" Did you ever tell that to your clients or ask that --….. THE DEPONENT: The words that you used, I did not do. BY MR. BRAUN: [Braun] Q. Did you ever ask them under any wording – 'do you want me to submit a successive application during the catch-up payment?' I'm sorry – 'during the catch-up payment eligibility period, just in case?' A. No."); Ex. 3, Hearing Tr. (Nov. 12, 2025) at 108:17-22 ("[Braun] Q. Did Ambush inform you that you could submit a catch-up payment application during the December 29, 2022, to June 27, 2023, eligibility period even if you had submitted a USVSST application before December 29, 2022? [Rusnak] A. No.").

effort.[5] During the arbitration hearing, Ambush's expert, Mr. O'Connor, admitted, "I don't think anybody would say that it wouldn't have been a good idea to file the exact same application."[6] However, because Ambush failed to do so, Mr. Rusnak did not receive a catch-up payment that he otherwise qualified for under the Fairness Act.

By contrast, faced with the same information as Ambush, most other lawyers representing similarly situated terrorism victims—whose clients had also previously submitted USVSST applications before December 29, 2022—nevertheless timely applied for catch-up payments within the timeframe allowed under the Fairness Act. Ex. J61 at 17–18 (GAO Catchup Payment Report). The majority of other eligible terrorism victims (512 out of 786) resubmitted claims during the statutory application time frame. *Id.* Although Ambush initially speculated without evidence that the 512 applicants who submitted successful applications were represented by only two firms, he subsequently backed off that claim.[7] Of the 274 terrorism victims who failed to timely submit catchup applications, the vast majority were Ambush's 219 *Schooley* plaintiff

---

[5] Ex. 3, Hearing Tr. (Nov. 12, 2025) at 109:17-24 ("[Braun] Just to be absolutely clear, as someone who previously worked with counsel to submit an application, do you have an understanding of whether it would have been difficult for counsel to have submitted an application on your behalf during the catch-up payment eligibility period? [Rusnak] A. No. Five or ten minutes to put an application together."); *Id.* at 108:23-109:14 ("[Braun] Q. Based on your experience submitting a USVSST application previously, would it have been onerous to submit a new USVSST application in case the Comptroller General interpreted the Fairness Act to permit such applications? [Rusnak] A. No. Not at all. And just to clarify as well, it's not something that I could do. I just want -- I don't know if that's clear. If a claimant is represented by counsel, I can't do anything with the Fund represented by counsel. I can't communicate directly with the Fund. I can't submit documents to the Fund. I can't submit an application. So I just -- I don't know that we've talked about that. I think it's worth raising as part of this answer so that Your Honor is aware that it's not something that I, as a claimant, could do.").

[6] Ex. 2, Hearing Tr. (Oct. 29, 2025) at 193:7-10 (O'Connor).

[7] Ex. 2, Hearing Tr. (Oct. 29, 2025) at 93:9-16 ("[Braun] Q. But you don't know how many law firms? It could have been two. It could have been three. It could have been 10 to your knowledge. You have no idea? [Ambush] A. I'll stand corrected, so it's -- whatever the number is, I'll stand by what the GAO report says. There were hundreds of victims who did so.").

clients.[8] The Comptroller General awarded catch-up payments to all of 512 qualifying victims submitting timely applications. *Id*. at 30 n.9 ("GAO's methodology includes these 512 claimants."). At the arbitration hearing, Mr. Rusnak testified that, had Ambush informed him of the option to submit an application during the eligibility period, he would have opted to do so as well.[9]

On May 15, 2025, the Fund stated in an email to Mr. Rusnak's counsel that the precise calculated Lump Sum Catch-Up Payment for his claim using the GAO's methodology was $685,442.38. Ex. R26 (Email from Fund to Robert Braun (May 15, 2025)); *see also* Ex. J61 (GAO Catchup Payment Report) (describing the formula for calculating catch-up payments).

Ambush recognized, both in contemporaneous communications and at the arbitration hearing, that the Fairness Act's language was vague and subject to multiple interpretations. *See, e.g.*, Ex. J49 (Letter from Ambush to Special Master Brown, Fund (Jan. 31, 2023)) at 1 ("I am writing to you because the language of the Fairness Act is ambiguous and vague."); Ex. J48 (Letter from Ambush to Clients (Jan. 4, 2023)) ("The words of the Act are vague.. . .") at 3.[10] There was

---

[8] Ex. 2, Hearing Tr. (Oct. 29, 2025) at 98:11-21 ("[Braun] Q. So of the 274 claimants who otherwise would have qualified for catch-up payments but did not because they didn't submit timely applications, 219 of that 274 were your clients, correct? [Ambush] A. I think I told you that. Yes. [Braun] Q. So the vast majority of otherwise eligible claimants that did not submit applications that were timely to qualify for catch-up payments were your clients, correct? [Ambush] A. I think -- for the third time, yes.").

[9] Ex. 3, Hearing Tr. (Nov. 12, 2025) at 114:6-17 ("[Braun] Q. Now, have you, in fact, sir, received a catch-up payment from the Fund? [Rusnak] A. No. [Braun] Q. Do you have an understanding of why not? [Rusnak] A. Because an application was not submitted on my behalf. [Braun] Q. If Ambush had informed you that you could have submitted a successive application, just in case, due to the ambiguity in the Fairness Act language, would you have asked him to do so on your behalf? [Rusnak] A. Absolutely.").

[10] *See also* Ex. 2, Hearing Tr. (Oct. 29, 2025) at 79:6-13 ("[Braun] Q. Now, sir, do you agree that the Fairness Act's language was vague and subject to multiple interpretations? [Ambush] A. Correct. [Braun] Q. In fact, you repeatedly said that in communications that you had with your clients in the USVSST fund, correct? [Ambush] A. Correct.").

6

also testimony at the hearing that, where the law is subject to competing interpretations, diligent representation requires an attorney to counsel a client about the benefits and risks of pursuing each potential course of action, even if the possibility of success remains remote.[11] Ambush nevertheless failed to counsel Mr. Rusnak on the possibility of submitting an additional catch-up payment application during the statutory time frame and on the risks of not doing so.

### C. Ambush and Mr. Rusnak Arbitrate Their Dispute

On the basis of this and other serious misconduct, Mr. Rusnak terminated Ambush's representation. Shortly thereafter, Ambush filed with the AAA an arbitration demand against Mr. Rusnak claiming that, by terminating Ambush, Mr. Rusnak breached his contract with Ambush— despite Maryland precedent holding that a client has an absolute right to terminate counsel. *See, e.g.*, *Somuah v. Flachs*, 721 A.2d 680, 684 (Md. 1998) ("An attorney's authority to act for a client is freely revocable by the client."); *see also id*. at 685 ("[T]he fact that an attorney has been retained under a contingent fee agreement does not affect the client's absolute right to discharge an attorney.").

Mr. Rusnak subsequently answered, denying Ambush's claims, as well as asserting malpractice counterclaims. Mr. Rusnak sought relief including damages, costs, and expenses, and

---

[11] Ex. 4, Hearing Tr. (Nov. 13, 2025) at 110:20-112:6 ("[Braun] Q. Now, I want to understand from you, where an attorney is confronted with a statute that is susceptible to -- he at least understands that the statute is susceptible to multiple reasonable interpretations, what obligations does that attorney have with respect to that attorney's clients in terms of what actions to take with respect to the statute? …. [Gerzhoy] THE WITNESS: …. So if you, as a lawyer, are confronted with an ambiguous statute that governs your conduct in a case, the first thing is you have an obligation to explain that ambiguity as you see it to the client. And then the second is that if you have a good faith basis for bringing an argument, your diligence and zeal obligations pursuant to 1.3 require that you do so. So if you are already pursuing actions on behalf of a group of clients, and there is a basis for, for example, in this case, getting catch-up payments because the statute is ambiguous, then as a diligent and zealous lawyer, you should make the argument that you qualify for catch-up payments.").

an order that Ambush promptly deliver Mr. Rusnak's complete client file to his successor attorneys.

The parties selected former Maryland Supreme Court Justice Honorable Irma S. Raker as the arbitrator for the dispute. Notice of Appointment for Hon. Irma Raker, ECF No. 1-3. Justice Raker held a final hearing on October 28, 29 and 31, 2025 and November 12, 13, and 19, 2025, where extensive evidence and testimony were presented.

During the arbitration hearing, Ambush blamed purported guidance provided by the Fund for his failure to take reasonable steps to counsel and protect his clients. However, as Ms. Gerzhoy (an expert retained by Mr. Rusnak) explained, Ambush "sought guidance, but he sought guidance from somebody who couldn't give legal advice and whose guidance was not binding."[12] The Fairness Act expressly gave authority to the Comptroller General (which oversees the GAO)—not to the Fund—to determine catch-up payment eligibility. *See* 34 U.S.C. § 20144(d)(4)(D)(i), (iii).[13] In response to Ambush's inquiries, the Fund repeatedly advised Ambush of that fact,[14] and warned

---

[12] Ex. 4, Hearing Tr. (Nov. 13, 2025) at 216:19-217:6 (Gerzhoy).

[13] Ex. 2, Hearing Tr. (Oct. 29, 2025) at 72:20-25 ("[Braun] Q. So it's the comptroller general who has responsibility under the Fairness Act for making a determination as to the amount of lump sum catch-up payments to Khobar Towers bombing victims, correct? [Ambush] A. Correct."); *Id.* at 74:1-6 ("[Braun] Q. The USVSST fund is not under the comptroller general, correct? [Ambush] A. Correct. Q. They're totally separate from the comptroller general? [Ambush] A. Correct."); *Id.* at 87:23-88:7 ("[Braun] Q. I just want to make sure we're clear here. So the comptroller general hasn't told you that you can't submit a successive payment application, correct? [Ambush] A. Correct. [Braun] Q. The comptroller general is the one who's actually going to make the determination of who gets catch-up payments and what the amount will be, correct? [Ambush] A. Correct.").

[14] Ex. 4, Hearing Tr. (Nov. 13, 2025) at 117:14-118:4 ("[Braun] Q. And how, if at all, is the USVSST Fund's direction of Ambush to the fact that it is the Comptroller General's responsibility to determine proposed lump sum catch-up payments relevant to your opinions here? [Gerzhoy] A. Well, it's yet another basis that the Fund is saying, 'You can't rely on what I'm saying, on what our guidance is here. You can't take it as legal advice because we're not ultimately the decisionmakers.' And so even more than the Fund saying it, it's the fact that the Fairness Act

8

him that it could not provide him with legal advice. Ex. J50 (Fund Email to Ambush (Feb. 7, 2023)) ("As always, the Special Master and Fund are unable to provide legal advice. . ..This response . . . does not constitute legal advice. . .. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal."); *Id.* (Fund Email to Ambush (Feb. 10, 2023)) ("The Fairness Act requires the Comptroller General of the United States to conduct an audit to determine proposed lump sum catch-up payments. . ... This response . . . does not constitute legal advice. . ..."). In contrast, Ambush did not receive any instruction or guidance from the Comptroller General/GAO that Mr. Rusnak was ineligible to submit an application during the catch-up payment eligibility period.[15]

At the arbitration hearing, there was expert testimony that the Fund's correspondence with Ambush did not absolve them of their responsibility to act diligently by submitting an application during the eligibility period for catch-up payments when there was a colorable argument that doing so would qualify clients like Mr. Rusnak for catch-up payments.[16] It was not sufficient for Ambush

---

requires it. The language of the Fairness Act itself says the Comptroller General is the one to make the determination, and the Fund is reiterating that fact.").

[15] Ex. 2, Hearing Tr. (Oct. 29, 2025) at 78:21-79:5 ("[Braun] Did you receive any statement from the comptroller general's office prior to the deadline for submitting a catch-up payment application that your Schooley clients could not submit an application? [Ambush] A. Could or could not? [Braun] Q. Could not. Did you get any guidance that they could not submit an application? [Ambush] A. No, they didn't issue it.").

[16] Ex. 4, Hearing Tr. (Nov. 13, 2025) at 114:12-116:4 ("[Braun] Q. So, I just want to understand. So, you were testifying a couple of minutes ago about an attorney's obligations when confronted with a law that is susceptible to a couple of different interpretations. Does the February 7 email from the USVSST Fund to Ambush -- how, if at all, does that impact the opinions that you expressed? [Gerzhoy] A. I think it is information that Mr. Ambush was obligated to relay to his clients. I don't think it changes -- it does not change my perspective about what he should have done in pursuit of those claims, because the Fund is not giving legal advice. I think reaching out to the Fund and asking for clarity in light of ambiguity is a good thing to do. If you are faced with something ambiguous and you want to get clarity, seek to get clarity from every source that you can. But where, first of all, you are not getting legal advice, and there is ambiguity, meaning there is a way to make an argument that is a colorable argument, that your interpretation of a statute is the correct one, then absent the client telling you not to do that, you have an obligation to do it. ....

to simply mention the fact of catch-up payments. He was obligated to explain the costs and benefits of each potential course of action.[17]

During the final hearing, Ambush's counsel questioned whether submitting an application during the catch-up payment statutory eligibility period would itself have violated professional duties, including to refrain from bringing baseless legal claims, disobeying tribunal obligations, and disrespecting the legal system. As Ms. Gerzhoy testified in detail, however, Ambush's counsel's questions were premised on fundamental misunderstandings of the ethics rules.[18]

---

In a contingency fee case … the client is not incurring a cost by you filing an additional motion, so the presumption is even greater that you will file every available motion that has a colorable argument to pursue monetary damages in this case.").

[17] Ex. 4, Hearing Tr. (Nov. 13, 2025) at 119:12-22 ("[Braun] Q. Is it a defense under the Maryland Rules of Professional Conduct for an attorney to say, 'Well, you didn't specifically ask me to submit a catch-up application on my [sic] behalf, and so I didn't violate any of the rules by not doing so'? [Gerzhoy] A. It is not. That is not a burden that the client bears. That's the reason that a client hires a lawyer. It's that the lawyer gives the client all of the available avenues for recovery."); *Id.* at 118:5-119:11 ("[Braun] Q. Now, in your opinion, did Ambush have an obligation to confer with Mr. Rusnak prior to deciding not to submit an application to the USVSST fund during the statutory eligibility period for catch-up payments? [Gerzhoy] A. Yes. [Braun] Q. Is it enough for an attorney, for purposes of satisfying that obligation, to say, 'Hey, there's a catch-up payment deadline coming'? [Gerzhoy] A. No. [Braun] Q. So what sort of information would an attorney need to provide to a client in order to satisfy the informed consent requirement under the Maryland Rules of Professional Conduct? [Gerzhoy] A. The costs and benefits of each of the proposed courses of action. 'So if we file a catch-up payment, here's what the potential benefit is, here's what the potential risk is. There is ambiguity in the statute. This is what the Fund says. The Fund is ultimately not the decision-maker. If we file to seek catch-up payments here, then you will be eligible, potentially, or not. It might be a futile effort.' You have to give the client enough to make a decision, which means what are the costs and the benefits. [Braun] Q. Have you seen any evidence here that Mr. Ambush or Ambush Law provided Mr. Rusnak with the informed consent that was required in connection with the catch-up payments? [Gerzhoy] A. I have not.").

[18] Ex. 4, Hearing Tr. (Nov. 13, 2025) at 221:25-222:18 ("[Perez-Roman] Q. And if Ambush had filed a duplicative application contrary to the Fund's and the GAO's guidance, would it have been contrary to Rule 1.3, since a lawyer cannot bring a claim where there is no basis in law or fact for doing so? [Gerzhoy] A. So I don't think it would violate Rule 1.3, and I think the opposite is true. I think by failing to do it, it violates Rule 1.3. I see no issue in Mr. Ambush asking the Fund for its interpretation, but as I mentioned before, their interpretation doesn't carry the day. And so if there is ambiguity, which there clearly is, because lots of people are confused about how to interpret this, then the answer is you file a duplicative claim. And if it gets denied, it gets denied. But because there is an argument that you could be eligible, a lawyer's obligation under Rule 1.3

During the arbitration, as his primary defense, Ambush blamed guidance from the Fund that purportedly suggested that his *Schooley* clients were not eligible for catch-up payments because they had previously applied to the Fund. For support, he pointed to a lawsuit by Mr. Rusnak and another Khobar Towers bombing victim who did not receive catch-up payments. That suit alleged that (a) the GAO incorrectly concluded that an additional application during the statutory eligibility period was necessary in order to qualify for a catch-up payment; and, alternatively, (b) the Fund erred in providing guidance regarding successive applications. Ex. J82

---

is to seek that remedy."); *Id.* at 222:19-224:7 ("[Perez-Roman] Q. And don't you think that if Ambush had filed a duplicative application contrary to the Fund's and the GAO's guidance, it would have been contrary to Rule 3.4, that states that 'an attorney shall not knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists'?. . . [Gerzhoy] A. So no. And the answer is that the Fund -- the position of the Fund doesn't have the weight of law. So what a claims administrator says is not legally binding. And I think they say that in a number of places, probably to protect themselves from getting sued over giving erroneous legal advice. And so that a claims administrator said, 'You can't file a successive application' or 'You shouldn't file one' or 'We'll reject one,' if you did it anyway, it's not as though you are defying a court order, for example. Because they don't have the legal authority to require that of you."); *Id.* at 227:7-25 ("[Perez-Roman] Q. Would filing a duplicative application against the Fund's guidance be considered a violation of Maryland Rules of Professional Conduct 3.4(c), which states that 'an attorney shall not knowingly disobey an obligation under the rules of a tribunal, except for an open refusal based on an assertion that no valid obligation exists'? [Gerzhoy] A. It would not, again, because the Fund is not promulgating law or doesn't have the force of a court order. But also, filing a successive application when the Fund says don't, if you do that, all you're doing is doing something that potentially is going to irritate the Fund. The cost of it -- because it's not a court. It's not a court order. It's not the ultimate decision maker. So it's not as though the Court has made a ruling and you are acting in opposition to that ruling."); *Id.* at 228:1-24 ("[Perez-Roman] Q. And you mentioned that it may have irritated the Fund. Wouldn't having filed a duplicative application against the Fund's advice been a violation of paragraph 5 of the preamble of the Maryland Rules of Professional Conduct, that states that 'an attorney should demonstrate respect for the legal system and for those who serve it, including judges, other attorneys, and public officials'? [Gerzhoy] A. It would not. So, first of all, I don't know that it would have irritated the Fund. What I'm saying is the worst I could imagine it doing is irritating the Fund. But if lawyers were in violation of that rule for every time they intentionally or unintentionally irritated someone, then every lawyer would be in trouble. What that rule and what that section of the preamble go to is things like harassing conduct, right? And being -- harassing somebody with lots of frivolous motions, for example…. Or being deeply disrespectful… to court personnel, using language that is inappropriate, sexual harassment, those types of things.").

(Compl., *Rusnak v. United States*, Case No. 1:25-cv-00292 (D.D.C.), ECF No. 1) ¶¶ 43, 48. Ambush asserted that Mr. Rusnak's catch-up payment counterclaim in this arbitration contradicted his claims in his suit against the GAO and Fund.[19]

In response, Mr. Rusnak noted that, under Maryland law, in order to recover on a malpractice claim, Mr. Rusnak needed only to show that Ambush was "a proximate cause" of Mr. Rusnak's injuries—not the sole cause. *See Stickley v. Chisholm*, 765 A.2d 662, 668 (Md. Ct. Spec. App. 2001) ("We are persuaded that it is more likely so than not so that the jury found that appellee's negligence was not the proximate cause of appellant's injury because that negligence was not the *sole* cause of injury. As the jury should have been instructed that appellee's negligence can—in combination with other causes—be **a** cause, the erroneous instruction entitles appellant to a new trial."); *Marlow v. Cerino*, 313 A.2d 505, 513 (Md. Ct. Spec. App. 1974) ("Appellants next argue that there can be more than one proximate cause of an injury. The statement is correct.").

Mr. Rusnak further explained that Ambush was a proximate cause of Mr. Rusnak's injuries because the evidence showed that: (i) Ambush's failure to submit an application during the statutory period was a "substantial factor" in Mr. Rusnak not receiving a catch-up payment (indeed, it was even a "but for" cause); and (ii) a "foreseeable" result of Ambush's negligent conduct in failing to submit an application was that Mr. Rusnak would not receive a catch-up payment. *See Collins v. Li*, 933 A.2d 528, 567 (Md. Ct. Spec. App. 2007) ("The test of foreseeability is not whether the particular event that occurred was to be expected, but whether the event fell within a general field of danger which should have been anticipated. Hence, foreseeability is derived from the notion that one should be held to account for probable results,

---

[19] Ex. 5, Hearing Tr. (Nov. 19, 2025) at 18:19-20:2.

which, in the contemplation of the parties, arise naturally from the acts complained of according to the usual course of things and which should have been anticipated." (citation modified)).

Whether the Fund provided confusing or mistaken guidance was, thus, irrelevant. In the arbitration, Mr. Rusnak noted that, when confronted with a vague or ambiguous statute or guidance, a reasonably diligent attorney takes precautions to protect clients regardless of which interpretation is ultimately adopted. Those precautions must include explaining the options available to clients and recommending the conservative approach that will best protect their clients' interests. In contrast to Ambush, it was undisputed during the arbitration that counsel representing the vast majority of eligible terrorism victims correctly anticipated (i.e., "foresaw") that—consistent with the plain language of the Fairness Act—submitting an application during the eligibility period would be necessary to qualify for catch-up payments. Mr. Rusnak therefore argued that the conduct of these other attorneys proved that the guidance provided by the Fund did not make the consequence unforeseeable. Indeed, the Fairness Act expressly gave authority to the Comptroller General (which oversees the GAO)—not the Fund—to determine catch-up payment eligibility. And the Fund repeatedly advised Ambush of that fact, as well as warning him that it could not provide him with legal advice.

It was also undisputed during the arbitration that, "but for" Ambush's failure to submit an application during the eligibility period, Mr. Rusnak would have received a catch-up payment. Accordingly, the evidence showed that Ambush's violation of the standard of care was a proximate cause of Mr. Rusnak's nonreceipt of catch-up payments.

During the arbitration, Mr. Rusnak observed that, even if the allegations reflected in Mr. Rusnak's lawsuit against the GAO and Fund did somehow contradict his arbitration counterclaims, that would not preclude Mr. Rusnak from obtaining relief on his arbitration counterclaims. Making

13

claims in the alternative—even when those claims are inconsistent—is an established and permissible component of legal practice that is expressly contemplated by both federal and Maryland procedural rules.[20] *See, e.g.*, Fed. R. Civ. P. 8(d)(3) ("*Inconsistent Claims or Defenses.* A party may state as many separate claims or defenses as it has, regardless of consistency."); Md. Rule 2-303(c) ("Consistency. A party may set forth two or more statements of a claim or defense alternatively or hypothetically. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has, regardless of consistency and whether based on legal or equitable grounds."); *see also Pemrock, Inc. v. Essco Co.*, 249 A.2d 711, 713–14 (Md. 1969) ("The Maryland Rules c[e]ase the fear of inconsistency that was said to be the hobgoblin of little minds and permit the pleading of alternative inconsistent claims.").

In addition, Ambush argued during post-hearing arbitration briefing that Congress could at some unknown time in the future pass a law directing the Fund to make a catch-up payment to Mr. Rusnak. However, no evidence was introduced on this point during the arbitration hearing. To the contrary, there was testimony that Ambush attempted to organize a legislative effort, but that it failed after garnering little support.[21] The fact that GAO "recommended" a change in the law more than two years ago did not alter the analysis. As Mr. Rusnak explained during the arbitration, a hypothetical future event (that even Ambush did not contend was likely or imminent) is not a legitimate legal ground for denying Mr. Rusnak's malpractice claim.

---

[20] Ex. 5, Hearing Tr. (Nov. 19, 2025) at 73:12-74:13.

[21] *See, e.g.*, Ex. 3, Hearing Tr. (Nov. 12, 2025) at 137:14-141:13.

The hearings were declared closed on January 23, 2026. A week after hearings were declared closed, Ambush filed a motion for leave to submit additional authority. Ex. 6.

On February 20, 2026, Justice Raker issued a Final Award. In the Final Award, Justice Raker concluded that:

> [Ambush] breached their duties to Respondent Rusnak by misinterpreting the Fairness Act's eligibility requirements for lump sum catch-up payments ("s"); and failing to counsel his clients that, in light of the ambiguities Ambush identified in the Fairness Act, they could protect their interests by filing an additional application for catchup payments with the Fund, withdrawing Rusnak's punitive damages request without obtaining Rusnak's advance informed consent, failing to advise Rusnak of the option to maintain his punitive damages request and, if necessary, pursue an appeal, failing to adequately monitor material appellate developments in the Owens/Opati litigation or to conduct any other legal research related to the strategy he adopted, and representing to Rusnak that, even if he withdrew his punitive damages request, Rusnak could nevertheless seek punitive damages post-judgment—without informing Rusnak of the risk that punitive damages might not be resurrected post-judgment.

Final Award at 9, ECF No. 1-2 Justice Raker further concluded that Ambush "committed malpractice in failing to file properly and timely for catch-up payments to the Fairness Fund." *Id.*

Justice Raker found, by contrast, that Mr. Rusnak "did not breach his attorney retainer agreement with Claimants Ambush in connection with terminating Ambush as his counsel," and that Mr. Rusnak "terminated the agreement with good cause." *Id.* at 8.

In the Final Award, Justice Raker awarded Mr. Rusnak, to be paid jointly and severally by Ambush: (i) $685,442.38 in damages on his malpractice counterclaim; (ii) pre-award interest at a 6% annual rate, calculated as $36,056.13; (iii) $1,047.23 in costs; and (iv) payment of all AAA arbitration fees and Arbitrator fees, calculated as a reimbursement of $36,475.00. *Id.* at 10-11. The Arbitrator also granted Mr. Rusnak's request for delivery of his personal file to Respondent's new counsel. *Id.* The Arbitrator further denied each of Ambush's claims against Mr. Rusnak. *Id.*

15

On March 12, 2026, Ambush filed a request for "interpretation of the award," which the arbitrator considered and denied on March 30, 2026. Arbitrator's Disposition of Appl. For Clarification of Award, ECF No. 1-5.

After the arbitrator had already been discharged, on April 1, 2026, Ambush filed a request to reopen the Record and for Reconsideration of the malpractice finding in light of the Opinion in *Rusnak v. United States*. ECF No. 12-4. In response, the AAA case administrator explained:

> Once a final award has been issued, the arbitrator's role in the case is complete and the hearings cannot be reopened. Under AAA Commercial Arbitration Rule R-52 (Modification of Award), the arbitrator may only consider a party's timely request to correct, clarify, or interpret the award as permitted by the rule.
>
> The arbitrator has already considered and denied the Claimant's request for clarification. Accordingly, the record cannot be reopened for further consideration.

Ex. 7 (AAA Sandy Duarte Email to *Ambush v. Rusnak* Counsel (Apr. 7, 2026)).

### III.  LEGAL STANDARD

Under 9 U.S.C. § 9, when a party applies to confirm an arbitration award, "the court *must* grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." (emphasis added). The court's review is "exceedingly deferential." *Raymond James & Assocs., Inc. v. Martin*, No. 21-CV-3096, 2022 WL 1104576, at \*6 (D. Md. Apr. 13, 2022). Review under the Federal Arbitration Act ("FAA") is "among the narrowest known at law." *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 (4th Cir. 1998). Courts do not review whether an arbitrator did her job "well, correctly, or reasonably, but simply whether [s]he did it." *Wachovia Sec., LLC v. Brand*, 671 F.3d 472, 478 (4th Cir. 2012) (citation omitted).

Under FAA § 9, confirmation of an arbitration award is intended to be a summary proceeding, and confirmation can be denied only if the award is vacated, modified, or corrected. *Taylor v. Nelson*, 788 F.2d 220, 225 (4th Cir. 1986) (a proceeding to confirm an arbitral award).

The party seeking vacatur bears a heavy burden. The four grounds enumerated in Section 10(a) are exclusive. *Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 584–86 (2008).

## IV.    DISCUSSION

This case presents a straightforward application of the Federal Arbitration Act's strong presumption in favor of confirmation. A former Justice of the Maryland Supreme Court, the Honorable Irma S. Raker, presided over a multi-day arbitration hearing, considered extensive evidence and briefing, and rendered a well-reasoned Final Award finding that Ambush committed legal malpractice under Maryland law by failing to timely file a successive application with the Fund and that Rusnak terminated the attorney-client relationship with good cause. The Award granted Rusnak $685,442.38 in damages, $36,475.00 in costs, and $36,056.13 in prejudgment interest.

In their Cross-Petition, Ambush asks this Court to do what the FAA expressly forbids: second-guess the merits of the Arbitrator's interpretation and application of Maryland malpractice law. Ambush asserts three purported grounds for modifying the award: (i) that the AAA's refusal to violate its own rules by reopening an already closed arbitration proceeding after the Final Award has issued and the arbitrator had been discharged constituted an improper refusal to hear pertinent and material evidence; (ii) the Arbitrator exceeded her powers in concluding that the evidence supported Mr. Rusnak's malpractice claim; and (iii) the Arbitrator acted in manifest disregard for the law in concluding that confusing instructions by the Fund did not bar Mr. Rusnak's malpractice claim as a matter of law.

Ambush's Cross-Petition does not challenge the Arbitrator's other findings. Ambush does not contest Justice Raker's finding that Mr. Rusnak "did not breach his attorney retainer agreement with Claimants Ambush in connection with terminating Ambush as his counsel," and that Mr.

17

Rusnak "terminated the agreement with good cause." Final Award at 8–9, ECF No. 1-2. Ambush also does not challenge Justice Raker's findings that Ambush breached their duties to Mr. Rusnak by:

> withdrawing Rusnak's punitive damages request without obtaining Rusnak's advance *informed* consent, failing to advise Rusnak of the option to maintain his punitive damages request and, if necessary, pursue an appeal, failing to adequately monitor material appellate developments in the Owens/Opati litigation or to conduct any other legal research related to the strategy he adopted, and representing to Rusnak that, even if he withdrew his punitive damages request, Rusnak could nevertheless seek punitive damages post-judgment—without informing Rusnak of the risk that punitive damages might not be resurrected post-judgment."

*Id.* at 9. Nor does Ambush challenge Justice Raker's findings that Ambush breached their duties to Mr. Rusnak because Ambush █████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████ Sealed Ex. A to Pet. to Confirm Arb. Award at 9, ECF No. 3.

Accordingly, none of the narrow statutory grounds for vacatur under 9 U.S.C. § 10 is satisfied here. The Cross-Petition should be denied in its entirety, and the Award should be confirmed pursuant to 9 U.S.C. § 9.

### A. Ambush's Contingent Cross-Petition to Vacate Is Untimely

Ambush's Contingent Cross-Petition to Vacate is untimely under 9 U.S.C. § 12, which mandates that "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." The Final Award in this case was issued on February 20, 2026. The three-month period following that date expired on May 20, 2026. Ambush's Contingent Cross-Petition was not filed until May 21, 2026—one day after the statutory deadline. ECF No. 12. Critically, the Arbitrator's March 20, 2026 denial of Ambush's Request for Clarification did not restart the three-month clock. As the

Fourth Circuit held in *First Kuwaiti General Trading & Contracting W.L.L. v. Kellogg Brown & Root International, Inc.*, 141 F.4th 522, 528 (4th Cir. 2025), a post-award order on a motion to clarify or correct does not extend the three-month limitations period, which runs exclusively from the date of the final award.

Ambush's failure to timely file their petition to vacate is fatal because the Fourth Circuit treats Section 12's three-month deadline as absolute. *Taylor*, 788 F.2d at 225. This deadline is not subject to any exceptions, including for tolling or due diligence. *Id.*  Accordingly, Ambush's Cross-Petition should be dismissed as untimely. However, in order to avoid any appealable issue and ensure the finality of the award, this Court should also reach and reject Ambush's vacatur arguments on the merits, and proceed to confirm the Award.

### B. The Arbitrator Did Not Refuse to Hear Pertinent and Material Evidence Under 9 U.S.C. § 10(a)(3).

Ambush contends that the Award must be vacated under FAA § 10(a)(3) because the Arbitrator purportedly "refus[ed] to hear evidence pertinent and material to the controversy"—specifically, the Memorandum Opinion in *Rusnak v. United States*, No. 1:25-cv-00292 (D.D.C. Mar. 24, 2026), which was issued four days after the Arbitrator denied Ambush's Request for Clarification. Contingent Cross-Pet. ¶ 17, ECF No. 12 (quoting 9 U.S.C. § 10(a)(3)). This argument fails for multiple independent reasons.

### 1.   The Court Opinion Did Not Exist During the Arbitration Proceedings.

Section 10(a)(3) addresses misconduct by arbitrators during the arbitration hearing—specifically, misconduct "in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). The provision targets situations where an arbitrator refuses—*during* the pendency of the proceedings—to consider evidence that a party seeks to introduce at or before the hearing.

It does not require arbitrators to reopen completed proceedings every time new information becomes available after an award is rendered. *See, e.g.*, *Golden Temple of Or., LLC v. Puri*, 774 F. App'x 1044, 1045 (9th Cir. 2019) (holding that "[t]he district court erred by vacating in part and remanding the first arbitration award on the grounds that the arbitrators should have considered events that occurred after the close of the arbitration proceeding"); *Shearson Hayden Stone, Inc. v. Liang*, 653 F.2d 310, 313 (7th Cir. 1981) ("The Arbitration Act does not allow vacation of an award for new evidence."); *Wash.-Balt. Newspaper Guild, Loc. 35 v. Wash. Post Co.*, 442 F.2d 1234, 1238 (D.C. Cir. 1971) ("[O]nce an arbitrator has made and published a final award his authority is exhausted and he is functus officio and can do nothing more in regard to the subject matter of the arbitration."); *Conlux USA Corp. v. Dixie-Narco, Inc.*, 929 F. Supp. 269, 274 (N.D. Ohio 1996) ("Of course, an arbitrator is not required to hear newly discovered evidence, and such evidence is not a basis for vacating an arbitration award. . ..."); *In re A.H. Robins Co., Inc.*, 232 B.R. 855, 863 (E.D. Va. 1999) ("She wishes to continue presenting new evidence and depositions; unfortunately for Ms. Rubens, the Arbitrator has spoken, and the evidentiary doors have closed."); *Int'l Bhd. of Firemen & Oilers, Loc. #261 v. Great N. Paper Co.*, No. 82-CV-0239, 1984 WL 49074, at \*5 (D. Me. Oct. 22, 1984) ("The Union has presented no authority to support its claim that an arbitration award must be vacated when the reviewing court is presented with new evidence which is disputed and which, based on the stated rationale for the arbitrator's award, might have resulted in a different conclusion had it been presented to the arbitrator. The authority discovered by the Court is to the contrary.").

The *Rusnak v. United States* opinion was issued on March 24, 2026—more than a month after the Final Award was rendered on February 20, 2026, and four days after the Arbitrator denied the Request for Clarification on March 20, 2026. The Arbitrator cannot have "refused to hear"

20

evidence that did not exist at the time of the hearing or the award. Section 10(a)(3) does not impose a continuing obligation on arbitrators (or the AAA) to monitor external litigation developments and reopen closed proceedings every time a party asserts that new "evidence" exists.

### 2.  The AAA's Denial of Ambush's Request to Reopen Was Proper.

Ambush acknowledges that the request to reopen the record was denied by the AAA's Manager of ADR Services—not by the Arbitrator—on the ground that "once a final award has been issued, the arbitrator's role in the case is complete and the hearings cannot be reopened." Contingent Cross-Pet. ¶ 18. This is a standard application of Rule 52 of the AAA Commercial Arbitration Rules, which requires any post-award modification requests to be made within 20 calendar days of the final award. The AAA's administrative decision to enforce its own procedural rules does not constitute "misconduct" by the Arbitrator within the meaning of Section 10(a)(3). This is particularly true where Ambush had already been given multiple previous opportunities to request additions to the record.

### 3.  The Evidence Was Cumulative of the Record.

Ambush themselves acknowledge that the *Rusnak v. United States* opinion merely confirmed "what the arbitration record already showed." Req. to Reopen the Record & for Reconsideration at 4, ECF No. 12-4. The facts recited in that opinion—that the Fund told claimants not to file successive applications, that the Fund closed 512 successive applications as duplicative, and that DOJ disagreed with the GAO's interpretation that existing applicants could qualify for catch-up payments by submitting applications during the statutory time frame—were already part of the arbitration record through joint stipulation exhibits and hearing testimony. Section 10(a)(3) does not require vacatur based on the post-award issuance of a judicial opinion that merely restates

21

facts already in evidence. The Arbitrator had this evidence before her and weighed it—she simply reached a different conclusion than Ambush would prefer.[22]

#### 4.  The Standard for § 10(a)(3) Misconduct Is Not Met.

Even assuming the evidence was material, vacatur under FAA § 10(a)(3) requires a showing that the arbitrator's refusal to hear evidence was so prejudicial as to deprive the moving party of a fundamentally fair hearing. Courts have consistently held that "[a]rbitrator[s] [are] not bound to hear all of the evidence tendered by the parties." *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Loc. 901*, 763 F.2d 34, 39 (1st Cir. 1985). They need only grant the parties "a fundamentally fair hearing." *Three S Delaware, Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 530 (4th Cir. 2007). There is no allegation that the Arbitrator excluded any evidence that Ambush sought to introduce during the hearing itself. The multi-day evidentiary hearing was conducted before a former Maryland Supreme Court Justice, with full briefing and expert testimony. Ambush received a fundamentally fair hearing.

### C.  The Arbitrator Did Not Exceed Her Powers Under 9 U.S.C. § 10(a)(4).

Ambush argues that the Final Award should be vacated because the Arbitrator "exceeded her powers" under § 10(a)(4) by rendering an award that is purportedly "completely irrational." Contingent Cross-Pet. ¶¶ 19, 21. This argument fundamentally misapprehends the narrow scope of § 10(a)(4) review.

#### 1.  The Arbitrator Interpreted and Applied the Governing Law.

Under § 10(a)(4), a court may vacate an award only "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject

---

[22] As explained in greater detail below, testimony and argument during the arbitration hearing demonstrated that the *Rusnak v. United States* case was not material to the issues in the arbitration.

matter submitted was not made." 9 U.S.C. § 10(a)(4). The Supreme Court has made clear that "the sole question" for a reviewing court is "whether the arbitrator (even arguably)" weighed the evidence, "not whether [she got the result] right or wrong." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013).

Here, the parties submitted to the Arbitrator the question of whether Ambush committed legal malpractice under Maryland law. The Arbitrator: (1) identified the applicable standard of care; (2) considered the evidence regarding the Fund's guidance and Ambush's conduct; (3) applied Maryland malpractice law to the facts; and (4) concluded that Ambush breached the standard of care. Whether this conclusion was correct is not a question for this Court.

### 2. Disagreement with the Merits Is Not a Ground for Vacatur.

Ambush's argument reduces to a claim that the Arbitrator got the malpractice analysis wrong—that a reasonable attorney who followed the Fund's guidance should not be held to have breached the standard of care. This is a merits argument. "It is not enough . . . to show that the [arbitrator] committed an error—or even a serious error." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). Courts "do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

The Award is neither "completely irrational" nor without any basis in the record. When asked about his understanding of his duties to consult with clients about strategic case decisions, Ambush testified:

> I'm not asking them -- they consult with me if they ask. Otherwise I give them information, but I make the decision. I tell them what we're about to do. . . they're not running the case. They're not telling or dictating[,] 'I want you to do this.'[23]

---

[23] Ex. 2, Hearing Tr. (Oct. 29, 2025) at 48:11-18.

23

In contrast to Ambush's understanding of his obligation and actions, the Arbitrator could rationally conclude that a reasonably prudent attorney, faced with a 180-day statutory deadline and vague guidance from the Fund, had an obligation to consult with clients about the risks of different options and, at minimum, file the application as a protective measure—regardless of the Fund's published FAQ guidance. Whether Ambush agrees with this assessment is irrelevant; the question is whether the Arbitrator arguably applied a recognized legal framework, which she plainly did.

Ambush argues that Rusnak's complaint in *Rusnak v. United States* undermines the malpractice finding because, in Ambush's view, Mr. Rusnak there attributed his exclusion to the Fund's guidance rather than to Ambush. This argument conflates two distinct, but entirely compatible, theories of causation. *See Marlow*, 313 A.2d at 513 ("Appellants next argue that there can be more than one proximate cause of an injury. The statement is correct."); *Stickley*, 765 A.2d at 668 ("We are persuaded that it is more likely so than not so that the jury found that appellee's negligence was not the proximate cause of appellant's injury because that negligence was not the *sole* cause of injury. As the jury should have been instructed that appellee's negligence can—in combination with other causes—be **a** cause, the erroneous instruction entitles appellant to a new trial.").

In the federal lawsuit, Mr. Rusnak alleged that the government's actions—specifically, the Fund's conflicting guidance and GAO's erroneous interpretation—was a cause of the 274 claimants' exclusion. That claim targeted the Fund's responsibility for creating the situation in which eligible claimants were misled. In the arbitration, Mr. Rusnak alleged that Ambush, as his attorney, had an independent professional duty to protect his interests notwithstanding the Fund's guidance—and that Ambush's failure to exercise independent professional judgment constituted malpractice. These are not inconsistent positions. Both the Fund and Ambush can bear

24

responsibility for different links in the causal chain. The Fund created confusing guidance; Ambush failed to navigate that confusion in a manner consistent with the standard of care. The Arbitrator found the latter, and that finding is within her authority regardless of what Mr. Rusnak argued in a separate proceeding against different parties. Moreover, the Arbitrator herself was aware of Rusnak's federal litigation and his positions therein. She considered this evidence and reached her conclusion. A reviewing court cannot reweigh this evidence.

Ambush contends that the Award is based on "speculative and unripe damages" because Congress *may eventually* amend the statute to authorize catch-up payments to the 274 excluded claimants. This argument is meritless. At the time of the Award, Rusnak had been definitively excluded from lump-sum catch-up payments. The Special Master had completed her authorization of payments, submitted her report to Congress, and terminated the reserve fund. The amount of Rusnak's loss—$685,442.38—was calculated by GAO and is undisputed.

The loss was thus not speculative; it had already occurred. Mr. Rusnak was excluded from payments that other similarly situated claimants have already received. And the amount of the loss, which was based on GAO's own calculations, was mathematically precise.

By contrast, Ambush's argument that Rusnak's damages might be "zero" if Congress eventually amends the statute *is* speculative. The possibility that Congress might, at some unknown future date, enact legislation to remedy a wrong does not eliminate a plaintiff's present damages. Maryland law does not require a malpractice plaintiff to await speculative legislative action before seeking compensation for an injury already suffered.

### D. The Arbitrator Did Not Act in Manifest Disregard of The Law.

Ambush argues that the Award reflects "manifest disregard" because the Arbitrator purportedly ignored the principle that "an attorney who acts according to the explicit instructions of a government agency . . . does not violate a standard of care under Maryland law." Contingent

25

Cross-Pet. ¶ 22. To establish manifest disregard manifest disregard of the law as a potential basis for vacatur, a party must demonstrate two elements: "(1) the disputed legal principle is clearly defined and is not subject to reasonable debate; and (2) the arbitrator refused to apply that legal principle." *Warfield v. ICON Advisers, Inc.*, 26 F.4th 666, 669–70 (4th Cir. 2022) (quoting *Jones v. Dancel*, 792 F.3d 395, 402 (4th Cir. 2015)). This is a "sky-high standard of judicial review" that, "in almost all manifest disregard cases," is "the beginning and the end of [the] analysis." *Id.* at 674.

Ambush's argument fails to satisfy either prong of the Fourth Circuit's test.

### 1. The Alleged Legal Principle Is Not "Clearly Defined and Not Subject to Reasonable Debate".

The first element of manifest disregard requires Ambush to identify a legal principle that is "clearly defined and is not subject to reasonable debate." *Id.* at 669–70 (quoting *Jones v. Dancel*, 792 F.3d 395, 402 (4th Cir. 2015)). Ambush has identified no Maryland case holding that reliance on the Fund's guidance categorically insulates an attorney from malpractice liability under all circumstances. That is because no such categorical rule exists under Maryland law. The question of whether reliance on such guidance satisfies the standard of care is inherently fact-specific—it depends on the clarity of the guidance, the availability of contrary information, the significance of the deadline at stake, and numerous other factors that are quintessentially within the province of the factfinder.

Indeed, the very existence of this dispute demonstrates that the legal principle at issue is "subject to reasonable debate." The Arbitrator—a former longtime Justice of the Maryland Supreme Court, who not only had decades of experience applying Maryland law but had, in fact, participated in developing much of that law—concluded that Ambush's reliance on the Fund's guidance did not satisfy the standard of care under the circumstances. This is not a situation where

26

the governing legal principle was so clear that no reasonable decision-maker could have reached the Arbitrator's conclusion.

### 2. The Arbitrator Did Not "Refuse to Apply" Any Legal Principle.

The second element requires Ambush to show that "the arbitrator refused to apply that legal principle." *Id.* As the Fourth Circuit has recognized, manifest disregard requires a showing that the arbitrator was "aware of the law, understood it correctly, found it applicable to the case before [her], and yet chose to ignore it in propounding [her] decision." *Three S Delaware*, 492 F.3d at 529. It requires more than "commit[ing] an error—. . .even a serious error." *Stolt-Nielsen*, 559 U.S. at 671. An arbitrator who considers the relevant legal principles but reaches a conclusion with which the losing party disagrees has not manifestly disregarded the law—she has simply decided the case adversely to that party.

Maryland legal malpractice requires proof of: (1) an attorney-client relationship; (2) the attorney's breach of a duty owed to the client; (3) proximate causation; and (4) damages. *Thomas v. Bethea*, 718 A.2d 1187, 1195–96 (1998). The Arbitrator applied precisely this framework. She found that Ambush owed a duty to Rusnak, that Ambush breached the standard of care by failing to file the successive application, that this failure caused Mr. Rusnak's exclusion from catch-up payments, and that Rusnak suffered damages in the amount of the lost payment. The Award thus "draws its essence" from Maryland law—which is all that is required to survive judicial review.

By contrast, Ambush never introduced any authority during the arbitration supporting the invented legal principle that reliance on the Fund's guidance categorically insulates an attorney from malpractice liability. Nor was there evidence that the Arbitrator was unaware of the Fund's guidance or ignored it. To the contrary, Ambush acknowledges that the Fund's guidance was presented to the Arbitrator and that the Arbitrator was fully aware of it. The Arbitrator considered

27

this evidence and concluded that it did not excuse Ambush's failure to act. That is an exercise of judgment, not a refusal to apply the law.

## V.       CONCLUSION

For these reasons, Mr. Rusnak respectfully requests that the Court enter judgment as follows:

1.  Confirmation of the Final Award as a Judgment of this Court against Ambush in the amount of $759,020.74—comprised of $685,442.38 in damages, $36,056.13 in pre-award interest, $1,047.23 in costs, and $36,475.00 as reimbursement for arbitration fees and Arbitrator fees;

2.  An award of post-judgment interest;

3.  An award of taxable costs; and

4.  Any and all further relief this Court deems just and proper.

Dated: June 3, 2026                                      Respectfully submitted,

*/s/ Robert A. Braun*
Robert A. Braun
D. Md. Bar No. 22059
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
rbraun@cohenmilstein.com

*Counsel for Petitioner Elvis J. Rusnak*

28