# EXHIBIT J61



United States Government Accountability Office

## Report to Congressional Committees

November 2024

# U.S. VICTIMS OF STATE SPONSORED TERRORISM FUND

# 1983 Beirut Barracks and 1996 Khobar Towers Bombing Claimants Due $614 Million

Exhibit J61

GAO-25-107564

# GAO Highlights

Highlights of GAO-25-107564, a report to congressional committees

**November 2024**

# U.S. VICTIMS OF STATE SPONSORED TERRORISM FUND

## 1983 Beirut Barracks and 1996 Khobar Towers Bombing Claimants Due $614 Million

## Why GAO Did This Study

Acts of state sponsored terrorism have resulted in the death and injury of thousands of U.S. persons and the suffering of victims' family members. The Fund was established in 2015 by the Justice for United States Victims of State Sponsored Terrorism Act. Administered by a Special Master, who is appointed by the Attorney General, and supported by DOJ personnel, the Fund provides compensation to eligible claimants though regular payment distribution rounds.

The Fairness Act includes a provision for GAO to determine lump sum catch-up payments for eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims. To conduct this work, GAO reviewed relevant legislation and DOJ documentation; analyzed Fund data on new and existing claimants; and interviewed Fund officials. In December 2023 and July 2024, GAO published *Federal Register* Notices requesting public comments on GAO's planned methodology for calculating lump sum catch-up payments. GAO received and carefully considered all comments received.

## What GAO Recommends

Congress should consider amending the Justice for United States Victims of State Sponsored Terrorism Act to allow any of the 274 victims who did not apply for lump sum catch-up payments due to DOJ's guidance to receive such payments.

View GAO-25-107564. For more information, contact Triana McNeil at (202) 512-8777 or McNeilT@gao.gov or Nagla'a El-Hodiri at (202) 512-7279 or ElHodiriN@gao.gov.

## What GAO Found

GAO determined that lump sum catch-up payments to 2,081 eligible victims of the 1983 Beirut barracks and 1996 Khobar Towers bombings total about $614 million. Lump sum catch-up payments are to result in the percentage of the claims these victims received from the U.S. Victims of State Sponsored Terrorism Fund (Fund) being equal to the percentage of the claims non-9/11 victims of state sponsored terrorism received from the Fund. However, 274 claimants did not submit applications for the payments during the statutory application time frame and therefore cannot be included in lump sum catch-up payments without action by Congress.

Specifically, GAO found that Department of Justice (DOJ) guidance may have discouraged up to 274 eligible Beirut barracks and Khobar Towers bombing victims from applying for lump sum catch-up payments. According to DOJ officials who administer the Fund—which provides compensation to certain U.S. persons injured in acts of international state sponsored terrorism—these claimants may have refrained from submitting applications after contacting the Fund or reviewing its application procedures. Under GAO's interpretation of the Fairness for 9/11 Families Act (Fairness Act), claimants who previously applied and were found eligible to participate in the Fund could still receive catch-up payments but must have submitted applications within the statutory application time frame (December 29, 2022, through June 27, 2023). The Fund, however, took the view that these existing claimants could not submit a separate or "successive" application in order to apply for catch-up payments because each claimant may only submit one application per claim under the Fund's procedures.

Existing claimants who did submit timely applications are eligible for catch-up payments and are included in our calculations. According to Fund officials, as provided by the Fairness Act, the Special Master will authorize catch-up payments in amounts as determined by GAO.

The Fairness Act does not authorize GAO to include the 274 claimants in its determination of lump sum catch-up payments given the application submission requirement, and DOJ officials have stated that the Fund cannot allow these claimants to submit successive applications under the Fund's established procedures. However, GAO determined that lump sum catch-up payments for these 274 claimants would be about $116 million. Amending the Justice for United States Victims of State Sponsored Terrorism Act would allow claimants who did not apply because of Fund guidance to receive lump sum catch-up payments.

**United States Government Accountability Office**

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 3 |
| | Lump Sum Catch-Up Payments Total About $614 Million; However, Some Potentially Eligible Claimants Did Not Submit Applications | 10 |
| | Conclusions | 20 |
| | Matter for Congressional Consideration | 21 |
| | Agency Comments and our Evaluation | 21 |
| Appendix I | Objective, Scope, and Methodology | 27 |
| Appendix II | *Federal Register* Notices – December 28, 2023, and July 9, 2024 | 31 |
| Appendix III | Summary of Public Comments on *Federal Register* Notices | 42 |
| Appendix IV | Comments from the Department of Justice | 57 |
| Appendix V | GAO Contacts and Staff Acknowledgement | 69 |

Figures

| | | |
|---|---|---|
| Figure 1: | Claimant Application Process for Payments under the U.S. Victims of State Sponsored Terrorism Fund (Fund) | 4 |
| Figure 2: | U.S. Victims of State Sponsored Terrorism Fund Frequently Asked Questions Conveyed to Beirut Barracks and Khobar Towers Bombing Victims | 15 |
| Figure 3: | Illustration of 1983 Beirut Barracks and 1996 Khobar Towers Claimants Lump Sum Catch-up Payments Application Process and Results | 17 |

**Abbreviations**

| | |
|---|---|
| DOJ | Department of Justice |
| Fairness Act | The Fairness for 9/11 Families Act |
| Fund | The United States Victims of State Sponsored Terrorism Fund |
| In Re 650 | In Re 650 Fifth Avenue and Related Properties |
| Peterson | Peterson v. Islamic Republic of Iran |
| Victims Act | Justice for United States Victims of State Sponsored Terrorism Act |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



U.S. GOVERNMENT ACCOUNTABILITY OFFICE

**441 G St. N.W.
Washington, DC 20548**

November 1, 2024

Congressional Requesters

Acts of state sponsored terrorism have resulted in the death and injury of thousands of U.S. persons and the suffering of victims' family members.[1] These include the 1983 and 1996 bombings of the U.S. Marine barracks in Beirut and Khobar Towers in Saudi Arabia, respectively, and the 9/11 attacks. In 2015, the Justice for United States Victims of State Sponsored Terrorism Act (Victims Act) was enacted, establishing the United States Victims of State Sponsored Terrorism Fund (Fund).[2] The Fund provides compensation to certain U.S. persons injured in acts of international state sponsored terrorism and their immediate family members. As of August 2024, the Fund has allocated approximately $3.4 billion to eligible claimants in four payment rounds between 2017 and 2023.[3]

Since the Fund's establishment in 2015, the Victims Act has been amended several times. Most recently, the Fairness for 9/11 Families Act (Fairness Act), enacted in December 2022, amended the Victims Act to include a provision for GAO to determine lump sum catch-up payments

---

[1]Under the Justice for United States Victims of State Sponsored Terrorism Act, the term "state sponsor of terrorism" means a country the government of which the Secretary of State has determined, for purposes of 50 U.S.C. § 4605(j) (since repealed), 22 U.S.C. § 2371, 22 U.S.C. § 2780, or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism. Pub. L. No. 114-113, div. O, tit. IV, § 404(j)(7), 129 Stat. 3007, 3017 (2015) (codified at 34 U.S.C. § 20144(j)(7)); see also 50 U.S.C. §§ 4813(c), 4826(c)(1). As of August 2024, there are four countries designated under these authorities: Cuba, the Democratic People's Republic of Korea (North Korea), Iran, and Syria.

[2]Pub. L. No. 114-113, § 404, 129 Stat. at 3007-18.

[3]The Fund's allocations distributed to eligible claimants occurred in 2017, 2019, 2020, and 2023. For more information on sources of deposits to the Fund, see GAO, *U.S. Victims of State Sponsored Terrorism Fund: Options for Increasing Deposits and Their Potential Impacts*, GAO-24-106863 (Washington, D.C.: May 1, 2024).

for eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims.[4]

To conduct this work, we analyzed Fund data and interviewed officials who support the Fund. In addition, prior to issuing this final report, the Fairness Act required us to publish our proposed methodology to estimate the catch-up payments in a *Federal Register* Notice, and to solicit public comments.[5] We published Notices on December 28, 2023, and July 9, 2024.[6] The public comments received on these Notices helped to inform our final methodology to determine catch-up payments. Among other things, we received input on claimant eligibility for catch-up payments, the percentage used to calculate catch-up payments, and whether to offset catch-up payments with compensation received from other sources.[7]

We conducted this performance audit from July 2023 to November 2024 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that

---

[4]The act provides for GAO to determine lump sum catch-up payments for eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims in "amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of such victims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of [December 29, 2022]." Pub. L. No. 117-328, div. MM, § 101(b)(3)(B)(iii), 136 Stat. 6106, 6108 (2022) (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(D)(i)). The Fairness Act additionally established and appropriated $3 billion to a reserve fund for those lump sum catch-up payments for eligible Beirut barracks and Khobar Towers bombing victims. *Id.* § 101(b)(3)(B)(iii), 136 Stat. at 6109 (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(D)(iv)(III)(aa)). "[N]ot later than 1 year after the Special Master disperses all lump sum catch-up payments" from the reserve fund the reserve fund is to terminate; all amounts remaining in the reserve fund in excess of proposed lump sum catch-up payments shall be deposited into the Fund. 34 U.S.C. § 20144(d)(4)(D)(iv)(IV).

[5]Pub. L. No. 117-328, § 101(b)(3)(B)(iii), 136 Stat. at 6108 (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(D)(i)-(ii)). See app. I for more information on our scope and methodology.

[6]Notice of Planned Methodology for Estimating Lump Sum Catch-Up Payments to Eligible 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims, 88 Fed. Reg. 89,693 (Dec. 28, 2023); Notice of Estimated Lump Sum Catch-Up Payments to Eligible 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims and Planned Methodology, 89 Fed. Reg. 56,376 (July 9, 2024). See app. II for additional information on the *Federal Register* Notices.

[7]See app. III for a summary of public comments on the *Federal Register* Notices and our responses.

the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## United States Victims of State Sponsored Terrorism Fund

The Fund is administered by a Special Master—an official appointed by the Attorney General under the Victims Act to administer compensation from the Fund—and supported by Department of Justice (DOJ) personnel.[8] Subject to the availability of funding, the Fund provides compensation through regular payment distribution rounds.[9] To be eligible to receive compensation from the Fund, an individual must submit a claim, through an application. Additionally, a claimant generally must hold a final judgment issued by a United States district court awarding the claimant compensatory damages arising from acts of international terrorism. For regular payment distribution rounds, once a claim is determined eligible, the Fund is to determine the amount of payment on an individual basis in accordance with specific statutory requirements, including that payments be made on a pro rata basis (i.e., proportionally), that compensatory damages awards on which claims are based are subject to statutory caps, and that applicants must provide information regarding compensation from sources other than the Fund, among other requirements.[10]

DOJ published a *Federal Register* Notice in July 2016 that describes the Fund's eligibility requirements and the procedures for the submission and

---

[8]See 34 U.S.C. § 20144(b)(1).

[9]Regular payment distribution rounds occur when the Special Master authorizes a payment distribution to eligible claimants. The Fund then allocates a specified amount for payment distribution. Since 2017, the Fund has allocated nearly $3.4 billion in four rounds of distributions to all claimants eligible to receive payment, with the allocations occurring in 2017, 2019, 2020, and 2023. In addition to providing compensation through regular payment distribution rounds, the Fund provides compensation through lump sum catch-up payments. The statutory eligibility requirements for lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims are described below.

[10]See 34 U.S.C. § 20144(b)(2)(B), (c), (d). For non-9/11 related victims, the statutory cap for individuals is $20,000,000. Non-9/11 related victims and their immediate families are subject to a collective $35,000,000 family statutory cap. A compensatory damages award is the amount of damages recoverable in satisfaction of, or in recompense for, loss or injury sustained.

consideration of applications to the Fund.[11] According to Fund officials, the Fund uses the procedures set forth in the Notice to determine the eligibility of victims to receive payments from the Fund. For example, it uses the procedures to determine if the claimant submitted a prior application to the Fund and was found eligible for regular payment distributions. The Notice specifies that "[o]nly one application may be submitted for each claim."[12] Figure 1 below shows the claimant application process to participate in the Fund.

**Figure 1: Claimant Application Process for Payments under the U.S. Victims of State Sponsored Terrorism Fund (Fund)**



| Judgment | Application | Calculation | Payments |
|---|---|---|---|
| The claimant takes private action to get a federal district court judgment against a state sponsor of terrorism. The U.S. government is not a party to these underlying lawsuits.[a] | The Fund receives applications from the claimant and determines their eligibility. | The Fund uses the amount of compensatory damages in the claimant's judgment for their payment calculation and applies statutory requirements. | The Fund makes payments pro rata (i.e., proportionally) and calculates each distribution of payments individually. Eligible claimants in one distribution may be eligible for the Fund's standard statutory distributions. |

Source: GAO analysis of U.S. Department of Justice information; GAO (icons). | GAO-25-107564

[a]The Fund also provides compensation to eligible claimants who were held hostage in the United States embassy in Iran from 1979 to 1981 and their spouses and children. These claimants do not need to obtain judgments and are not the subject of GAO's mandate.

## Lump Sum Catch-Up Payments for 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims

The Fairness Act included a provision for GAO to calculate lump sum catch-up payments to 1983 Beirut barracks bombing victims and 1996

---

[11]Justice for United States Victims of State Sponsored Terrorism Act, 81 Fed. Reg. 45,535, 45,537-38 (July 14, 2016).

[12]*Id.* at 45,537; see Pub. L. No. 114-113, § 404(b)(2)(A), 129 Stat. at 3008 (codified at 34 U.S.C. § 20144(b)(2)(A) (requiring the publication in the *Federal Register* and on a website procedures necessary for United States persons to apply and establish eligibility for payment not later than 60 days after the initial appointment of the Special Master)).

Khobar Towers bombing victims.[13] Lump sum catch-up payments to specific claimants as determined by GAO are separate from the Fund's regular payment distribution rounds. The Fairness Act further established eligibility requirements for these lump sum catch-up payments. In order to receive these payments, Beirut barracks and Khobar Towers bombing victims must have submitted applications to the Fund within the statutory application time frame, which was December 29, 2022, through June 27, 2023.[14] They must also have been awarded a qualifying final judgment before December 29, 2022.[15]

In establishing the framework for these lump sum catch-up payments, the Fairness Act amended the Victims Act to provide a new opportunity for certain victims of these acts of state sponsored terrorism to participate in the Fund and to receive lump sum catch-up payments. Before the enactment of the Fairness Act, many Beirut barracks bombing and Khobar Towers bombing victims had not applied to participate in the Fund, although they were not precluded from doing so. Because victims must generally submit applications within 90 days of obtaining a final

---

[13]Pub. L. No. 117-328, § 101(b)(3)(B)(iii), 136 Stat. at 6108 (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(D)(i)). Previously, the Sudan Claims Resolution Act included a provision for GAO to calculate lump sum catch-up payments to eligible 9/11 victims, spouses, and dependents. Pub. L. No. 116-260, div. FF, tit. XVII, § 1705(b)(2), 134 Stat. 3291, 3293-94 (2020) (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(C)(i)). In August 2021, we reported on the estimated lump sum catch-up payments for 9/11 victims, spouses, and dependents. GAO, *U.S. Victims of State Sponsored Terrorism Fund: Estimated Lump Sum Catch-Up Payments*, GAO-21-105306 (Washington, D.C.: Aug. 11, 2021). Congress then directed the Special Master to authorize lump sum catch-up payments in the amounts determined by GAO, and appropriated funds necessary to pay them. Pub. L. No. 117-328, § 101(b)(3)(B)(ii), 136 Stat. at 6107-08. According to DOJ officials, in 2023, the Fund allocated $2.65 billion in lump sum catch-up payments to eligible 9/11 claimants.

[14]Pub. L. No. 117-328, § 101(b)(2), (b)(3)(B)(iii), 136 Stat. at 6107-08 (pertinent portions codified at 34 U.S.C. § 20144(c)(3)(A)(ii)(II), (d)(4)(D)(i)).

[15]*Id.* § 101(b)(3)(B)(iii), 136 Stat. at 6108 (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(D)(i)); see also 34 U.S.C. § 20144(c)(3)(A)(ii)(II). The Victims Act defines a final judgment as an enforceable final judgment, decree, or order on liability and damages entered by a United States district court that is not subject to further appellate review. Pub. L. No. 114-113, § 404(j)(4), 129 Stat. at 3016 (codified at 34 U.S.C. § 20144(j)(4)). The final judgment awards the claimant (victim) compensatory damages arising from acts of international terrorism by a state sponsor of terrorism. All appeals must be completed before a judgment is final pursuant to the act.

judgment, those who had not done so were time barred from applying.[16] The Fairness Act changed that and allowed these victims, who had not previously submitted any applications to the Fund, to apply to participate in the Fund and to receive lump sum catch-up payments.[17] The Fairness Act, in directing the Comptroller General to determine amounts of lump sum catch-up payments, also permitted Beirut barracks bombing and Khobar Towers bombing victims who had previously applied and been deemed eligible for regular distribution payments from the Fund to submit duplicate or successive applications to the Fund in order to apply for these catch-up payments.[18] We refer to applications in this group as "successive applications."[19]

The Fairness Act also amended a provision of the Victims Act related to victims who were involved in certain lawsuits against Iran. At the time the Fund was established, the law allowed plaintiffs in two identified lawsuits, Peterson v. Islamic Republic of Iran (Peterson) and In Re 650 Fifth Avenue and Related Properties (In Re 650)[20] to make a choice regarding submitting an application to the Fund. Plaintiffs could choose not to apply to participate in the Fund and receive and retain payments from Peterson

---

[16]In general, victims who had a final judgment when the Special Master first issued procedures under the Victims Act had 90 days to apply to the Fund and victims who obtained their final judgment subsequently have 90 days thereafter to apply to the Fund. 34 U.S.C. § 20144(c)(3)(A)(i)-(ii).

[17]Pub. L. No. 117-328, § 101(b)(3)(B)(iii), (b)(4), 136 Stat. at 6108-09 (pertinent portions codified at 34 U.S.C. § 20144(d)(4)(D)(i), (e)(2)(B)(v)). For those victims who are eligible to receive catch-up payments, they may be eligible to receive future regular payment distributions from the Fund as well.

[18]See id. § 101(b)(2), (b)(3)(B)(iii), 136 Stat. at 6106-08 (pertinent portions codified at 34 U.S.C. § 20144(c)(3)(A)(ii)(II), (d)(4)(D)(i) (conditioning eligibility for lump sum catch-up payments on those individuals submitting applications for payment between December 29, 2022, and June 27, 2023)). As described below, the Fund took a different view with respect to the ability of these individuals to submit applications in order to apply for lump sum catch-up payments. GAO's view is for the purpose of implementing the Comptroller General's responsibilities under 34 U.S.C. § 20144(d)(4)(D)(i)-(iii) to conduct an audit and calculate amounts for the Special Master to allocate lump sum catch-up payments.

[19]Because these victims were already in the Fund, they may be eligible to receive future regular payment distributions from the Fund as well.

[20]Peterson v. Islamic Republic of Iran, No. 10 Civ. 4518 (S.D.N.Y.) and In Re 650 Fifth Ave. and Related Props., No. 08 Civ. 10934 (S.D.N.Y. filed Dec. 17, 2008).

or In Re 650, if any.[21] Alternatively, plaintiffs could choose to participate in the Fund. If they chose to participate, they were required to irrevocably assign to the Fund all rights, title, and interest in their claims to the assets at issue in those cases.[22] Lastly, plaintiffs in these cases were also permitted to submit an application for conditional payment from the Fund. For these "conditional claimants," the Special Master was required to determine and set aside payment amounts, pending a final judgment in these cases.[23] In the event that a final judgment was entered in favor of the plaintiffs in the Peterson action and funds were distributed, the payments allocated to claimants who applied for a conditional payment were to be considered void, and any funds previously allocated to such conditional payments were to be made available and distributed to all other eligible claimants.[24] A final judgment in favor of plaintiffs in Peterson was entered, and distributions to them commenced on October 19, 2016.[25] Accordingly, conditional claimants who received funds through the Peterson case did not receive award payments from the Fund, and the Fund did not include them in award calculations in 2017 for the first round of payments or in subsequent payment rounds.[26] The Fairness Act allowed the Comptroller General to include both the plaintiffs in Peterson

---

[21]A plaintiff is the party who brings a civil suit in a court of law. Under the Victims Act, plaintiffs in these cases are referred to as "judgment creditors" and "Settling Judgment Creditors," which are persons having a legal right to enforce execution of a judgment for a specific sum of money. In *Peterson*, victims of Iran-sponsored acts of terrorism sought to enforce their judgments against Iran by obtaining a set of assets held at a New York bank for Bank Markazi, the Central Bank of Iran. *Bank Markazi v. Peterson*, 578 U.S. 212, 219-21 (2016).

[22]Pub. L. No. 114-113, § 404(e)(2)(B)(iii), 129 Stat. at 3013 (codified at 34 U.S.C. § 20144(e)(2)(B)(iii)). According to Fund officials, only plaintiffs from *In Re 650* elected to participate in the Fund; therefore, the Fund received no distributions from the *Peterson* case.

[23]*Id.* § 404(e)(2)(B)(iv), 129 Stat. at 3013-14 (codified at 34 U.S.C. § 20144(e)(2)(B)(iv)).

[24]*Id.* § 404(e)(2)(B)(iv)(II)(bb), 129 Stat. at 3014 (codified at 34 U.S.C. § 20144(e)(2)(B)(iv)(II)(bb)).

[25]See *Bank Markazi v. Peterson*, 578 U.S. 212 (2016); U.S. Victims of State Sponsored Terrorism Fund, *Supplemental Report from the Special Master* 6 (Washington, D.C.: Aug. 2017).

[26]U.S. Victims of State Sponsored Terrorism Fund, *Supplemental Report from the Special Master* 6 (Washington, D.C.: Aug. 2017). There were 78 conditional claimants who were *Peterson* judgment creditors. *Id.* According to the Fund, because a final judgment in favor of plaintiffs in *Peterson* was entered and distributions to the claimants commenced in 2016, these conditional claimants have not and will not be included in the Fund's regular award calculations or receive Fund award payments in any future regular payment distributions.

who chose not to participate in the Fund as well as these conditional claimants in GAO's lump sum catch-up payment calculations because they satisfied the eligibility requirements for those payments.[27] The conditional claimants are eligible for lump sum catch-up payments despite their decision to file applications for conditional payment from the Fund and accept Peterson payments.[28]

The Fairness Act also amended a provision of the Victims Act that limits the ability of claimants to receive payments from the Fund based on the percent of compensatory damages awarded to others in the Fund. The Victims Act outlines minimum payments requirements based on whether eligible applicants have received, or are entitled or scheduled to receive, 30 percent or more of the amount they are owed on their claims from any source other than the Fund.[29] Such applicants shall not receive any payment from the Fund until all other eligible applicants generally have received from the Fund an amount equal to 30 percent of the amount they are owed (referred to as the "30 percent rule").[30] As a result of amendments made to the Victims Act by the Fairness Act, Peterson plaintiffs who may not receive regular Fund distributions because they have received 30 percent or more of their judgments from sources other

---

[27]*See* Pub. L. No. 117-328, § 101(b)(3)(B)(iii), (b)(4), 136 Stat. at 6108-09 (pertinent portions codified at 34 U.S.C. § 20144(d)(4)(D)(i), (e)(2)(B)(v)).

[28]*Id.*

[29]The statute requires that as part of the procedures to apply and establish eligibility for payment, the Special Master must require applicants to provide the Special Master with information regarding compensation from any source other than this Fund that the claimant (or, in the case of a personal representative, the victim's beneficiaries) has received or is entitled or scheduled to receive as a result of the act of international terrorism that gave rise to a claimant's final judgment, including information identifying the amount, nature, and source of such compensation. Pub. L. No. 114-113, § 404(b)(2)(B), 129 Stat. at 3008 (codified at 34 U.S.C. § 20144(b)(2)(B)). Those procedures require applicants to provide information and documentation regarding the amount, nature, and source of any payment they received or are entitled or scheduled to receive, and state that applicants must update that information throughout the period of the Fund. Justice for United States Victims of State Sponsored Terrorism Act, 81 Fed. Reg. 45,535, 45,538 (July 14, 2016).

[30]Pub. L. No. 114-113, § 404(d)(3)(B)(i), 129 Stat. at 3011 (codified at 34 U.S.C. § 20144(d)(3)(B)(i)).

than the Fund can receive lump sum catch-up payments.[31] The Peterson plaintiffs who applied during the statutory application time frame had received more than 30 percent of their judgments.

The Fund received applications from 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who applied during the statutory application time frame. For applications submitted by new entrants to the Fund, Fund officials report that they assessed the applications consistent with existing Fund procedures, including determining claimants' eligibility to participate in the Fund. For claimants who had already been in the Fund and submitted new applications during the statutory application time frame—i.e., successive applications—the Fund administratively closed their applications. According to the Fund, in accordance with Fund procedures in place since 2016, individuals, including those already found eligible by the Fund or who applied conditionally to the Fund, can submit only one application to the Fund.

---

[31]The Fairness Act amended the Victims Act to provide that the minimum payments requirements include the total amount received by applicants who are 1983 Beirut barracks bombing victims or 1996 Khobar Towers bombing victims as a result of or in connection with *Peterson* or *In Re 650*. It further provides that any such applicant who has received or is entitled or scheduled to receive 30 percent or more of such applicant's compensatory damages judgment as a result of or in connection with such proceedings shall not receive any payment from the Fund, except as consistent with minimum payments requirements or as part of a lump sum catch-up payment under section 101 of the Fairness Act. Pub. L. No. 117-328, § 101(b)(3)(A), 136 Stat. at 6107 (pertinent portion codified at 34 U.S.C. § 20144(d)(3)(B)(iii)). As such, given the terms of the statute, certain claimants who received compensation from sources other than the Fund may receive a lump sum catch-up payment, but not receive payment in the Fund's standard statutory distributions.

## Lump Sum Catch-Up Payments Total About $614 Million; However, Some Potentially Eligible Claimants Did Not Submit Applications

### Lump Sum Catch-Up Payments for 2,081 Claimants Total About $614 Million

According to our analysis of the Fund's data, a total of 2,081 claimants submitted applications during the statutory application time frame—on or after December 29, 2022, and by June 27, 2023. Of these applications, 1,773 were submitted by Beirut barracks victims and 308 were submitted by Khobar Towers victims.

Additionally, of the 2,081 applications,1,569 were submitted by new claimants who had not previously applied to the Fund and who are eligible to participate in the Fund, and 512 were submitted by existing claimants who received a prior eligibility determination from the Fund for regular payment distributions.[32] For purposes of our analysis, we determined that these 2,081 claimants were eligible for catch-up payments and therefore we included them in our calculation.

We determined that the total lump sum catch-up payments for the 2,081 eligible Beirut barracks and Khobar Towers bombing victims total about $614 million: about $493 million for the 1,773 eligible Beirut barracks bombing victims, and about $120 million for the 308 eligible Khobar Towers bombing victims.[33] The lump sum catch-up payment amount is the amount that, after receiving the lump sum catch-up payments, would result in the percentage of claims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund. To calculate this total:

---

[32]GAO's view is that the Fairness Act does not disqualify claimants who previously applied to the Fund and then subsequently submitted successive applications during the statutory application time frame in order to apply for lump sum catch-up payments.

[33]Dollar amounts do not sum to the total due to rounding.

- We first determined the overall percentage of claims non-9/11 victims of state sponsored terrorism received from the Fund during the first three rounds of Fund distributions. This was calculated by determining the payment amounts received by non-9/11 claimants from the Fund in the first through third payment rounds.[34] We then summed the payments for the three payment rounds across all non-9/11 claimants.[35] This totaled about $1.448 billion. Next, we determined the net eligible claims[36] of the non-9/11 claimants as of the third round that they received a payment, offset by qualifying compensation from other sources, and summed across all claimants. This totaled about $9.027 billion. We divided the amount of payments from the Fund (i.e., about $1.448 billion) by the non-9/11 victims' net eligible claims offset by qualifying compensation from other sources (i.e., about $9.027 billion) to identify 16.0353 percent. This determines the amount of payments that non-9/11 victims received as a percentage of their claims during the first three rounds of the Fund distributions.

- Using this percent, we determined the total amount needed to provide lump sum catch-up payments to the eligible Beirut barracks and Khobar Towers claimants.[37] We applied the percent to the claimants' net eligible claims offset by qualifying compensation from other

---

[34]This category included victims of state sponsored terrorism whose eligible claims are unrelated to the acts of international terrorism carried out on September 11, 2001. It included 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who received payments from the Fund in any of the first through third payment rounds. We excluded three types of claims: (1) those where the victim received no payments because they were conditional claimants (the 78 conditional claimants who were *Peterson* judgment creditors); (2) those where the victim never received payment in any of the first through third rounds of distribution because qualifying compensation from other sources (offsets) exceeded 30 percent of the compensatory damages (before applying the individual and family statutory caps); and (3) those where the offsets exceeded the percentage of compensatory damages awarded to other eligible applicants in each of the first through third rounds of distribution for which these claims were eligible. Altogether there were seven claims where the resulting payments in each of the three distributions were calculated to be zero by the Fund, which we excluded.

[35]This approach took into account that some non-9/11 claimants only received second round payments (and not first round payments), and that some non-9/11 claimants only received third round payments (and not first or second round payments).

[36]Net eligible claims amounts for non-9/11 claimants are the monetary amount of all eligible claims after the application of individual and family statutory caps.

[37]This category included the 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted eligible applications to the Fund within the statutory application time frame (between December 29, 2022, and June 27, 2023). This included both claimants who have not received any payments from the Fund and those who have received payments in any of the first through fourth payment rounds.

sources (about $4.106 billion). This produced an amount of about $658 million.

- We then subtracted payments that some eligible Beirut barracks and Khobar Towers claimants have received during the first four rounds of the Fund's distributions (about $44 million). After subtracting that amount, the final lump sum catch-up payment amount was about $614 million.

## DOJ Guidance May Have Discouraged up to 274 Beirut Barracks and Khobar Towers Bombing Victims Who Were Already in the Fund from Applying for Lump Sum Catch-Up Payments

Under the Fairness Act, one of the requirements for 1983 Beirut barracks and 1996 Khobar Towers claimants to receive a lump sum catch-up payment is that claimants must have "submitted applications" during the statutory application time frame.[38] In our interpretation of the Comptroller General's mandate under the Fairness Act, claimants who previously applied to the Fund and were found eligible could submit an application in order to apply for lump sum catch-up payments. The Fund, however, takes the view that claimants who have applied to the Fund and were found eligible cannot file subsequent applications—for lump sum catch-up payments or any other reason.

According to Fund officials, the statute and Fund procedures together prevent the Fund from accepting successive applications from existing eligible claimants because each claimant to the Fund may only submit one application per claim.[39] This effectively means that these claimants cannot receive lump sum catch-up payments because they cannot have submitted an application during the statutory application time frame. The procedures the Fund is referring to were initially issued in a July 14, 2016, *Federal Register* Notice, which stated that "[o]nly one application may be

---

[38]Pub. L. No. 117-328, § 101(b)(3)(B)(iii), 136 Stat. at 6108 (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(D)(i)).

[39]DOJ also refers to these as "duplicative filings" or "duplicative claims." U.S. Victims of State Sponsored Terrorism Fund, *Frequently Asked Questions*, https://www.usvsst.com/Home/Faq (last accessed Aug. 14, 2024) (Frequently Asked Question (FAQ) 7.1 What are lump sum catch-up payments?).

submitted for each claim."[40] The Fund did not change these application procedures after the enactment of the Fairness Act.[41] Rather, to comply with the Fairness Act's requirement that the Special Master update Fund procedures as necessary as a result of the Fairness Act's enactment, the Fund updated the frequently asked questions section of its website.[42] The frequently asked questions conveyed that Beirut barracks bombing

---

[40]Justice for United States Victims of State Sponsored Terrorism Act, 81 Fed. Reg. 45,535, 45,537 (July 14, 2016). This *Federal Register* Notice provides guidance on the application process and procedures for state sponsored terrorism victims applying to the Fund for compensation. See Pub. L. No. 114-113, § 404(b)(2)(A), 129 Stat. at 3008 (codified at 34 U.S.C. § 20144(b)(2)(A) (requiring the publication in the *Federal Register* and on a website procedures necessary for United States persons to apply and establish eligibility for payment not later than 60 days after the initial appointment of the Special Master)). According to Fund officials, the Fund uses the procedures to determine the eligibility of victims' claims.

[41]Fund officials noted that these procedures also remained in place when GAO calculated lump sum catch-up payments for certain 9/11 victims, spouses, and dependents, after passage of the Sudan Claims Resolution Act, and the Fund did not create a separate application process for those lump sum catch-up payments. However, the Sudan Claims Resolution Act permitted 9/11 victims, spouses, and dependents to receive lump sum catch-up payments if they had applied to the Fund before the date of enactment of that act. Pub. L. No. 116-260, 134 Stat. at 3293-94 (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(C)(i)). Therefore, GAO could calculate lump sum catch-up payments for 9/11 victims, spouses, and dependents who submitted applications to the Fund prior to the date of enactment of the Sudan Claims Resolution Act, while GAO cannot calculate lump sum catch-up payments to 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims unless they have submitted an application during the 180-day period from the date of enactment of the Fairness Act.

[42]Pursuant to the act, the Special Master was required to "update, as necessary as a result of the enactment of such Act, such procedures and other guidance previously issued by the Special Master." Pub. L. No. 117-328, § 101(b)(1), 136 Stat. at 6106 (pertinent portion codified at 34 U.S.C. § 20144(b)(2)(A)).

victims and Khobar Towers bombing victims previously found eligible are not eligible to receive lump sum catch-up payments (see fig. 2).[43]

---

[43]On February 7, 2023, the Fund added language to that section of its website that 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims "who are not eligible for lump sum catch-up payments under the Fairness Act, such as USVSST Fund claimants previously found eligible, may still be eligible for compensation in the USVSST Fund's other statutory distributions." U.S. Victims of State Sponsored Terrorism Fund, *Frequently Asked Questions*, https://www.usvsst.com/Home/Faq (last accessed Aug. 14, 2024) (FAQ 7.3 Which 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims are included in the Fairness Act's lump sum catch-up payment provision and how do these victims file a claim with the USVSST Fund?). The Fund provided guidance to existing eligible claimants and counsel who contacted the Fund about filing successive applications consistent with these frequently asked questions, according to Fund officials. Comments submitted by some claimants to GAO in response to our *Federal Register* Notices stated the Fund similarly informed them that if they were previously found eligible for the Fund, they were not eligible to apply for lump sum catch-up payments.

**Figure 2: U.S. Victims of State Sponsored Terrorism Fund Frequently Asked Questions Conveyed to Beirut Barracks and Khobar Towers Bombing Victims**



Source: https://www.usvsst.com (Aug. 30, 2024).  |  GAO-25-107564

According to our analysis of the Fund's data, 1,569 new Beirut barracks and Khobar Towers claimants submitted applications during the statutory application time frame and were determined by the Fund to be eligible to participate in the Fund. These claimants are included in our calculation of lump sum catch-up payments. Additionally, according to our analysis of the Fund's data, 786 Beirut barracks and Khobar Towers bombing claimants previously applied to the Fund and were previously found eligible to participate in the Fund (i.e., for the Fund's regular payment distribution rounds) (see fig. 3).

**Figure 3: Illustration of 1983 Beirut Barracks and 1996 Khobar Towers Claimants Lump Sum Catch-up Payments Application Process and Results**



Source: GAO analysis of U.S. Department of Justice data.  |  GAO-25-107564

Of these 786 claimants, 512 submitted applications during the statutory application time frame despite DOJ's guidance stating that the Fund could not accept duplicate applications and that they were not eligible for lump

sum catch-up payments.[44] According to Fund officials, the Fund administratively closed these applications because the Fund considered the applications to be successive applications. Although the Fund administratively closed these applications, we included them in our catch-up payment calculations because these 512 claimants submitted applications during the statutory application time frame and met other applicable requirements. According to Fund officials, as provided by the Fairness Act, the Special Master will authorize lump sum catch-up payments in amounts as determined by GAO.

Additionally, in our analysis of the Fund's data, 274 of the 786 claimants did not submit applications during the statutory application time frame. According to Fund officials, the 274 claimants may have refrained from submitting applications after contacting the Fund or reviewing the Fund's application procedures based on the advice from their counsel or the Fund. In comments received on our July 2024 *Federal Register* Notice, many individuals and attorneys stated they were dissuaded from filing successive applications because of information they received from the Fund. For instance, two attorneys representing 225 claimants with prior eligibility determinations commented that they did not submit applications for lump sum catch-up payments because Fund officials told them the claimants were not eligible and that any duplicate applications submitted would not be accepted.[45]

The Comptroller General does not have the authority to include the 274 claimants in the determination of lump sum catch-up payments because individuals must have submitted an application to be eligible for those

---

[44]Comments we received indicate claimants were intending to apply for lump sum catch-up payments pursuant to the terms of the Fairness Act. As noted above, the Fund's website provided that Fund "claimants previously found eligible" are an example of victims "who are not eligible for lump sum catch-up payments under the Fairness Act." U.S. Victims of State Sponsored Terrorism Fund, *Frequently Asked Questions*, https://www.usvsst.com/Home/Faq (last accessed Aug. 14, 2024) (FAQ 7.3).

[45]While Fund officials have stated that the Comptroller General will determine which claimants are eligible for these catch-up payments and the amount of the catch-up payment for each eligible claimant, the Fund's guidance in FAQs and correspondence with claimants affected their eligibility. In particular, officials stated that claimants did not need to file additional or separate applications for lump sum catch-up payments, while also noting that 9/11 related claimants for whom GAO previously calculated lump sum catch-up payments did not need to reapply to the Fund in order to receive their catch-up payments; conveyed that those with prior eligibility determinations were not eligible for lump sum catch-up payments; and stated that claimants should not resubmit their application and that successive applications would be closed as duplicative.

payments under the Fairness Act.[46] However, in our analysis of the Fund's data, we estimated that lump sum catch-up payments for these 274 claimants would be about $116 million.[47]

The Special Master has the authority to grant a claimant, for good cause, a reasonable extension of the application submission deadlines.[48] However, according to Fund officials, the Special Master cannot grant an application deadline extension to the 274 claimants who did not re-apply during the Fairness Act's application time frame because the Special Master cannot accept successive applications. In other words, because only new claimants can submit applications during the Fairness Act's application time frame, there is no basis for an application deadline extension from the Special Master, according to Fund officials. In addition, Fund officials have stated that this "good cause" provision by its terms does not apply to provisions of the Fairness Act related to lump sum catch-up payments.[49] As such, after receiving requests to grant such a deadline extension from existing eligible Beirut barracks or Khobar Towers claimants, the Special Master informed those claimants that their duplicate claims would be administratively closed and did not grant any deadline extensions.

[46]The Fairness Act provision for lump sum catch-up payments does not prescribe the form of an application. Thus, we included any claimant who had submitted an application to DOJ during the statutory application time frame, even if it was closed by DOJ as duplicative. We also included a formal submission to DOJ stating the specific intent to apply for a catch-up payment. However, we could not accept questions or requests for advice from the Fund as an "application" because they lacked a clear statement of intent to apply or other information that we could construe as the submission of an application consistent with the statute. Moreover, GAO lacks information on why those claimants with prior eligibility determinations did not submit applications during the statutory application time frame in order to apply for lump sum catch-up payments. It is possible that they did not apply because of the Fund's guidance or advice, or for other reasons.

[47]This amount was derived by applying the same methodology used to determine lump sum catch-up payments for the eligible 2,081 claimants described above. Specifically, we applied the 16.0353 percent to the net eligible claims of the 274 claimants, taking into account qualifying compensation from other sources and any prior payments from the Fund.

[48]34 U.S.C. § 20144(c)(3)(B) (applying to deadlines under (c)(3), including the statutory application time frame under (c)(3)(A)(ii)(II) for certain 1983 Beirut barracks and 1996 Khobar Towers bombing victims to submit applications in order to apply for lump sum catch-up payments).

[49]Fund officials further stated that the good cause exception relates to the 90-day deadline to submit an application after the date of obtaining a final judgment, or the 90-day deadline described in 34 U.S.C. § 20144(c)(3)(A)(i).

The Fairness Act does not authorize GAO to include these claimants in our calculations of lump sum catch-up payments given the application submission requirement, and Fund officials have stated that the Fund's procedures do not provide for accepting or reviewing additional applications from claimants who previously applied to the Fund and were found eligible. This means there is no mechanism to address the advice the Fund provided that may have prevented otherwise eligible claimants from submitting applications during the statutory application time frame. Amending the Justice for United States Victims of State Sponsored Terrorism Act to direct the Special Master to make lump sum catch-up payments to those among the 274 claimants who did not submit applications during the statutory application time frame because of Fund guidance would provide a mechanism for them to receive lump sum catch-up payments.[50] The claimants who can demonstrate to the Fund that they did not apply for lump sum catch-up payments because of Fund guidance—such as through documentation of written or verbal communications with the Fund, or a sworn statement that describes reliance on that guidance—would be placed in the same position as if the Fund had not provided guidance contrary to GAO's interpretation and implementation of the Comptroller General's mandate under the Fairness Act. To ensure that the Fund can identify these claimants and make payments if the statute is amended, we are providing the claim identification numbers and lump sum catch-up payment amounts that we calculated for the 274 claimants to the Special Master with this report.

## Conclusions

Certain U.S. persons injured in acts of international state sponsored terrorism and their immediate family members may be eligible to receive compensation from the United States Victims of State Sponsored Terrorism Fund. The Fairness Act included a provision for GAO to calculate lump sum catch-up payments to 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who applied during the act's application time frame. A total of 2,081 claimants timely submitted

---

[50]The appropriations for these lump sum catch-up payments will continue to be available for a certain amount of time after GAO issues its report on these payments. The Special Master is required to authorize lump sum catch-up payments as identified by GAO not earlier than 90 days after the Comptroller General submits GAO's report on these payments, and not later than 1 year after that date. 34 U.S.C. § 20144(d)(4)(D)(iv)(II). "[N]ot later than 1 year after the Special Master disperses all lump sum catch-up payments" from the reserve fund the reserve fund is to terminate; all amounts remaining in the reserve fund in excess of proposed lump sum catch-up payments shall be deposited into the Fund. *Id.* § 20144(d)(4)(D)(iv)(IV).

such applications, and we determined that the lump sum catch-up payments for these claimants total about $614 million.

Fund guidance may have discouraged up to 274 Beirut barracks and Khobar Towers bombing victims who were already in the Fund from submitting applications during the statutory application time frame in order to apply for lump sum catch-up payments. The Fund conveyed to the public, including to existing eligible claimants and their counsel, that Beirut barracks bombing victims and Khobar Towers bombing victims previously found eligible for regular payment distributions are not eligible to receive lump sum catch-up payments. We could not include these claimants in our catch-up payment calculations because they did not submit applications during the time frame, which is a requirement under the Fairness Act. Amending the Justice for United States Victims of State Sponsored Terrorism Act to direct the Special Master to make lump sum catch-up payments to those among the 274 claimants who did not submit applications because of Fund guidance would provide a mechanism for them to receive lump sum catch-up payments.

## Matter for Congressional Consideration

Congress should consider amending the Justice for United States Victims of State Sponsored Terrorism Act to direct the Special Master to make lump sum catch-up payments to 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who did not apply for those payments because of DOJ guidance that stated that only one application may be submitted for each claim and that Fund claimants previously found eligible for regular payment distributions are not eligible for lump sum catch-up payments. (Matter for Consideration 1).

## Agency Comments and our Evaluation

We provided a draft of this report to the Department of Justice (DOJ) for review and comment. DOJ responded to the draft in written comments, which we reproduced in appendix IV.

In its comments, DOJ described the department's and the Special Master's roles in administering the United States Victims of State Sponsored Terrorism Fund (Fund), as well as the application procedures issued by the Fund. DOJ also noted amendments made to the Fund's governing statute, the Justice for United States Victims of State Sponsored Terrorism Act (Victims Act), including provisions for GAO to determine lump sum catch-up payments to certain groups of victims.

In its comments, DOJ stated that GAO established an application submission requirement for claimants to be eligible for lump sum catch-up payments. Specifically, DOJ stated that GAO "add[ed] a new application

procedure and requirement that applied to only 786 of the Beirut barracks bombing or Khobar Towers bombing claimants," that GAO did not provide notice to claimants of this requirement, and that the Fairness Act itself did not mandate or establish separate application procedures for lump sum catch-up payments. As noted in our report, in order to receive catch-up payments, the Fairness Act required Beirut barracks and Khobar Towers bombing victims to have submitted applications to the Fund within the statutory application time frame, which was December 29, 2022, through June 27, 2023.[51] This is a statutory requirement, not one created by GAO. While the Fairness Act did not prescribe the form of application, an application was explicitly required. Further, we note that claimants recognized this explicit statutory requirement. Hundreds of existing claimants submitted applications during the statutory application time frame in order to apply for catch-up payments, despite DOJ's guidance stating that the Fund could not accept duplicate applications and that existing claimants were not eligible for those payments, and additional claimants flagged the requirement in their questions or requests for advice from the Fund.

DOJ also stated that we used different procedures for lump sum catch-up payments for Beirut barracks and Khobar Towers bombing victims than for lump sum catch-up payments for 9/11 victims, spouses, and dependents. It stated that, for the 9/11 cohort, we calculated catch-up payments "based on each claimants' [sic] sole application to the Fund," while requiring separate applications for the Beirut barracks and Khobar Towers cohort. DOJ further stated that "[t]he Fund treated the provisions in the statute relating to these [lump sum catch-up payments] the same way as it treated the analogous language in the statute relating to the 9/11 [lump sum catch-up payments]." However, there were key differences in the statutory provisions for the 9/11 cohort and the Beirut barracks and Khobar Towers cohort with respect to the application submission requirement, such that the language was not analogous. As noted in our report, the Sudan Claims Resolution Act permitted 9/11 victims, spouses, and dependents to receive lump sum catch-up payments if they had applied to the Fund before the date of enactment of that act.[52] Therefore, GAO could calculate lump sum catch-up payments for 9/11 victims, spouses, and dependents who submitted applications to

---

[51]Pub. L. No. 117-328, § 101(b)(2), (b)(3)(B)(iii), 136 Stat. 6106, 6107-08 (2022) (pertinent portions codified at 34 U.S.C. § 20144(c)(3)(A)(ii)(II), (d)(4)(D)(i)).

[52]Pub. L. No. 116-260, 134 Stat. at 3293-94 (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(C)(i)).

the Fund prior to the date of enactment of the Sudan Claims Resolution Act. In contrast, GAO cannot calculate lump sum catch-up payments to Beirut barracks bombing victims and Khobar Towers bombing victims unless they have submitted an application during the 180-day period from the date of enactment of the Fairness Act.

In order to give effect to the application submission requirement found in the Fairness Act, we included in our calculation of lump sum catch-up payments individuals who submitted applications during the statutory application time frame and were determined by the Fund to be eligible to participate in the Fund. This included 512 existing claimants. Because the Fund publicly conveyed that Beirut barracks bombing victims and Khobar Towers bombing victims previously found eligible need not apply for lump sum catch-up payments and are not eligible to receive those payments, up to 274 additional existing claimants may have refrained from submitting applications. As GAO lacks the authority to determine catch-up payments for claimants who did not submit applications during the statutory time frame, our report includes a matter for congressional consideration. This matter, if implemented, would direct the Special Master to make lump sum catch-up payments to those among the 274 existing claimants who did not submit applications during the statutory application time frame because of Fund guidance.

DOJ also stated its views regarding GAO's inclusion of the 78 individuals who are Peterson conditional claimants in its lump sum catch-up payment calculations. According to DOJ, "GAO's decision to permit 'successive' applications ignores the statutory choice these claimants were required to and did make at the inception of the Fund." However, the Fairness Act provided for the Comptroller General to include in GAO's lump sum catch-up payment calculations the claimants who satisfied the eligibility requirements for those payments.[53] Because the 78 conditional claimants satisfied these eligibility requirements, GAO included them. The Fairness Act also amended a provision of the Victims Act that limits the ability of claimants to receive payments from the Fund until other claimants in the Fund have received 30 percent of their compensatory damages (i.e., the "30 percent rule"). The amendment specifically allows Peterson plaintiffs who have received 30 percent or more of their judgments from sources

---

[53]See Pub. L. No. 117-328, § 101(b)(3)(B)(iii), (b)(4), 136 Stat. at 6108-09 (pertinent portions codified at 34 U.S.C. § 20144(d)(4)(D)(i), (e)(2)(B)(v)).

other than the Fund to receive lump sum catch-up payments.[54] Accordingly, this provision of the Fairness Act required an approach for GAO's lump sum catch-up payment calculations that is different than the Fund's methodology for regular payment distributions. As a result of these amendments, the 78 Peterson conditional claimants, who had already received more than 30 percent of their judgments, can receive lump sum catch-up payments.

DOJ also stated that GAO's lump sum catch-up payment calculation methodology, particularly our use of offsets, diverges from that of the Fund's long-standing, publicly available calculation methodology. DOJ further noted that "[t]his manner of applying offsets will result in payments of [lump sum catch-up payments] to claimants who have already recovered large percentages of their compensatory damages amounts from sources of compensation other than the Fund." We agree. The Fairness Act requires a payment methodology for lump sum catch-up payments that is different from the Fund's payment methodology. As noted in our report, the Victims Act, as amended by the Fairness Act, requires that we determine lump sum catch-up payments "based on the amounts outstanding and unpaid on eligible claims." As such, we subtracted recoveries from other sources received by claimants under their final judgments from their net eligible claims to produce the amount "outstanding and unpaid" on their claims. This is not necessarily equivalent to how the Fund applies offsets in administering the 30 percent rule. We did not apply the 30 percent rule because, for purposes of lump sum catch-up payments, the Fairness Act made this provision inapplicable to Peterson plaintiffs who had received 30 percent or more of their judgments as a result of those proceedings.

Finally, DOJ stated that the Special Master will authorize lump sum catch-up payments in amounts calculated by GAO, consistent with the statute.

We are sending copies of this report to the appropriate congressional committees, the Department of Justice, and other interested parties. In addition, the report is available at no charge on the GAO website at https://www.gao.gov.

---

[54]*Id.* § 101(b)(3)(A), 136 Stat. at 6107 (pertinent portion codified at 34 U.S.C. § 20144(d)(3)(B)(iii)).

Information on each lump sum catch-up payment amount pursuant to 34 U.S.C. § 20144(d)(4)(D)(iii)(I)-(II) is being provided under separate cover.

If you or your staff have any questions about this report, please contact Triana McNeil at (202) 512-8777 or McNeilT@gao.gov or Nagla'a El-Hodiri at (202) 512-7279 or ElhodiriN@gao.gov.

Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix V.

Triana McNeil
Director, Homeland Security and Justice

Nagla'a El-Hodiri
Director, International Affairs and Trade

*List of Committees*

The Honorable Patty Murray
Chair
The Honorable Susan Collins
Vice-Chair
Committee on Appropriations
United States Senate

The Honorable Richard J. Durbin
Chair
The Honorable Lindsey Graham
Ranking Member
Committee on the Judiciary
United States Senate

The Honorable Tom Cole
Chairman
The Honorable Rosa DeLauro
Ranking Member
Committee on Appropriations
House of Representatives

The Honorable Jim Jordan
Chairman
The Honorable Jerrold Nadler
Ranking Member
Committee on the Judiciary
House of Representatives

# Appendix I: Objective, Scope, and Methodology

Our objective was to determine lump sum catch-up payments for eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims.[1] To determine the lump sum catch-up payment amounts, we obtained Fund data from the Department of Justice (DOJ). We obtained spreadsheets of Fund data that included information on (1) payments from the Fund received by non-9/11 claimants in the first through third payment rounds;[2] (2) net eligible claims[3] of these non-9/11 claimants; (3) qualifying compensation from other sources received by these non-9/11

---

[1]The Fairness for 9/11 Families Act (Fairness Act), enacted in December 2022, provides for GAO to determine lump sum catch-up payments for eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims in "amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of such victims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of [December 29, 2022]." Pub. L. No. 117-328, div. MM, § 101(b)(3)(B)(iii), 136 Stat. 6106, 6108 (2022) (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(D)(i)). The Fairness Act additionally established and appropriated $3 billion to a reserve fund for those lump sum catch-up payments for eligible Beirut barracks and Khobar Towers bombing victims. *Id.* § 101(b)(3)(B)(iii), 136 Stat. at 6109 (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(D)(iv)(III)(aa)). "[N]ot later than 1 year after the Special Master disperses all lump sum catch-up payments" from the reserve fund the reserve fund is to terminate; all amounts remaining in the reserve fund in excess of proposed lump sum catch-up payments shall be deposited into the Fund. 34 U.S.C. § 20144(d)(4)(D)(iv)(IV).

[2]This includes some 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who were eligible for payment from the Fund in prior rounds. According to Fund data, twelve 1983 Beirut barracks bombing victims or 1996 Khobar Towers bombing victims were eligible for Fund payment for the first time in round 1,141 in round 2, 423 in round 3, and 708 in round 4. Claimants continue to receive payment in future rounds, so the numbers of claimants receiving payment in rounds two, three, and four are cumulative. We did not include in this group 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who did not receive any payment in the first through third payment rounds. We used this information to help us identify the percentage of claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of the Fairness Act's enactment date (December 29, 2022). See 34 U.S.C. § 20144(d)(4)(D)(i). Given this reference to the act's enactment date, we omitted fourth-round payments from the calculation of the payment percentage because non-9/11 victims of state sponsored terrorism received them after that date. The Fund notified eligible claimants of their fourth-round payment amounts on December 30, 2022, and began issuing the fourth-round payments on a rolling basis on January 4, 2023, after the Fairness Act was enacted. U.S. Victims of State Sponsored Terrorism Fund, *Special Master's Report Regarding the Fourth Distribution* 3 (Washington, D.C.: Jan. 2023).

[3]For the purposes of our analysis, "net eligible claims" refers to the monetary amount of all eligible claims after the application of individual and family statutory caps by the Fund, if applicable. 34 U.S.C. § 20144(d)(3)(A)(ii).

Appendix I: Objective, Scope, and
Methodology

claimants;[4] (4) net eligible claims[5] of the 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted eligible applications to the Fund within the statutory application time frame (between December 29, 2022, and June 27, 2023); and (5) qualifying compensation from other sources received by the 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted eligible applications to the Fund within the statutory application time frame. We also obtained information on qualifying compensation from other sources from counsel representing the 78 conditional claimants who were judgment creditors in Peterson v. Islamic Republic of Iran.[6] This information covered seventeen payment distributions to these individuals, including payments received in connection with Peterson.

First, we determined the amount of payments that non-9/11 claimants received in the first three rounds of Fund payments, as a percentage of their net eligible claims offset by qualifying compensation from other sources. We determined the payment amounts received by non-9/11

---

[4]Not all compensation from other sources is necessarily offset against claimants' net eligible claims. When referring to "qualifying compensation from other sources" for purposes of our methodology and calculations, we are referring to compensation from other sources that the Fund would offset from its awards under its calculation methodology, which the Fund provided to GAO.

[5]As of March 2024, data from the Fund on the claim amounts after the application of individual and family statutory caps ("net eligible claims") for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who were potentially eligible for lump sum catch-up payments were not available for new applicants to the Fund. This is because these new claimants have not been included in a payment distribution that would require the application of individual and family statutory caps by the Fund. GAO used Fund methodology to apply the individual and family statutory caps to these claims. See U.S. Victims of State Sponsored Terrorism Fund, *Payment Calculation Explanation for Non-9/11-Related Claims* 2-3 (Washington, D.C.: Dec. 2022). Before applying the $35 million family statutory cap, we first treated any individual claim that exceeded the $20 million individual statutory cap as $20 million. For purposes of the $35 million family statutory cap, GAO summed individual claims for those claims that indicated a family relationship in the data by a family identification number. Once summed, if claims within a family identification number exceeded the $35 million family statutory cap, we then allocated the $35 million family statutory cap among the family members in proportion to their individual claims. We provided our analysis to the Fund for review and they confirmed that based on their review our approach appeared consistent with their methodology. While this analysis enabled us to determine the "net eligible claims" for the purposes of estimating lump sum catch-up payments for our population, we recognize that the Fund may receive additional information or data in the future that might impact these amounts if these claimants are included in a future payment distribution.

[6]*Peterson v. Islamic Republic of Iran*, No. 10 Civ. 4518 (S.D.N.Y.).

**Appendix I: Objective, Scope, and Methodology**

claimants from the Fund in the first through third payment rounds.[7] We then summed the payments for the three payment rounds across all non-9/11 claimants. We determined the net eligible claims of the non-9/11 claimants as of the third round that they received a payment, offset by qualifying compensation from other sources, and summed across all claimants. Next, we divided the amount of payments by the net eligible claims offset by qualifying compensation from other sources to determine the percentage called for in our mandate of 16.0353 percent.

Second, using GAO's percentage calculation, we determined the total amount needed to provide lump sum catch-up payments to the 2,081 eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims based on these victims' net eligible claims offset by qualifying compensation from other sources. To identify a claimant's lump sum catch-up payment, we multiplied this amount by the GAO percentage that we calculated above. Then, to identify a net lump sum catch-up payment, we subtracted any amount of money a claimant had previously received from the Fund.

According to information from the Fund, some claimants who are eligible for regular Fund distributions and who applied for lump sum catch-up payments reported that they had recovered some payments on their final judgments. We obtained from the Fund information on qualifying compensation from other sources as of March 2024 for these claimants. Fund officials confirmed that, based on information included in these applications, all applicants who reported compensation from other sources are judgment creditors in Peterson whose offsets are the amounts recovered in Peterson. These offsets amounted to 30 percent or more of these claimants' judgments. We separately confirmed that the

---

[7]The non-9/11 claimants included 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who received payments from the Fund in any of the first through third payment rounds. See 34 U.S.C. § 20144(j)(9). In applying this standard, we excluded three types of claims: (1) those where the victim received no payments because they were conditional claimants (the 78 conditional claimants who were *Peterson* judgment creditors); (2) those where the victim never received payment in any of the first through third rounds of distribution because qualifying compensation from other sources (offsets) exceeded 30 percent of the compensatory damages (before applying the individual and family statutory caps); and (3) those where the offsets exceeded the percentage of compensatory damages awarded to other eligible applicants in each of the first through third rounds of distribution for which these claims were eligible. See *id.* § 20144(d)(4)(D)(i). Altogether, there were seven claims where the resulting payments in each of the three distributions were calculated to be zero by the Fund, which we excluded. See appendix III Summary of Public Comments on *Federal Register* Notices for more information on the methodology for estimating lump sum catch-up payments.

**Appendix I: Objective, Scope, and
Methodology**

conditional claimants who were judgment creditors in Peterson also received 30 percent or more of their judgments in connection with that litigation by obtaining offset information from counsel representing those claimants. As a result, claimants from both of these groups were permitted to receive lump sum catch-up payments under the terms of the Fairness Act, although they ordinarily would be barred from receiving regular payment distributions from the Fund.[8]

We received data from the Fund as of May 2024 for 1,773 claimants for the 1983 Beirut barracks bombing and 308 claimants for the 1996 Khobar Towers bombing who submitted eligible applications to the Fund and applied in the statutory application time frame. Of those, 512 had received a prior eligibility determination from the Fund[9] and 1,569 were new applicants. We also received data on 5 victims of these attacks who submitted applications during the statutory application time frame whose eligibility was not approved by the Fund as of October 2024. We did not include these victims in our final lump sum catch-up payment calculations.

We assessed the reliability of the Fund data by reviewing related documentation and interviewing knowledgeable agency officials. We also assessed the reliability of the data we received from attorneys representing the 78 conditional claimants who were judgment creditors in Peterson by interviewing those attorneys and comparing the data they provided to the Fund data. We used the data provided by those attorneys because that provided more information on qualifying compensation from other sources than the information provided by the Fund. Our review of the data found it to be sufficiently reliable for the purposes of determining catch-up payments for eligible claimants.

---

[8]See 34 U.S.C. § 20144(d)(3)(B)(iii), (e)(2)(B)(v).

[9]GAO's methodology includes these 512 claimants. The Fairness Act provision for lump sum catch-up payments does not disqualify claimants who previously applied to the Fund and were found eligible, and then subsequently submitted successive applications during the statutory application time frame in order to apply for lump sum catch-up payments. This is because the Fairness Act does not state that victims cannot submit successive applications in order to apply for lump sum catch-up payments. See *id.* § 20144(c)(3)(A)(ii)(II), (d)(4)(D)(i) (conditioning eligibility for lump sum catch-up payments on those individuals submitting applications for payment between December 29, 2022, and June 27, 2023).

# Appendix II: *Federal Register* Notices – December 28, 2023, and July 9, 2024



**Federal Register** / Vol. 88, No. 248 / Thursday, December 28, 2023 / Notices    89693

**ACTION:** Meeting notice.

**SUMMARY:** Notice of these Web-based subcommittee meetings is being provided in accordance with GSA's Federal Advisory Committee Management Program regulations. This notice provides the updated schedule for a series of Web-based meetings for three subcommittees of the GSA Acquisition Policy Federal Advisory Committee (GAP FAC): the Acquisition Workforce Subcommittee, the Industry Partnerships Subcommittee, and the Policy and Practice Subcommittee. These subcommittee meetings are open to the public. Information on attending and providing written public comment is under the **SUPPLEMENTARY INFORMATION** section.

**DATES:** The three Subcommittees will hold recurring Web-based meetings 3 p.m. to 5 p.m., eastern standard time (EST)on the following dates:

| Acquisition workforce subcommittee | Industry partnerships subcommittee | Policy and practice subcommittee |
|---|---|---|
| 1/22/24 ......... | 1/23/24 ......... | 1/25/24 |
| 2/23/24 ......... | 2/20/24 ......... | 2/22/24 |
| 3/18/24 ......... | 3/19/24 ......... | 3/21/24 |
| 4/15/24 ......... | 4/16/24 ......... | 4/18/24 |

**ADDRESSES:** The meetings will be accessible via webcast. Registrants will receive the webcast information before the meeting.

**FOR FURTHER INFORMATION CONTACT:** Boris Arratia, Designated Federal Officer, Office of Government-wide Policy, 703–795–0816, or email: *boris.arratia@gsa.gov;* or Stephanie Hardison, Office of Government-wide Policy, 202–258–6823, or email: *stephanie.hardison@gsa.gov.* Additional *information about* the subcommittees and the Committee, including meeting materials and agendas, will be available on-line at *https://gsa.gov/policy-regulations/policy/acquisition-policy/gsa-acquisition-policy-federal-advisory-committee.*

**SUPPLEMENTARY INFORMATION:**

**Background**

The GAP FAC serves as an advisory body to GSA's Administrator on how GSA can use its acquisition tools and authorities to target the highest priority Federal acquisition challenges. To accomplish its work, the GAP FAC established three subcommittees: Policy and Practices, Industry Partnerships, and Acquisition Workforce.

The Policy and Practice Subcommittee will focus on procurement policy that supports robust climate and sustainability action. This group will focus on regulatory, policy, and process changes required to embed climate and sustainability considerations in Federal acquisitions.

The Industry Partnerships Subcommittee will investigate ways to expand a climate focus on Federal acquisition while reinforcing inclusion, domestic sourcing, small business opportunity, and innovation from an Industry standpoint. This includes identifying and addressing gaps in sustainable attributes standards for the goods and services that the Federal government buys.

The Acquisition Workforce Subcommittee will explore ways to advance a culture of sustainability and climate action within the acquisition workforce. This includes equipping and enabling the acquisition workforce to effectively use sustainability as a critical element in the evaluation and source selection process.

The frequency of meetings for the three subcommittees is every four weeks to give committee members additional time to reflect on the information being provided by guest speakers. The previous notice can be found here: *https://www.federalregister.gov/documents/2023/11/06/2023-24432/gsa-acquisition-policy-federal-advisory-committee-notification-of-upcoming-web-based-public-meeting.*

**Purpose of the Meetings**

The purpose of these web-based meetings is for the subcommittees to develop recommendations for submission to the full Committee. The Committee will, in turn, deliberate on the subcommittees recommendations and decide whether to proceed with formal advice to GSA based upon them.

**Meeting Agenda**

- Opening Remarks
- Subject Matter Experts Presentations
- Subcommittee Member Discussions
- Closing Remarks and Adjourn

**Meeting Registration**

The subcommittee meetings are open to the public and will be accessible by webcast. All public attendees will need to register to obtain the meeting webcast information. Registration information is located on the GAP FAC website: *https://www.gsa.gov/policy-regulations/policy/acquisition-policy/gsa-acquisition-policy-federal-advisory-committee.* All registrants will be asked to provide their name, affiliation, and email address. After registration, individuals will receive webcast access information via email.

**Public Comments**

Written public comments are being accepted via email at *gapfac@gsa.gov.* To submit a written public comment, please email at *gapfac.gsa.gov* and include your name, organization name (if applicable), and include "GAPFAC–2022–0001" on any attached document(s) (if applicable).

**Jeffrey A. Koses,**
*Senior Procurement Executive, Office of Acquisition Policy, Office of Government-wide Policy.*
[FR Doc. 2023–28668 Filed 12–27–23; 8:45 am]
**BILLING CODE 6820–RV–P**

---

**GOVERNMENT ACCOUNTABILITY OFFICE**

**Notice of Planned Methodology for Estimating Lump Sum Catch-Up Payments to Eligible 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims; Request for Comment**

**AGENCY:** Government Accountability Office (GAO).

**ACTION:** Notice of planned methodology for estimating lump sum catch-up payments; request for comment.

**SUMMARY:** GAO is now accepting comments on our notice of planned methodology for estimating potential lump sum catch-up payments to certain 1983 Beirut Barracks bombing victims and certain 1996 Khobar Towers bombing victims who have submitted eligible claims for payment to the United States Victims of State Sponsored Terrorism Fund. We invite comments on all aspects of the planned methodologies proposed in this notice. GAO is publishing this notice pursuant to of the requirements of the Fairness For 9/11 Families Act (Fairness Act). Comments should be sent to the email address below.

**DATES:** Interested persons are invited to submit comments on or before January 28, 2024.

**ADDRESSES:** Submit comments to *FundPaymentComments@gao.gov* or by U.S. mail to Ms. Triana McNeil at 441 G Street NW, Washington, DC 20548.

**FOR FURTHER INFORMATION CONTACT:** David Lutter, at (202) 512–7500 or *LutterD@gao.gov* if you need additional information. For general information, contact GAO's Office of Public Affairs, 202–512–4800.

**SUPPLEMENTARY INFORMATION:** Pursuant to sec. 101 of Fairness For 9/11 Families Act (Fairness Act), GAO is publishing this notice of estimated potential lump

Appendix II: Federal Register Notices –
December 28, 2023, and July 9, 2024

89694    Federal Register / Vol. 88, No. 248 / Thursday, December 28, 2023 / Notices

sum catch-up payments to certain 1983 Beirut Barracks bombing victims and certain 1996 Khobar Towers bombing victims who have submitted eligible claims to the United States Victims of State Sponsored Terrorism Fund (Fund), on or after December 29, 2022, and by June 27, 2023.[1]

For purposes of the Fund, the term ''claim'' generally refers to a claim based on compensatory damages awarded to a United States person in a final judgment.[2] These judgments are issued by a United States district court under state or federal law against a foreign state that has been designated a state sponsor of terrorism and arising from acts of international terrorism.[3] In general, a claim is determined eligible for payment from the Fund if the Special Master determines that the judgment holder (referred to as a ''claimant'') is a United States person, that the claim at issue meets the definition of claim above, and that the claim was submitted timely.[4] All decisions made by the Special Master with regard to compensation from the Fund are final and not subject to administrative or judicial review.[5] As of January 2023, the Fund has allocated to all eligible claimants approximately $3.4 billion in four payment rounds, which were authorized in 2017, 2019, 2020, and 2023. The Fund was established in 2015 by the Justice for United States Victims of State Sponsored Terrorism Act (Victims

Act).[6] At the time of enactment, the Victims Act allowed plaintiffs in two identified lawsuits, *In Re 650 Fifth Avenue and Related Properties* and *Peterson* v. *Islamic Republic of Iran* (*Peterson*)[7] to elect to participate in the Fund and assign any and all rights, title, and interest in the actions for the purposes of participating in the Fund.[8] Plaintiffs in these actions who did not elect to participate in the Fund were also permitted to submit an application for conditional payment from the Fund in which initial payment amounts would be determined and set aside, pending a final determination in these actions.[9] In the event that a final judgment was entered in favor of the plaintiffs in the actions and funds were distributed, the payments allocated to claimants who applied for a conditional payment were to be considered void, and any funds previously allocated to such conditional payments be made available and distributed to all other eligible claimants.[10] A final judgment in favor of plaintiffs in *Peterson* was entered, appealed to the United States Court of Appeals for the Second Circuit, and ultimately affirmed by the United States Supreme Court on April 20, 2016.[11] Distributions to the judgment creditor plaintiffs in *Peterson* commenced on October 19, 2016.[12] Accordingly, conditional claimants who were judgment creditors in *Peterson* did not receive award payments, and the Fund did not include them in award calculations in 2017 for the first round of payments or subsequent payment rounds.[13] These conditional claimants

include 1983 Beirut Barracks bombing victims and 1996 Khobar Towers bombing victims.

The Victims Act outlines minimum payment requirements in which any applicant with an eligible claim who has received, or is entitled or scheduled to receive, any payment that is equal to, or in excess of, 30 percent of the total compensatory damages owed on the applicant's claim from any source other than the Fund[14] shall not receive any payment from the Fund until all other eligible applicants have received from the Fund an amount equal to 30 percent of the compensatory damages awarded to those applicants pursuant to their final judgments.[15] The Fairness Act amended the Victims Act to provide that the minimum payment requirements include the total amount received by applicants who are 1983 Beirut Barracks bombing victims or 1996 Khobar Towers bombing victims as a result of or in connection with *Peterson* or *In Re 650 Fifth Avenue and Related Properties*.[16] It further provides that any such applicant who has received or is entitled or scheduled to receive 30 percent or more of such applicant's compensatory damages judgment as a result of or in connection with such proceedings shall not receive any payment from the Fund, except as consistent with minimum payment requirements or as part of a lump sum catch-up payment under section 101 of the Fairness Act.[17]

Section 101 of the Fairness Act contains a provision for GAO to conduct an audit and publish a notice estimating potential lump sum catch-up payments for 1983 Beirut Barracks bombing victims and 1996 Khobar Towers bombing victims who submitted eligible applications to the Fund on or after December 29, 2022, and by June 27, 2023.[18] This section also established a lump sum catch-up payment reserve fund within the Fund and appropriated

---

[1] Public Law 117–328, div. MM, 136 Stat. 4459, 6106–6111 (classified as amended at 34 U.S.C. 20144(d)(4)(D)). Other 1983 Beirut Barracks bombing victims and 1996 Khobar Towers bombing victims have applied to and been determined eligible for payment from the Fund in prior rounds. Section 101 directs us to estimate catch-up payments for those who submitted eligible claims to the Fund between the date of enactment (December 29, 2022), and June 27, 2023, which is the date the application period closed for catch-up payments. In general, the deadline for submitting a claim to the Fund is not later than 90 days after obtaining a final judgment. However, the Fairness Act reopened the application period for 1983 Beirut Barracks bombing victims and 1996 Khobar Towers bombing victims awarded final judgments before December 29, 2022, providing that these victims had 180 days from the date of enactment of the Fairness Act (June 27, 2023) to submit an application for payment to the Fund. 34 U.S.C. 20144(c)(3)(A)(ii).

[2] 34 U.S.C. 20144(c)(2).

[3] 34 U.S.C. 20144(c)(2).

[4] 34 U.S.C. 20144(c)(1).

[5] *See* 34 U.S.C. 20144(b)(3). Although not subject to administrative or judicial review, a claimant whose claim is denied in whole or in part by the Special Master may request a hearing before the Special Master not later than 30 days after receipt of a written decision. Id. 20144(b)(4). Not later than 90 days after any such hearing, the Special Master must issue a final written decision affirming or amending the original decision, and that written decision is final and nonreviewable. Id.

[6] Public Law 114–113, div. O, tit. IV, sec. 404, 129 Stat. 2242, 3007–3017 (classified as amended at 34 U.S.C. 20144(d)(4)(C)).

[7] *In Re 650 Fifth Avenue and Related Properties*, No. 08 Civ. 10934 (S.D.N.Y. filed Dec. 17, 2008) and *Peterson* v. *Islamic Republic of Iran*, No. 10 Civ. 4518 (S.D.N.Y.).

[8] Public Law 114–113, 129 Stat. at 3013.

[9] Public Law 114–113, 129 Stat. at 3013–14.

[10] Id. at 3014. In the event of an adverse final judgment in *Peterson* or *In Re 650 Fifth Avenue and Related Properties*, the Special Master was to release a portion of an eligible claimant's conditional payment to such eligible claimant if the Special Master anticipates that such claimant will receive less than the amount of the conditional payment from any proceeds from the final judgment that is entered in favor of the plaintiffs. Id. Such portion shall not exceed the difference between the amount of the conditional payment and the amount the Special Master anticipates such claimant will receive from the proceeds. Id.

[11] *See Bank Markazi aka Central Bank of Iran* v. *Peterson,* 578 U.S. 212 (2016); U.S. Victims of State Sponsored Terrorism Fund, ''Supplemental Report from the Special Master,'' at 6 (August 2017).

[12] U.S. Victims of State Sponsored Terrorism Fund, ''Supplemental Report from the Special Master,'' at 6 (August 2017).

[13] Id. There were 78 conditional claimants who were *Peterson* judgment creditors who fell into this category. Id.

[14] Claimants are required to provide the Special Master with information regarding compensation from any source other than this Fund that the claimant (or, in the case of a personal representative, the victim's beneficiaries) has received or is entitled or scheduled to receive as a result of the act of international terrorism that gave rise to a claimant's final judgment, including information identifying the amount, nature, and source of such compensation. 34 U.S.C. 20144(b)(2)(B).

[15] 34 U.S.C. 20144(d)(3)(B)(i).

[16] 34 U.S.C. 20144(d)(3)(B)(iii).

[17] 34 U.S.C. 20144(d)(3)(B)(iii).

[18] 34 U.S.C. 20144(d)(4)(D)(i). As discussed in footnote 1, section 101 directs us to estimate catch-up payments for those who submitted eligible claims to the Fund between the date of enactment (December 29, 2022), and June 27, 2023, which is the date the application period closed for catch-up payments. See 34 U.S.C. 20144(c)(3)(A)(ii).

Appendix II: Federal Register Notices –
December 28, 2023, and July 9, 2024

Federal Register / Vol. 88, No. 248 / Thursday, December 28, 2023 / Notices   89695

$3 billion to this reserve fund.[19] Specifically, we are publishing for comment our methodology for estimating lump sum catch-up payments for eligible 1983 Beirut Barracks bombing victims and 1996 Khobar Towers bombing victims in "amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of such victims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of the date of enactment." [20] For the purposes of this analysis and consistent with the Fairness Act, "1983 Beirut Barracks bombing victim" means "a plaintiff, or estate or successor in interest thereof, who has an eligible claim to the Fund that arises out of the October 23, 1983, bombing of the United States Marine Corps Barracks in Beirut, Lebanon, and includes a plaintiff, estate, or successor in interest who is a judgment creditor in *Peterson* v. *Islamic Republic of Iran* or a settling judgment creditor as identified in the order dated May 27, 2014, in *In Re 650 Fifth Avenue & Related Properties.*" [21] The term "1996 Khobar Towers bombing victim" means "a plaintiff, or estate or successor in interest thereof, who has an eligible claim to the Fund that arises out of the June 25, 1996 bombing of the Khobar Tower housing complex in Saudi Arabia, and includes a plaintiff, estate, or successor in interest who is a judgment creditor in *Peterson* v. *Islamic Republic of Iran* or a settling judgment creditor as identified in the order dated May 27, 2014, in *In Re 650 Fifth Avenue & Related Properties.*" [22]

[19] 34 U.S.C. 20144(d)(4)(D)(iv). The Fairness Act directed the Special Master to authorize lump sum catch-up payments to 9/11 victims, spouses and dependents in amounts equal to those previously estimated by GAO. GAO, *U.S. Victims of State Sponsored Terrorism Fund: Estimated Lump Sum Catch-Up Payments,* GAO–21–105306 (Aug. 11, 2021). Additionally, not earlier than 90 days and not later than 1 year after submission of the report that is to follow this notice the Special Master is to authorize lump sum catch-up payments from the reserve fund in amounts equal to those estimated by GAO. 34 U.S.C. 20144(d)(4)(D)(iv)(II).

[20] 34 U.S.C. 20144(d)(4)(D)(i). Further, section 101 provides for GAO to conduct this audit in accordance with 34 U.S.C. 20144(d)(3)(A), which generally requires that distributions be made on a pro rata basis and also places limits on the amount of eligible claims (referred to as "statutory caps"). For example, for individuals, the cap is $20,000,000 and for claims of non-9/11 family members when aggregated, the cap is $35,000,000. As such, we plan to use data from the Fund, to the extent available, on the claim amounts after the application of statutory caps.

[21] 34 U.S.C. 20144(j)(15).

[22] 34 U.S.C. 20144(j)(16).

**Methodology To Produce Estimates for Lump Sum Catch-Up Payments**

To estimate the amount(s) called for in section 101, GAO will utilize data from the Fund on the following amounts: (1) payments from the Fund received by non-9/11 claimants in the first through fourth payment rounds; [23] (2) net eligible claims [24] of these non-9/11 claimants in the first through fourth payment rounds; (3) net eligible claims [25] of the 1983 Beirut Barracks bombing victims and 1996 Khobar Towers bombing victims who were deemed eligible by the Fund and applied between December 29, 2022, and June 27, 2023; [26] and (4) compensation from other sources [27]

[23] As discussed in footnote 1, this includes some 1983 Beirut Barracks bombing victims and 1996 Khobar Towers bombing victims who applied to and received payment from the Fund in prior rounds. If claimants applied to the Fund more than once, they only appear in the data we received the first time they applied and were determined eligible. For example, the data we received show 12 claimants of the 1983 Beirut Barracks bombing or 1996 Khobar Towers bombing attacks who received a payment in round 1, 141 in round 2, 423 in round 3, and 708 in round 4.

[24] For the purposes of our analysis, "net eligible claims" refers to the monetary amount of all eligible claims after the application of statutory caps by the Fund, if applicable. 34 U.S.C. 20144(d)(3)(A). In accordance with GAO standards, we will assess the reliability and completeness of the data from the Fund to ensure that it is appropriate for these purposes.

[25] As of December 2023, data from the Fund on the claim amounts after the application of statutory caps ("net eligible claims") for 1983 Beirut Barracks bombing victims and 1996 Khobar Towers bombing victims who are potentially eligible for lump sum catch-up payments was not available. This is because these claimants have not yet been included in a payment distribution that would require the application of statutory caps by the Fund. While we have data from the Fund on compensatory damages awards, we do not yet have the data with claim amounts after the application of statutory caps. We plan to work with the Fund to generate these data and to incorporate these updated claim amounts into our analysis when available.

[26] We received new data from the Fund as of December 2023 for 1,362 claimants for the 1983 Beirut barracks bombing and 159 claimants for the 1996 Khobar Towers bombing who were deemed eligible by the Fund and applied between December 29, 2022, and June 27, 2023. We also received data on 60 victims of these attacks whose eligibility for the Fund is still being determined as of November 2023. These applications are pending because the Fund is awaiting additional documentation from these individuals that is needed to determine their claims' eligibility. Some of these 1,581 claimants may be judgment creditors in *Peterson*. We also received data from the Fund on the 78 conditional claimants who are *Peterson* judgment creditors discussed in footnote 13. Because eligibility for some of these victims is still being determined, we refer to the group as a whole as "potentially eligible" for catch-up payments.

[27] Claimants are required to provide the Special Master with information regarding compensation from any source other than this Fund that the claimant (or, in the case of a personal representative, the victim's beneficiaries) has received or is entitled or scheduled to receive as a result of the act of international terrorism that gave

received by the 1983 Beirut Barracks bombing victims and 1996 Khobar Towers bombing victims who were deemed eligible by the Fund and applied between December 29, 2022, and June 27, 2023.

Using these data, we estimated that the amount of payments that non-9/11 claimants received, as a percentage of their net eligible claims in the first four rounds of Fund distributions, was 4.6122 percent (referred to as "GAO percentage calculation"). To estimate GAO's payment percentage, we determined the payment amounts received by non-9/11 claimants from the Fund in the first through fourth payment rounds. Next, we determined the net eligible claims of these non-9/11 claimants in each round. We divided the amount of payments by the net eligible claims to determine GAO's percentage calculation.

Using the GAO percentage calculation, we plan to estimate two amounts for purposes of the second notice: (1) the total amount needed to provide lump sum catch-up payments to potentially eligible 1983 Beirut Barracks bombing victims and 1996 Khobar Towers bombing victims based on these victims' net eligible claims; and (2) the total amount needed to provide lump sum catch-up payments to potentially eligible 1983 Beirut Barracks bombing victims and 1996 Khobar Towers bombing victims based on these victims' net eligible claims offset by compensation from other sources.[28] In the data provided, 1,417 of the potentially eligible 1983 Beirut Barracks bombing victims and 1996 Khobar Towers bombing victims have reported compensation from other sources, such as court-awarded compensation.[29]

After consideration of the comments from this notice, we will issue a second

rise to a claimant's final judgment, including information identifying the amount, nature, and source of such compensation. 34 U.S.C. 20144(b)(2)(B). We received data from the Fund on compensation from other sources for claimants who are potentially eligible for catch-up payments.

[28] In our prior work, we did not offset eligible 9/11 victims, spouses and dependents' net eligible claims with compensation from other sources because this population did not have qualifying compensation from other sources. Although some 9/11 claimants may have received awards from the 9/11 Victims Compensation Fund (VCF), money received from the VCF is not considered an offset for the Fund's award calculations. See U.S. Victims of State Sponsored Terrorism Fund, *Frequently Asked Questions, http://www.usvsst.com/faq.php* (last accessed Dec. 4, 2023) (see 4.8 *Updated* What is a source of compensation other than the USVSST Fund?).

[29] According to Fund data, compensation from other sources received by potentially eligible 1983 Beirut Barracks bombing victims and 1996 Khobar Towers bombing victims range from $0 to approximately $5 million.

Appendix II: Federal Register Notices –
December 28, 2023, and July 9, 2024

89696          Federal Register / Vol. 88, No. 248 / Thursday, December 28, 2023 / Notices

**Federal Register** notice, utilizing data from the Fund to report estimated lump sum catch-up payments based on these methodologies with any changes we determine appropriate. We invite comments on all aspects of the planned methodologies proposed in this notice. After consideration of the comments from this notice, we will again seek public comment on the second **Federal Register** notice.

*Authority:* Pub. L. 117–328, div. MM, 136 Stat. 4459, 6106–6111 (34 U.S.C. 20144(d)(4)(D)).

**Triana McNeil,**
*Director, Homeland Security and Justice, U.S. Government Accountability Office.*
[FR Doc. 2023–28674 Filed 12–27–23; 8:45 am]
BILLING CODE 1610–02–P

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**Disease, Disability, and Injury Prevention and Control Special Emphasis Panel (SEP)—CE24–034, Rigorous Evaluation of Policies for Their Impacts on the Primary Prevention of Multiple Forms of Violence; Amended Notice of Closed Meeting**

Notice is hereby given of a change in the meeting of the Disease, Disability, and Injury Prevention and Control Special Emphasis Panel (SEP)—CE24–034, Rigorous Evaluation of Policies for their Impacts on the Primary Prevention of Multiple Forms of Violence; February 27, 2024, 8 a.m.–5 p.m., EST, web conference, in the original **Federal Register** notice. The meeting notice was published in the **Federal Register** on October 24, 2023, Volume 88, Number 204, page 73020.

The notice is being amended to change the date to a two-day meeting and to change the times. The notice should read as follows:

*Name of Committee:* Disease, Disability, and Injury Prevention and Control Special Emphasis Panel (SEP)—CE24–034, Rigorous Evaluation of Policies for their Impacts on the Primary Prevention of Multiple Forms of Violence.

*Dates:* February 27–28, 2024.
*Times:* 8:30 a.m.–5:30 p.m., EST.
The meeting is closed to the public.
FOR FURTHER INFORMATION CONTACT:
Carlisha Gentles, Pharm.D., B.C.P.S., C.D.C.E.S., Scientific Review Officer, National Center for Injury Prevention and Control, Centers for Disease Control

and Prevention, 4770 Buford Highway NE, Mailstop S106–9, Atlanta, Georgia 30341. Telephone: (770) 488–1504; Email: *CGentles@cdc.gov.*

The Director, Office of Strategic Business Initiatives, Office of the Chief Operating Officer, Centers for Disease Control and Prevention, has been delegated the authority to sign **Federal Register** notices pertaining to announcements of meetings and other committee management activities, for both the Centers for Disease Control and Prevention and the Agency for Toxic Substances and Disease Registry.

**Kalwant Smagh,**
*Director, Office of Strategic Business Initiatives, Office of the Chief Operating Officer, Centers for Disease Control and Prevention.*
[FR Doc. 2023–28615 Filed 12–27–23; 8:45 am]
BILLING CODE 4163–18–P

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**Disease, Disability, and Injury Prevention and Control Special Emphasis Panel (SEP)—CE24–013, Research Grants To Identify Effective Community-Based Strategies for Overdose Prevention (R01); Amended Notice of Closed Meeting**

Notice is hereby given of a change in the meeting of the Disease, Disability, and Injury Prevention and Control Special Emphasis Panel (SEP)—CE24–013, Research Grants to Identify Effective Community-Based Strategies for Overdose Prevention (R01); March 12–13, 2024, 8:30 a.m.–5 p.m., EDT, web conference, in the original **Federal Register** notice. The meeting notice was published in the **Federal Register** on October 18, 2023, Volume 88, Number 200, page 71867.

The notice is being amended to change the meeting dates to a three-day meeting. The notice should read as follows:

*Name of Committee:* Disease, Disability, and Injury Prevention and Control Special Emphasis Panel (SEP)—CE24–013, Research Grants to Identify Effective Community-Based Strategies for Overdose Prevention (R01).

*Dates:* March 12–14, 2024.
*Times:* 8:30 a.m.–5 p.m., EDT.
The meeting is closed to the public.
FOR FURTHER INFORMATION CONTACT:
Aisha L. Wilkes, M.P.H., Scientific Review Officer, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention,

4770 Buford Highway NE, Mailstop S106–9, Atlanta, Georgia 30341. Telephone: (404) 639–6473; Email: *AWilkes@cdc.gov.*

The Director, Office of Strategic Business Initiatives, Office of the Chief Operating Officer, Centers for Disease Control and Prevention, has been delegated the authority to sign **Federal Register** notices pertaining to announcements of meetings and other committee management activities, for both the Centers for Disease Control and Prevention and the Agency for Toxic Substances and Disease Registry.

**Kalwant Smagh,**
*Director, Office of Strategic Business Initiatives, Office of the Chief Operating Officer, Centers for Disease Control and Prevention.*
[FR Doc. 2023–28614 Filed 12–27–23; 8:45 am]
BILLING CODE 4163–18–P

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**Disease, Disability, and Injury Prevention and Control Special Emphasis Panel (SEP)—CE22–003, Rigorously Evaluating Programs and Policies To Prevent Child Sexual Abuse (CSA); Amended Notice of Closed Meeting**

Notice is hereby given of a change in the meeting of the Disease, Disability, and Injury Prevention and Control Special Emphasis Panel (SEP)—CE22–003, Rigorously Evaluating Programs and Policies to Prevent Child Sexual Abuse (CSA); April 11, 2024, 8:30 a.m.–5 p.m., EDT, videoconference, in the original **Federal Register** notice. The meeting notice was published in the **Federal Register** on November 2, 2023, Volume 88, Number 211, page 75287.

The notice is being amended to change the start time to 10:30 a.m. The notice should read as follows:

*Name of Committee:* Disease, Disability, and Injury Prevention and Control Special Emphasis Panel (SEP)—CE22–003, Rigorously Evaluating Programs and Policies to Prevent Child Sexual Abuse (CSA).

*Date:* April 11, 2024.
*Time:* 10:30 a.m.–5 p.m., EDT.
The meeting is closed to the public.
FOR FURTHER INFORMATION CONTACT:
Aisha L. Wilkes, M.P.H., Scientific Review Officer, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, 4770 Buford Highway NE, Mailstop S106–9, Atlanta, Georgia 30341.

Appendix II: Federal Register Notices –
December 28, 2023, and July 9, 2024



**56376**      **Federal Register** / Vol. 89, No. 131 / Tuesday, July 9, 2024 / Notices

licenses); and, if there are multiple terrestrial licensees, a further description of the leasing arrangement and explanation of how those licensees together hold all of the relevant licenses in a particular geographically dependent area (GIA). Entities completing FCC Form 608 for the purposes of providing SCS must also indicate that the application is for SCS by checking a box on Form 608.

This information collection is designed to allow Commission staff to carry out its statutory duties to regulate satellite communications in the public interest; namely, to ensure that prospective providers of SCS will operate in compliance with the applicable regulatory framework. This process utilizes an existing Commission form, which will remove confusion by employing the procedures that are already in place. The modifications for Form 608 covered herein will enable the Commission to more accurately track filings related to the provision of SCS, a critical component of application review given the interplay between part 1 lease filings and part 25 license applications inherent in the SCS framework. This is especially crucial where multiple entities together hold all co-channel licenses in a particular band throughout a geographically independent area (GIA) and wish to deploy a leasing agreement with a satellite operator to provide SCS. Such arrangements are only permitted in the circumstances described in section 1.9047(d)(1)(ii)(A)–(B); specifically, the Commission must be able to confirm that the multiple licensees in fact cover the entirety of the GIA in question and that, when reviewing related part 25 license applications, the entire area of the proposed service is covered by the associated leases. This collection will thereby enable the Commission to monitor and enforce the entry criteria that SCS providers must satisfy, and which are designed to minimize the possibility of harmful interference. Finally, the collection will play a critical role in the Commission's effort to review and track leasing arrangements that will result in entities providing SCS.

Federal Communications Commission.

**Aleta Bowers,**
*Information Management Specialist, Office of the Secretary.*

[FR Doc. 2024–15060 Filed 7–8–24; 8:45 am]

BILLING CODE 6712–01–P

## GOVERNMENT ACCOUNTABILITY OFFICE

**Notice of Estimated Lump Sum Catch-Up Payments to Eligible 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims and Planned Methodology; Request for Comment**

**AGENCY:** U.S. Government Accountability Office (GAO).

**ACTION:** Notice of estimated lump sum catch-up payments and planned methodology; request for comment.

**SUMMARY:** GAO is now accepting comments on proposed lump sum catch-up payments to certain 1983 Beirut barracks bombing victims and certain 1996 Khobar Towers bombing victims who have submitted eligible applications for payment to the United States Victims of State Sponsored Terrorism Fund. GAO is publishing this notice pursuant to the requirements of the Fairness for 9/11 Families Act. Comments should be sent to the email address below.

**DATES:** Interested persons are invited to submit comments on or before August 8, 2024.

**ADDRESSES:** Submit comments to *FundPaymentComments@gao.gov* or by U.S. mail to Ms. Triana McNeil at 441 G Street NW, Washington, DC 20548.

**FOR FURTHER INFORMATION CONTACT:** David Lutter, at 202–512–7500 or *LutterD@gao.gov*, if you need additional information. For general information, contact GAO's Office of Public Affairs, 202–512–4800.

**SUPPLEMENTARY INFORMATION:**

### Background

Pursuant to section 101 of the Fairness for 9/11 Families Act (Fairness Act), GAO is conducting a review and publishing a notice of proposed lump sum catch-up payments to certain 1983 Beirut barracks bombing victims [1] and certain 1996 Khobar Towers bombing victims [2] who have submitted eligible

[1] For the purposes of this analysis and consistent with the Fairness Act, "1983 Beirut barracks bombing victim" means "a plaintiff, or estate or successor in interest thereof, who has an eligible claim [to the Fund] that arises out of the October 23, 1983, bombing of the United States Marine Corps barracks in Beirut, Lebanon; and includes a plaintiff, estate, or successor in interest [ ] who is a judgment creditor [in] *Peterson* v. *Islamic Republic of Iran* [ ] or a Settling Judgment Creditor as identified in the order dated May 27, 2014, [in] *In Re 650 Fifth Avenue & Related Properties.*" 34 U.S.C. 20144(j)(15).

[2] The term "1996 Khobar Towers bombing victim" means "a plaintiff, or estate or successor in interest thereof, who has an eligible claim [to the Fund] that arises out of the June 25, 1996 bombing of the Khobar Tower housing complex in Saudi

applications to the United States Victims of State Sponsored Terrorism Fund (Fund), on or after December 29, 2022, and by June 27, 2023.[3] On December 28, 2023, GAO published a notice (88 FR 89693) of our methodology for estimating certain lump sum catch-up payments. In this notice, we are providing a summary of comments and our responses to comments on the December notice, our revised proposed methodology, and the estimated amount needed to provide lump sum catch-up payments to certain 1983 Beirut barracks bombing victims and certain 1996 Khobar Towers bombing victims who have submitted eligible applications for payment to the Fund, and we are accepting comments on updates to our planned methodology.

The Fund, which is administered by a Special Master and supported by Department of Justice (DOJ) personnel,[4] was established in 2015 by the Justice for United States Victims of State Sponsored Terrorism Act (Victims Act).[5] For purposes of the Fund, the term "claim" generally refers to a claim based on compensatory damages awarded to a United States person in a qualifying final judgment.[6] These judgments are issued by a United States district court under state or federal law against a foreign state that was designated as a state sponsor of terrorism at the time certain acts of international terrorism occurred or was so designated as a result of such acts,

Arabia; and includes a plaintiff, estate, or successor in interest [ ] who is a judgment creditor [in] *Peterson* v. *Islamic Republic of Iran* [ ] or a Settling Judgment Creditor as identified in the order dated May 27, 2014, [in] *In Re 650 Fifth Avenue & Related Properties.*" 34 U.S.C. 20144(j)(16).

[3] Public Law 117–328, div. MM, sec. 101(b)(3)(B)(iii), 136 Stat. 4459, 6108–6109 (pertinent portion codified at 34 U.S.C. 20144(d)(4)(D)). Section 101 directs us to estimate catch-up payments for those who submitted eligible applications to the Fund between the date of enactment (Dec. 29, 2022), and June 27, 2023, which is the date by which claimants must have applied to the Fund to be considered for catch-up payments. We refer to this time frame, Dec. 29, 2022 through June 27, 2023, as the "statutory application time frame" throughout the remainder of this notice. In general, the deadline for submitting a claim to the Fund is not later than 90 days after obtaining a final judgment. However, the Fairness Act established a new application period for all 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims awarded final judgments before Dec. 29, 2022, providing that these victims had 180 days from the date of enactment of the Fairness Act (June 27, 2023) to submit an application for payment to the Fund. Public Law 117–328, 136 Stat. at 6106–6107 (pertinent portion codified at 34 U.S.C. 20144(c)(3)(A)(ii)).

[4] See 34 U.S.C. 20144(b)(1).

[5] Public Law 114–113, div. O, tit. IV, sec. 404, 129 Stat. 2242, 3007–3017 (codified as amended at 34 U.S.C. 20144).

[6] 34 U.S.C. 20144(c)(2).

Appendix II: Federal Register Notices –
December 28, 2023, and July 9, 2024

**Federal Register** / Vol. 89, No. 131 / Tuesday, July 9, 2024 / Notices          56377

and arising from acts of international terrorism.[7] In general, a claim is determined eligible for payment from the Fund if the Special Master determines that the judgment holder (referred to as a "claimant") is a United States person, that the claim at issue meets the definition of claim above, and that the application for payment was submitted timely.[8] As of January 2023, the Fund has allocated to eligible claimants approximately $3.4 billion in four payment rounds, which were distributed in 2017, 2019, 2020, and 2023. Claimants in these four payment rounds included 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims.[9]

Additionally, at the time the Fund was established, the law allowed plaintiffs in two identified lawsuits, *Peterson* v. *Islamic Republic of Iran* (*Peterson*) and *In Re 650 Fifth Avenue and Related Properties*[10] to elect to participate in the Fund and irrevocably assign all rights, title, and interest in the actions for the purposes of participating in the Fund.[11] Plaintiffs in these actions who did not elect to participate in the Fund were also permitted to submit an application for conditional payment from the Fund in which payment amounts would be determined and set aside, pending a final determination in these actions.[12] In the event that a final judgment was entered in favor of the plaintiffs in the *Peterson* action and funds were distributed, the payments allocated to claimants who applied for a conditional payment were to be considered void, and any funds

previously allocated to such conditional payments be made available and distributed to all other eligible claimants.[13] A final judgment in favor of plaintiffs in *Peterson* was entered, appealed to the United States Court of Appeals for the Second Circuit, and ultimately affirmed by the United States Supreme Court on April 20, 2016.[14] Distributions to the judgment creditor plaintiffs in *Peterson* commenced on October 19, 2016.[15] Accordingly, conditional claimants who were judgment creditors in *Peterson* did not receive award payments from the Fund, and the Fund did not include them in award calculations in 2017 for the first round of payments or subsequent payment rounds.[16]

The Victims Act outlines minimum payments requirements in which any applicant with an eligible claim who has received, or is entitled or scheduled to receive, any payment that is equal to, or in excess of, 30 percent of the total compensatory damages owed on the applicant's claim from any source other than the Fund[17] shall not receive any payment from the Fund until all other eligible applicants generally have received from the Fund an amount equal to 30 percent of the compensatory damages awarded to those applicants pursuant to their final judgments (referred to as the "30 percent rule").[18] The Fairness Act amended the Victims Act to provide that the minimum

payments requirements include the total amount received by applicants who are 1983 Beirut barracks bombing victims or 1996 Khobar Towers bombing victims as a result of or in connection with *Peterson* or *In Re 650 Fifth Avenue and Related Properties*. It further provides that any such applicant who has received or is entitled or scheduled to receive 30 percent or more of such applicant's compensatory damages judgment as a result of or in connection with such proceedings shall not receive any payment from the Fund, except as consistent with minimum payments requirements or as part of a lump sum catch-up payment under section 101 of the Fairness Act.[19]

Section 101 of the Fairness Act contains a provision for GAO to conduct an audit and publish a notice of proposed lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted eligible applications to the Fund during the statutory application time frame (December 29, 2022, and by June 27, 2023).[20] This section also established a lump sum catch-up payment reserve fund within the Fund and appropriated $3 billion to this reserve fund.[21]

We published our initial planned methodology for comment on December 28, 2023 (88 FR 89693). We are now publishing for comment our updated planned methodology for estimating lump sum catch-up payments pursuant to section 101 of the Fairness Act for eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers

---

[7] 34 U.S.C. 20144(c)(2).

[8] 34 U.S.C. 20144(c)(1). All decisions made by the Special Master with regard to compensation from the Fund are final and generally not subject to administrative or judicial review. *See* 34 U.S.C. 20144(b)(3). A claimant whose claim is denied in whole or in part by the Special Master may request a hearing before the Special Master not later than 30 days after receipt of a written decision. Id. 20144(b)(4)(A). Not later than 90 days after any such hearing, the Special Master must issue a final written decision affirming or amending the original decision, and that written decision is final and nonreviewable. Id. 20144(b)(4)(B).

[9] According to Fund data, 12 1983 Beirut barracks bombing victims or 1996 Khobar Towers bombing victims were eligible for Fund payment for the first time in round 1, 141 in round 2, 423 in round 3, and 708 in round 4. Claimants continue to receive payment in future rounds, so the numbers of claimants receiving payment in rounds two, three, and four are cumulative.

[10] *Peterson* v. *Islamic Republic of Iran*, No. 10 Civ. 4518 (S.D.N.Y.) and *In Re 650 Fifth Avenue and Related Properties*, No. 08 Civ. 10934 (S.D.N.Y. filed Dec. 17, 2008).

[11] Public Law 114–113, 129 Stat. at 3013 (pertinent portion codified at 34 U.S.C. 20144(e)(2)(B)(iii)).

[12] Public Law 114–113, 129 Stat. at 3013–3014 (pertinent portion codified at 34 U.S.C. 20144(e)(2)(B)(iv)).

[13] Public Law 114–113, 129 Stat. at 3014 (pertinent portion codified at 34 U.S.C. 20144(e)(2)(B)(iv)(II)(bb)).

[14] *See Bank Markazi aka Central Bank of Iran* v. *Peterson*, 578 U.S. 212 (2016); U.S. Victims of State Sponsored Terrorism Fund, "Supplemental Report from the Special Master," at 6 (August 2017).

[15] U.S. Victims of State Sponsored Terrorism Fund, "Supplemental Report from the Special Master," at 6 (August 2017).

[16] Id. There were 78 conditional claimants who were *Peterson* judgment creditors. Id.

[17] The statute requires that as part of the procedures to apply and establish eligibility for payment, the Special Master must require applicants to provide the Special Master with information regarding compensation from any source other than this Fund that the claimant (or, in the case of a personal representative, the victim's beneficiaries) has received or is entitled or scheduled to receive as a result of the act of international terrorism that gave rise to a claimant's final judgment, including information identifying the amount, nature, and source of such compensation. Public Law 114–113, 129 Stat. at 3008 (pertinent portion codified at 34 U.S.C. 20144(b)(2)(B)). Those procedures require applicants to provide information and documentation regarding the amount, nature, and source of any payment they received or are entitled or scheduled to receive, and state that applicants must update that information throughout the period of the Fund. "Justice for United States Victims of State Sponsored Terrorism Act," 81 FR 45535, 45538 (July 14, 2016).

[18] Public Law 114–113, 129 Stat. at 3011 (pertinent portion codified at 34 U.S.C. 20144(d)(3)(B)(i)).

[19] Public Law 117–328, 136 Stat. at 6107 (pertinent portion codified at 34 U.S.C. 20144(d)(3)(B)(iii)).

[20] Public Law 117–328, 136 Stat. at 6108 (pertinent portion codified at 34 U.S.C. 20144(d)(4)(D)(i)). As discussed in footnote 3, section 101 directs us to estimate lump sum catch-up payments for those who submitted eligible applications to the Fund between the date of enactment (Dec. 29, 2022) and June 27, 2023, which is the date the application period closed for catch-up payments. See Public Law 117–328, 136 Stat. at 6106–6107 (pertinent portion codified at 34 U.S.C. 20144(c)(3)(A)(ii)). GAO's methodology for the estimation of lump sum catch-up payments is only for the purposes of carrying out the provisions directed to the Comptroller General under the Fairness Act.

[21] Public Law 117–328, 136 Stat. at 6108–6109 (pertinent portion codified at 34 U.S.C. 20144(d)(4)(D)(iv)). Additionally, not earlier than 90 days and not later than 1 year after submission of the report that is to follow this notice, the Special Master is to authorize lump sum catch-up payments from the reserve fund in amounts equal to those estimated by GAO. 34 U.S.C. 20144(d)(4)(D)(iv)(II). Not later than 1 year after the Special Master disburses all lump sum catch-up payments from the reserve fund the reserve fund is to terminate; all amounts remaining in the reserve fund in excess of proposed lump sum catch-up payments shall be deposited into the Fund. 34 U.S.C. 20144(d)(4)(D)(iv)(IV).

Appendix II: Federal Register Notices –
December 28, 2023, and July 9, 2024

56378          Federal Register / Vol. 89, No. 131 / Tuesday, July 9, 2024 / Notices

bombing victims in "amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of such victims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of December 29, 2022." [22] The language used in section 101 to describe the percentage resulting from the receipt of lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims is equivalent to the language in the Sudan Claims Resolution Act, which directed us to estimate lump sum catch-up payments to 9/11 victims, spouses, and dependents. [23] Section 101 further provides for GAO to conduct this audit in accordance with 34 U.S.C. 20144(d)(3)(A), which requires that distributions be made "on a pro rata basis, based on the amounts outstanding and unpaid on eligible claims, until such amounts have been paid in full or the Fund is closed." [24] Additionally, 34 U.S.C. 20144(d)(3)(A) places limits on the amount of eligible claims (referred

to as "individual and family statutory caps"). [25]

**Summary of Comments**

GAO received a total of 319 comments by the closing date of January 29, 2024. GAO received 310 comments from individuals and 9 comments from law firms representing victims of state-sponsored terrorism. [26] GAO received 316 comments by email; the remaining 3 comments were received in voicemails or letters. In general, comments from individuals were from 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims, 9/11 victims and their family members, and Members of Congress; [27] and comments from law firms were from attorneys representing 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims.

GAO has carefully considered all comments received. Below is a summary of the types of comments GAO received and GAO's responses. [28]

*Equity Issues Related to U.S. Victims of State Sponsored Terrorism Fund and Lump Sum Catch-Up Payments*

Some comments expressed concern with certain groups of victims within the Fund being prioritized and stated that all victims should be treated equally and fairly. Some commenters also stated that since 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims were never excluded from the Fund, they should not receive catch-up payments.

*GAO Response:* Section 101 of the Fairness Act includes a provision for GAO to conduct an audit and publish a notice of proposed lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted eligible applications to the Fund during the statutory application time frame. As

such, GAO is carrying out the processes directed by that provision and is not otherwise taking a position with respect to who should receive lump sum catch-up payments.

*Eligibility Criteria for a Lump Sum Catch-Up Payment*

GAO received comments regarding the eligibility criteria for a lump sum catch-up payment. Many of the comments on this topic related to the timing of applications to the Fund by 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims. Specifically, commenters raised issues related to prior applicants to the Fund who either withdrew their prior applications or were already deemed eligible claimants by the Fund, and reapplied within the statutory application time frame. One group of commenters stated that applicants who withdrew prior applications and subsequently reapplied to the Fund within the statutory application time frame should be considered ineligible for a lump sum catch-up payment, describing them as "late filers." A second group of commenters who submitted a comment letter stated that claimants who applied to the Fund previously, as conditional claimants or otherwise, and then subsequently applied to the Fund within the statutory application time frame should be eligible for a lump sum catch-up payment. These commenters stated that section 101 of the Fairness Act does not prohibit successive applications or further define the term "application" in a way that would disqualify claimants who previously applied to the Fund and then applied subsequently within the statutory application time frame. Some commenters also raised concerns that the Fund had administratively closed claimants' applications, or did not permit claimants to apply under the Fund's procedures. [29]

---

[22] 34 U.S.C. 20144(d)(4)(D)(i). The Fairness Act required GAO, by Dec. 28, 2023, to conduct an audit and publish a notice in the **Federal Register**. The act further required GAO to provide a 30-day period for public comment and to submit a report to congressional committees and the Special Master not later than 30 days after the expiration of the comment period. Id. 20144(d)(4)(D)(ii)–(iii). We acknowledge that we did not meet the date identified in the statute for submitting a report to congressional committees and the Special Master. We also acknowledge that the Fairness Act does not contain a provision for GAO to publish a second **Federal Register** notice on this topic. We believe that we need to issue this notice to ensure an accurate and transparent methodology for claimants to receive the correct amounts of lump sum catch-up payments. In response to the first **Federal Register** notice, we received numerous comments that raised disparate and considered views, and it is critical that we fully consider and address them. In addition, this second notice considers certain claimant data that were not available in December 2023 when we issued the first notice to meet the date required by the Fairness Act.

[23] See Public Law 116–260, div. FF, tit. XVII, sec. 1705(b)(2), 134 Stat. 1182, 3293–3294 (pertinent portion codified at 34 U.S.C. 20144(d)(4)(C)(i) ("[T]he Comptroller General of the United States shall conduct an audit and publish in the **Federal Register** a notice of proposed lump sum catch-up payments to 9/11 victims, 9/11 spouses, and 9/11 dependents who have submitted applications in accordance with subparagraph (B) in amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of 9/11 victims, 9/11 spouses, and 9/11 dependents received from the Fund being equal to the percentage of the claims of 9/11 family members received from the Fund, as of December 27, 2020.")).

[24] See 34 U.S.C. 20144(d)(3)(A)(i) (requiring the division of funds on a pro rata basis, subject to minimum payments provisions in 34 U.S.C. 20144(d)(3)(B) and limitations in 34 U.S.C. 20144(d)(3)(A)(ii)).

[25] 34 U.S.C. 20144(d)(3)(A)(ii). For example, for individuals, the cap is $20,000,000 and for claims of non-9/11 family members when aggregated, the cap is $35,000,000.

[26] GAO counted comments received multiple times with the same content and sender as one comment.

[27] We received a comment letter signed by three Members of Congress. According to the comment letter, they are members of the United States Senate who worked on the Fairness Act and on S. 5156, the Fairness for American Victims of State-Sponsored Terrorism Act (which later became the catch-up payment provision in the Fairness Act). The Members of Congress provided comments stating their views that all eligible claimants should be referred to GAO from the Special Master, GAO should use the Fund's payment percentage for purposes of lump sum catch-up payments, and GAO should exclude offsets from claimants' net eligible claims.

[28] Some comments fell into multiple categories and are included in all applicable categories.

[29] According to Fund officials, the Fund administratively closed applications submitted by claimants previously found eligible because it cannot and does not accept successive or duplicate applications. See "Justice for United States Victims of State Sponsored Terrorism Act," 81 FR 45535, 45537 (July 14, 2016) (stating that "[o]nly one application may be submitted for each claim"). On Feb. 7, 2023, during the statutory application time frame, the Fund updated the frequently asked questions section of its website, adding language that 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims "who are not eligible for lump sum catch-up payments under the Fairness Act, such as USVSST Fund claimants previously found eligible, may still be eligible for compensation in the USVSST Fund's other statutory distributions." U.S. Victims of State Sponsored Terrorism Fund, *Frequently Asked Questions, https://www.usvsst.com/Home/Faq* (last accessed June 25, 2024) (Frequently Asked Question (FAQ) 7.3 Which 1983 Beirut barracks

Appendix II: Federal Register Notices –
December 28, 2023, and July 9, 2024

**Federal Register** / Vol. 89, No. 131 / Tuesday, July 9, 2024 / Notices      **56379**

*GAO Response:* GAO's view is that the provision for lump sum catch-up payments in section 101 of the Fairness Act does not disqualify claimants who previously applied to the Fund and then subsequently applied within the statutory application time frame.[30] The Comptroller General's mandate to determine amounts of lump sum catch-up payments does not state that successive applications cannot be submitted for lump sum catch-up payments, and we do not read such a prohibition in the related provision regarding the deadline for application submission.[31] Accordingly, we are updating our methodology to include all eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted an application to the Fund within the statutory application time frame, including those who submitted successive applications to the Fund.[32]

In accordance with section 101 of the Fairness Act, we will not include claimants who did not have a final judgment awarded as of the date of enactment of the Fairness Act and will not include claimants who did not submit an application to the Fund within the statutory application time frame.[33]

*Support for GAO's Percentage Calculation Methodology*

Comments received expressed support for GAO's percentage calculation methodology as described in our December 28, 2023, notice (88 FR 89693). These commenters noted that the methodology we outlined was the same formula used to calculate the 9/11 lump sum catch-up payments, and also noted that since the relevant statutory language for that calculation and this calculation are identical, they find this approach appropriate. These commenters also generally stated that employing a different formula or methodology would potentially give prioritization or preferential treatment to one group of victims over another.

*GAO's Response:* We agree that the language used in section 101 of the Fairness Act to describe the percentage that we are to calculate to estimate lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims is equivalent to the language in the Sudan Claims Resolution Act, which directed us to estimate lump sum catch-up payments to 9/11 victims, spouses, and dependents.[34] Thus, we plan to use the

same methodology that we used to calculate "GAO's percentage calculation" for the 9/11 lump sum catch-up payments for this population.

*Request To Use the Fund's Payment Percentage*

GAO received comments about the use of the Fund's payment percentage for our estimation of lump sum catch-up payments. For example, commenters suggested that GAO add the payment percentages calculated by the Fund in the first through fourth rounds to determine the percentage needed for catch-up payments.[35]

*GAO's Response:* Section 101 of the Fairness Act calls for GAO to estimate lump sum catch-up payments "in amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of such victims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of December 29, 2022." [36] Consistent with our approach pursuant to equivalent language in the Sudan Claims Resolution Act and outlined in a prior notice (86 FR 31312, June 11, 2021) and report,[37] GAO estimated the amount needed to provide lump sum catch-up payments to 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted

bombing victims and 1996 Khobar Towers bombing victims are included in the Fairness Act's lump sum catch-up payment provision and how do these victims file a claim with the USVSST Fund?). Further, on July 28, 2023, the Fund updated FAQ 7.1 What are lump sum catch-up payments? and FAQ 7.3 to add language stating that "[e]ach claimant has one claim before the USVSST Fund for all compensation, including lump sum catch-up payments. The USVSST Fund cannot accept duplicative filings." According to Fund officials, claimants may have refrained from filing an application after contacting the Fund or reviewing the application procedures based on the advice received from their counsel or the Fund. For good cause shown, the Special Master may grant a claimant a reasonable extension of the section 20144(c)(3)(A)(ii)(II) deadline. 34 U.S.C. 20144(c)(3)(B) (applying to deadlines under (c)(3), as enacted by the Victims Act, Public Law 114–113, 129 Stat. at 3010).

[30] GAO's view is for purposes of implementing the Comptroller General's responsibilities under 34 U.S.C. 20144(d)(4)(D)(i)–(iii) to conduct an audit and calculate amounts for the Special Master to allocate lump sum catch-up payments.

[31] See 34 U.S.C. 20144(c)(3)(A)(ii)(II); 34 U.S.C. 20144(d)(4)(D)(i) (conditioning eligibility for lump sum catch-up payments on those individuals filing applications for payment between Dec. 29, 2022, and June 27, 2023). Interpreting the statute in this way also aligns with another provision of the Fairness Act, related to litigation involving certain 1983 Beirut barracks bombing victims and 1996 Khobar Towers victims. See Public Law 117–328, 136 Stat. at 6109 (pertinent portion codified at 34 U.S.C. 20144(e)(2)(B)(v) (providing that statutory provisions regarding elections by plaintiffs in *Peterson* v. *Islamic Republic of Iran* and *In Re 650 Fifth Avenue and Related Properties* shall not apply with respect to 1983 Beirut barracks bombing victims and 1996 Khobar Towers victims who submit an application during the statutory application time frame)).

[32] This includes claimants who, within the statutory application time frame, submitted applications to the Fund, including those who submitted a letter to the Fund expressing the claimants' intent to apply for lump sum catch-up payments, regardless of a previous determination of eligibility by the Fund or administrative closure of their applications. As discussed in further detail below, this comprises 512 claimants (which includes 78 conditional claimants who were *Peterson* judgment creditors).

[33] Section 101 of the Fairness Act requires that applications be submitted on or after Dec. 29, 2022, and by June 27, 2023. In contrast, the Sudan Claims Resolution Act provided 9/11 victims, spouses, and dependents 90 days from the date of enactment to submit an application for a payment. Public Law 116–260, 134 Stat. at 3293–3294 (pertinent portion codified at 34 U.S.C. 20144(d)(4)(C)(i)). Therefore, GAO could calculate lump sum catch-up payments for 9/11 victims, spouses, and dependents who submitted applications to the Fund prior to the date of enactment of the Sudan Claims Resolution Act, while GAO cannot calculate lump sum catch-up payments to 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims unless they have submitted an application during the 180-day period from the date of enactment of the Fairness Act.

[34] Compare 34 U.S.C. 20144(d)(4)(D)(i) ("in amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of such victims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of December 29, 2022"), with 34 U.S.C. 20144(d)(4)(C)(i) ("in amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of 9/11 victims, 9/11 spouses, and 9/11 dependents received from the Fund being equal to the percentage of the claims of 9/11 family members received from the Fund, as of December 27, 2020."). The Fairness Act directed the Special Master to

authorize lump sum catch-up payments to 9/11 victims, spouses, and dependents in amounts equal to those previously estimated by GAO and appropriated funds for that purpose. Public Law 117–328, 136 Stat. at 6107; GAO, *U.S. Victims of State Sponsored Terrorism Fund: Estimated Lump Sum Catch-Up Payments,* GAO–21–105306 (Aug. 11, 2021).

[35] The Fund's "payment percentage" is the amount of funds available to pay all eligible claimants in a given round divided by compensatory damages after accounting for the individual and family statutory caps, compensation from other sources, and prior payments from the Fund. The payment percentage for the initial round of payments was 13.6561 percent (generally rounded to 13.66 percent in USVSST Fund communications). The payment percentage for the second round of payments was 4.1955 percent (rounded to 4.2 percent in USVSST Fund communications). The payment percentage for non-9/11-related claimants in the third round of payments was 5.8385 percent (rounded to 5.84 percent in USVSST Fund communications). The non-9/11-related payment percentage for the fourth round was 0.4047 percent (rounded to 0.4 percent in USVSST Fund communications). The payment percentage total for all four rounds is 24.0948 percent, rounded here to 24 percent. See U.S. Victims of State Sponsored Terrorism Fund, "Payment Calculation Explanation for Non-9/11-Related Claims," at 5 (December 2022).

[36] 34 U.S.C. 20144(d)(4)(D)(i).

[37] GAO, *U.S. Victims of State Sponsored Terrorism Fund: Estimated Lump Sum Catch-Up Payments,* GAO–21–105306 (Aug. 11, 2021) (see Enclosure II for further discussion of the Fund's payment percentage and GAO's percentage calculation).

56380    Federal Register / Vol. 89, No. 131 / Tuesday, July 9, 2024 / Notices

potentially eligible applications within the statutory application time frame in an equal percentage to that of the payments that have been made to non-9/11 claimants in the Fund's first three payment rounds.[38]

We note that there are key differences in how the Fund calculated its payment percentage and how GAO calculated the percentage of lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims. In particular, the Fund and GAO calculated percentages in different ways to fulfill distinct purposes. The Fund's mission in each payment round is to distribute the available money in the Fund—a known amount—among Fund claimants. Section 101 of the Fairness Act, however, directs GAO to estimate the amount of money that is needed to catch up eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims in an equal percentage to that of the payments that have been made to non-9/11 claimants in the Fund's first three payment rounds.[39]

*Offsetting Eligible Claims With Compensation From Other Sources for Lump Sum Catch-Up Payments*

GAO received comments regarding our planned approach of estimating two amounts in this notice: (1) the total amount needed to provide lump sum catch-up payments to potentially eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims based on these victims' net eligible claims; and (2) the total amount needed to provide lump sum catch-up payments to potentially eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims based on these victims' net eligible claims offset by compensation from other sources. Some commenters advocated for the final lump sum catch-up payment estimates provided by GAO to be offset by compensation from other sources for this population. These commenters stated that the statute governing the Fund and section 101 of the Fairness Act support an approach that is based on an individual's unpaid compensatory damages claim, which is an applicant's claim value after moneys received from sources other than the Fund are deducted. These commenters also noted that certain 1983 Beirut barracks

bombing victims and 1996 Khobar Towers bombing victims have received compensation from other sources that are to be offset by the Fund pursuant to the statute governing the Fund.[40]

In contrast, other commenters advocated for the final lump sum catch-up payment estimates provided by GAO to not be offset by compensation from other sources for this population. These commenters stated that section 101 of the Fairness Act's use of the phrase "received from the Fund" should be read to modify the employment of 34 U.S.C. 20144(d)(3)(A) such that claims should not be offset other than from amounts received from the Fund. These commenters acknowledged 34 U.S.C. 20144(d)(3)(A)(i) provides that payments should be "based on the amounts outstanding and unpaid on eligible claims," but stated that this language does not apply to catch-up payments because the focus of the directive to GAO is on amounts received from the Fund. They further stated that the exemption for eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims from the 30 percent rule for the purposes of receiving a lump sum catch-up payment indicates congressional intent that, for the purposes of these catch-up payments, the normal Fund rules offsetting payments should not apply.

Some commenters also raised concerns about GAO's planned approach of estimating two amounts and that GAO should provide only one estimated amount.

*GAO's Response:* Section 101 of the Fairness Act requires GAO to conduct this audit "in accordance with clauses (i) and (ii) of [34 U.S.C. 20144(d)(3)(A)]." Consistent with our prior lump sum catch-up payment calculation for 9/11 victims, spouses, and dependents, and in accordance with clause (ii) of 34 U.S.C. 20144(d)(3)(A), we plan to estimate lump sum catch-up payments for this population using their "net eligible claims,"[41] that is, the amount of their claims after the application of individual and family statutory caps.[42]

Section 101 also requires us to conduct our work in accordance with clause (i) of 34 U.S.C. 20144(d)(3)(A), which requires that payments be made "based on the amounts outstanding and unpaid on eligible claims." In order to give effect to this provision, compensatory damages from other sources received by the claimant under their final judgment must be subtracted to produce the amount "outstanding and unpaid" on their claims. In our prior work, we did not offset eligible 9/11 victims, spouses, and dependents' net eligible claims with compensation from other sources because that population did not have qualifying compensation from other sources.[43] Since certain 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims do have qualifying compensation from other sources, our reading of section 101's directive for us to conduct our work in accordance with clause (i) of 34 U.S.C. 20144(d)(3)(A) requires us to offset their net eligible claims by the amounts paid on eligible claims in the final lump sum catch-up payment estimates provided in our report.[44]

In light of the language of clause (i) of 34 U.S.C. 20144(d)(3)(A), the comments

[38] We did not include the Fund's fourth payment round because, according to the Fund, it did not begin issuing fourth-round payments until Jan. 4, 2023, after the Fairness Act was enacted.

[39] See our methodology section below for more details of the calculation of the GAO percentage.

[40] See 34 U.S.C. 20144(d)(3)(A)(i). These commenters stated that while the Fairness Act explicitly exempts 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims from the 30 percent rule for the purposes of receiving a lump sum catch-up payment, the statute governing the Fund still requires that their total compensatory damages be offset of the moneys they have already received or are scheduled to receive.

[41] For the purposes of our analysis, "net eligible claims" refers to the monetary amount of all eligible claims after the application of individual and family statutory caps. 34 U.S.C. 20144(d)(3)(A)(ii).

[42] 34 U.S.C. 20144(d)(3)(A)(ii). For example, for individuals, the cap is $20,000,000 and for claims

of non-9/11 family members when aggregated, the cap is $35,000,000.

[43] See 34 U.S.C. 20144(d)(3)(A)(i)(III), (d)(3)(B).

[44] This provision is different than the minimum payments provisions in 34 U.S.C. 20144(d)(3)(B), under which any applicant with an eligible claim who has received, or is entitled or scheduled to receive, any payment that is equal to, or in excess of, 30 percent of the total compensatory damages owed to such applicant on the applicant's claim from any source other than the Fund shall not receive any payment from the Fund until such time as all other eligible applicants have received from the Fund an amount equal to 30 percent of the covered compensatory damages awarded to those applicants. See 34 U.S.C. 20144(d)(3)(A)(i) ("Except as provided in subparagraph (B) [minimum payments provisions] and subject to the limitations described in clause (ii) [individual and family statutory caps], the Special Master shall carry out paragraph (1), by . . . further dividing the funds allocated to non-9/11 related victims of state sponsored terrorism on a pro rata basis, based on the amounts outstanding and unpaid on eligible claims, until such amounts have been paid in full or the Fund is closed."). The Fairness Act added a new provision, codified at 34 U.S.C. 20144(d)(3)(B)(iii), stating that compensatory damages received or entitled or scheduled to be received by an applicant who is a 1983 Beirut barracks bombing victim or a 1996 Khobar Towers bombing victim as a result of or in connection with *Peterson* or *In Re 650 Fifth Avenue and Related Properties* are excepted for purposes of lump sum catch-up payments. In using the term "offsets," we refer to compensation from sources other than the Fund for the purposes of applying clause (i) of 34 U.S.C. 20144(d)(3)(A) and the minimum payments provisions. GAO's view is for purposes of implementing the Comptroller General's responsibilities under 34 U.S.C. 20144(d)(4)(D)(i)– (iii) to conduct an audit and calculate amounts for the Special Master to allocate lump sum catch-up payments.

**Federal Register** / Vol. 89, No. 131 / Tuesday, July 9, 2024 / Notices     **56381**

we received on this issue, and concerns by some commenters about our approach of providing two amounts, we will provide in this notice one estimate: the total amount needed to provide lump sum catch-up payments to potentially eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims based on these victims' net eligible claims offset by compensation from other sources.

**Methodology To Produce Estimates for Lump Sum Catch-Up Payments**

To estimate the amount(s) called for in section 101, GAO used the following data from the Fund: (1) payments from the Fund received by non-9/11 claimants in the first through third payment rounds;[45] (2) net eligible claims[46] of these non-9/11 claimants; (3) compensation from other sources received by these non-9/11 claimants;[47] (4) net eligible claims[48] of the 1983

Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted eligible applications to the Fund within the statutory application time frame (between December 29, 2022, and June 27, 2023);[49] and (5) compensation from other sources received by the 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submitted eligible applications to the Fund within the statutory application time frame.[50]

To carry out our mandate under section 101 of the Fairness Act, using data from the Fund described above, we estimated the amount of payments that non-9/11 claimants received in the first three rounds of Fund payments, as a percentage of their net eligible claims offset by compensation from other sources.[51] We first determined the payment amounts received by non-9/11 claimants from the Fund in the first through third payment rounds.[52] We then summed the payments for the three payment rounds across all non-9/11 claimants. Next, we determined the net eligible claims of the non-9/11 claimants as of the third round that they received a payment, offset by compensation from other sources, and summed across all claimants. We divided the amount of payments by the net eligible claims offset by compensation from other sources to determine the percentage called for in our mandate of 16.0353 percent (GAO's percentage calculation).[53]

**Estimates for Lump Sum Catch-Up Payments**

Using GAO's percentage calculation, we estimated the total amount needed to provide lump sum catch-up payments to the 2,086 potentially eligible 1983

---

[45] As discussed in footnote 9, this includes some 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who were eligible for payment from the Fund in prior rounds. We did not include in this group 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who did not receive any payment in the first through third payment rounds. We used this information to help us identify the percentage of claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of the Fairness Act's enactment date (Dec. 29, 2022). See 34 U.S.C. 20144(d)(4)(D)(i). Given this reference to the act's enactment date, we omitted fourth-round payments from the calculation of the payment percentage because non-9/11 victims of state sponsored terrorism received them after that date. The Fund notified eligible claimants of their fourth-round payment amounts on Dec. 30, 2022, and began issuing the fourth-round payments on a rolling basis on Jan. 4, 2023, after the Fairness Act was enacted. U.S. Victims of State Sponsored Terrorism Fund, "Special Master's Report Regarding the Fourth Distribution," at 3 (January 2023).

[46] For the purposes of our analysis, "net eligible claims" refers to the monetary amount of all eligible claims after the application of individual and family statutory caps by the Fund, if applicable. 34 U.S.C. 20144(d)(3)(A)(ii).

[47] Not all compensation from other sources is necessarily offset against claimants' net eligible claims. When referring to "compensation from other sources" for purposes of our methodology and estimates, we are referring to compensation from other sources that the Fund would offset from its awards under its calculation methodology, which the Fund provided to GAO.

[48] As of March 2024, data from the Fund on the claim amounts after the application of individual and family statutory caps ("net eligible claims") for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who are potentially eligible for lump sum catch-up payments were not available for new applicants to the Fund. This is because these new claimants have not been included in a payment distribution that would require the application of individual and family statutory caps by the Fund. GAO used Fund methodology to apply the individual and family statutory caps to these claims. See U.S. Victims of State Sponsored Terrorism Fund, Payment Calculation Explanation for Non-9/11-Related Claims at 2–3 (December 2022). Before applying the $35 million family statutory cap, we first treated

any individual claim that exceeded the $20 million individual statutory cap as $20 million. For purposes of the $35 million family statutory cap, GAO summed individual claims for those claims that indicated a family relationship in the data by a family identification number. Once summed, if claims within a family identification number exceeded the $35 million family statutory cap, we then allocated the $35 million family statutory cap among the family members in proportion to their individual claims. We provided our analysis to the Fund for review and they confirmed that based on their review our approach appeared consistent with their methodology. While this analysis enabled us to determine the "net eligible claims" for the purposes of estimating lump sum catch-up payments for our population, we recognize that the Fund may receive additional information or data in the future that might impact these amounts if these claimants are included in a future payment distribution.

[49] We received data from the Fund as of May 2024 for 1,778 claimants for the 1983 Beirut barracks bombing and 308 claimants for the 1996 Khobar Towers bombing who submitted eligible applications to the Fund and applied in the statutory application time frame. Of those, 512 had received a prior eligibility determination from the Fund and 1,559 were new applicants. We also received data on 14 victims of these attacks who submitted applications during the statutory application time frame whose eligibility is still being determined by the Fund as of June 2024. Because eligibility for some of these victims is still being determined, we refer to the group as a whole as "potentially eligible" for catch-up payments. These applications are pending because the Fund is awaiting additional documentation from these individuals that is needed to determine their claims' eligibility. We encourage applicants with pending applications to provide requested documentation to the Fund that is needed to determine their claims' eligibility. For purposes of estimating lump sum catch-up payments in this notice, we are including all of the potentially eligible claims. However, in our final report, to be issued no later than 30 days following the close of the comment period, we will only include the total amount needed to provide lump sum catch-up payments to 1983 Beirut barracks bombing victims and 1986 Khobar Towers bombing victims who submitted claims that the Fund has deemed eligible.

[50] We obtained from the Fund information on compensation from other sources as of March 2024 for claimants who have eligibility for regular distributions from the Fund. Fund officials confirmed that, based on information included in these applications, all applicants who reported compensation from other sources are Peterson judgment creditors whose offsets are the amounts recovered in Peterson. After GAO informed the Fund that it would include claimants who previously had eligibility determinations made by the Fund in its estimated lump sum catch-up payment calculations, on May 31, 2024, the Fund provided the remaining offset information that the 78 conditional claimants who were Peterson

judgment creditors included in their applications for lump sum catch-up payments, for purposes of our audit and calculations. In order to apply the minimum payments provisions in 34 U.S.C. 20144(d)(3)(B), before issuing our final report, we will need to confirm the source of the offsets for these 78 conditional claimants. The Fund does not use information contained in duplicate applications administratively closed by the Fund for Fund purposes, according to the Fund officials.

[51] In accordance with GAO standards, we will assess the reliability and completeness of the data from the Fund to ensure that it is appropriate for these purposes.

[52] The non-9/11 claimants included 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who received payments from the Fund. See 34 U.S.C. 20144(j)(9). In applying this standard, we excluded three types of claims: (1) those where the victim received no payments because they were conditional claimants; (2) those where the victim never received payment in any of the first through third rounds of distribution because compensation from other sources (offsets) exceeded 30 percent of the compensatory damages (before applying the individual and family statutory caps); and (3) those where the offsets exceeded the percentage of compensatory damages awarded to other eligible applicants in each of the first through third rounds of distribution for which these claims were eligible. See id. 20144(d)(4)(D)(i).

[53] We reported 4.6122 percent in the first notice. The percentage changed due to a data programming error that occurred in our initial estimate and has now been corrected. Specifically, the net eligible claims were inadvertently included in the initial round that the payment was received as well as in the subsequent rounds, resulting in a larger summed net eligible claims and a lower calculated percentage. Furthermore, the calculation included the fourth payment round which, as indicated in footnote 35, had a very low payment percentage among the four rounds.

Appendix II: Federal Register Notices –
December 28, 2023, and July 9, 2024

**56382**    Federal Register / Vol. 89, No. 131 / Tuesday, July 9, 2024 / Notices

Beirut barracks bombing victims and 1996 Khobar Towers bombing victims based on these victims' net eligible claims offset by compensation from other sources.[54] In the data provided, 1,495 of the potentially eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims reported compensation from other sources of some non-zero amount, such as court-awarded compensation.[55] To identify a claimant's lump sum catch-up payment, the calculated GAO percentage will be applied to the claimant's net eligible claims offset by compensation from other sources. Then, to identify a net lump sum catch-up payment, we will subtract any amount of money a claimant had previously received from the Fund.[56] Our calculation produced $614,988,012.55, the total amount needed to provide lump sum catch-up payments for Beirut barracks and Khobar Towers bombing victims who submitted eligible applications to the Fund within the statutory application time frame.[57]

After consideration of the comments from this notice, we will issue a report using data from the Fund to report estimated lump sum catch-up payments based on this methodology with any changes we determine appropriate. We invite comments on all aspects of the planned methodology and lump sum catch-up payments proposed in this notice. Our final report will be available on *gao.gov*.

*Authority:* Pub. L. 117–328, div. MM, sec. 101(b)(3)(B)(iii), 136 Stat. 4459,

[54] In our prior work, we did not offset eligible 9/11 victims, spouses, and dependents' net eligible claims with compensation from other sources because this population did not have qualifying compensation from other sources. Although some 9/11 claimants may have received awards from the September 11th Victim Compensation Fund (VCF), money received from the VCF is not considered an offset for the Fund's award calculations. See U.S. Victims of State Sponsored Terrorism Fund, *Frequently Asked Questions, https:// www.usvsst.com/Home/Faq* (last accessed June 18, 2024) (see 4.8 What is a source of compensation other than the USVSST Fund?).

[55] The Fund provided information about compensation from other sources for all potentially eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims. According to Fund data, the reported compensation from other sources for some of these potentially eligible claimants was $0. For potentially eligible claimants who received compensation from other sources of some non-zero amount, that compensation ranged from approximately $65,000 to approximately $5 million.

[56] The payments previously received from the Fund will include all the payment rounds—first through fourth rounds—as applicable.

[57] The net lump sum catch-up payment is the difference between the calculated lump sum catch-up and the compensation already received from the Fund (it would be zero if the compensation already received from the Fund is equal to or exceeds the calculated lump sum catch-up).

6108–6109 (pertinent portion codified at 34 U.S.C. 20144(d)(4)(D)).

**Triana McNeil,**
*Director, Homeland Security and Justice, U.S. Government Accountability Office.*
[FR Doc. 2024–15016 Filed 7–8–24; 8:45 am]
**BILLING CODE 1610–02–P**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**[Document Identifiers: CMS–855B]**

**Agency Information Collection Activities: Proposed Collection; Comment Request**

**AGENCY:** Centers for Medicare & Medicaid Services, Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Centers for Medicare & Medicaid Services (CMS) is announcing an opportunity for the public to comment on CMS' intention to collect information from the public. Under the Paperwork Reduction Act of 1995 (PRA), Federal agencies are required to publish notice in the **Federal Register** concerning each proposed collection of information (including each proposed extension or reinstatement of an existing collection of information) and to allow 60 days for public comment on the proposed action. Interested persons are invited to send comments regarding our burden estimates or any other aspect of this collection of information, including the necessity and utility of the proposed information collection for the proper performance of the agency's functions, the accuracy of the estimated burden, ways to enhance the quality, utility, and clarity of the information to be collected, and the use of automated collection techniques or other forms of information technology to minimize the information collection burden.

**DATES:** Comments must be received by September 9, 2024.

**ADDRESSES:** When commenting, please reference the document identifier or OMB control number. To be assured consideration, comments and recommendations must be submitted in any one of the following ways:

1. *Electronically.* You may send your comments electronically to *http:// www.regulations.gov.* Follow the instructions for "Comment or Submission" or "More Search Options" to find the information collection document(s) that are accepting comments.

2. *By regular mail.* You may mail written comments to the following address: CMS, Office of Strategic Operations and Regulatory Affairs, Division of Regulations Development, Attention: Document Identifier/OMB Control Number: ___, Room C4–26–05, 7500 Security Boulevard, Baltimore, Maryland 21244–1850.

To obtain copies of a supporting statement and any related forms for the proposed collection(s) summarized in this notice, please access the CMS PRA website by copying and pasting the following web address into your web browser: *https://www.cms.gov/ Regulations-and-Guidance/Legislation/ PaperworkReductionActof1995/PRA-Listing.*

**FOR FURTHER INFORMATION CONTACT:** William N. Parham at (410) 786–4669.

**SUPPLEMENTARY INFORMATION:**

**Contents**

This notice sets out a summary of the use and burden associated with the following information collections. More detailed information can be found in each collection's supporting statement and associated materials (see **ADDRESSES**).

CMS–855B  Medicare Enrollment Application for Clinics/Group Practices and Other Suppliers

Under the PRA (44 U.S.C. 3501–3520), Federal agencies must obtain approval from the Office of Management and Budget (OMB) for each collection of information they conduct or sponsor. The term "collection of information" is defined in 44 U.S.C. 3502(3) and 5 CFR 1320.3(c) and includes agency requests or requirements that members of the public submit reports, keep records, or provide information to a third party. Section 3506(c)(2)(A) of the PRA requires Federal agencies to publish a 60-day notice in the **Federal Register** concerning each proposed collection of information, including each proposed extension or reinstatement of an existing collection of information, before submitting the collection to OMB for approval. To comply with this requirement, CMS is publishing this notice.

**Information Collections**

1. *Type of Information Collection Request:* Reinstatement with change of a previously approved collection; *Title of Information Collection:* Medicare Enrollment Application for Clinics/ Group Practices and Other Suppliers; *Use:* Various sections of the Act, the United States Code (U.S.C.), Internal Revenue Service (IRS) Code, and the CFR require providers and suppliers to

# Appendix III: Summary of Public Comments on *Federal Register* Notices

On December 28, 2023, we published a *Federal Register* Notice that detailed our proposed methodology to estimate lump sum catch-up payments to eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims.[1] We received 319 comments on this Notice, which we summarized in our Notice published on July 9, 2024.[2] GAO received 310 comments from individuals and 9 comments from law firms representing victims of state sponsored terrorism. GAO received 316 comments by email; the remaining 3 comments were received in voicemails or letters. In general, comments from individuals were from 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims, 9/11 victims and their family members, and Members of Congress;[3] and comments from law firms were from attorneys representing 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims. In our July 9, 2024, Notice, we summarized and responded to the types of comments GAO received. The types of comments received included comments that raised equity issues related to the United States Victims of State Sponsored Terrorism Fund (Fund) and lump sum catch-up payments; raised issues related to eligibility criteria for a lump sum catch-up payment; expressed support for GAO's percentage calculation methodology or asked GAO to use the Fund's payment percentage; and provided differing views on offsetting eligible claims with compensation from other sources for lump sum catch-up payments.

Our July 2024 *Federal Register* Notice contained our revised methodology for calculating lump sum catch-up payments to eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims and the estimated amount needed for the payments. We received a total of 80 comments. GAO received 72 comments from individuals and

---

[1]Notice of Planned Methodology for Estimating Lump Sum Catch-Up Payments to Eligible 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims, 88 Fed. Reg. 89,693 (Dec. 28, 2023).

[2]Notice of Estimated Lump Sum Catch-Up Payments to Eligible 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims and Planned Methodology, 89 Fed. Reg. 56,376 (July 9, 2024).

[3]In response to our first *Federal Register* Notice, we received a comment letter signed by three members of the United States Senate who, according to the letter, worked on the Fairness for 9/11 Families Act (Fairness Act) and on S. 5156, the Fairness for American Victims of State-Sponsored Terrorism Act (which later became the catch-up payment provision in the Fairness Act). The Senators stated their views that all eligible claimants should be referred to GAO from the Special Master, that GAO should use the Fund's payment percentage for purposes of lump sum catch-up payments, and that GAO should exclude offsets from claimants' net eligible claims.

Appendix III: Summary of Public Comments on
Federal Register Notices

8 comments from law firms representing victims of state sponsored terrorism. GAO received 78 comments by email; the remaining 2 comments were received in voicemails. In general, comments from individuals were from 1983 Beirut barracks bombing victims, 1996 Khobar Towers bombing victims, 9/11 victims and their family members, and Members of Congress;[4] and comments from law firms were from attorneys representing 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims.

## Summary of Comments on Second *Federal Register* Notice

GAO has carefully considered all comments received. Below, we summarize and respond to the following types of comments GAO received:[5]

- Eligibility criteria for a lump sum catch-up payment;
    - the Fund's position on successive applications;
    - responsibility for determining who is a claimant in the Fund;
- Request to use the Fund's payment percentage;
- Offsetting eligible claims with compensation from other sources for lump sum catch-up payments;
- Calculation of lump sum catch-up payments;
- Meaning of "1983 Beirut barracks bombing victim" and "1996 Khobar Towers bombing victim";
- Meaning of "final judgment"; and
- Issue related to the methodology of prior Fund distributions.

## Eligibility Criteria for a Lump Sum Catch-up Payment: the Fund's Position on Successive Applications

GAO received comments regarding the Fund's policy that victims cannot submit successive applications in order to apply for lump sum catch-up payments. Some comments expressed support for GAO's view that the provision for lump sum catch-up payments in section 101 of the Fairness for 9/11 Families Act (Fairness Act) does not disqualify claimants who previously applied to the Fund and then filed a subsequent, timely application for those payments. The majority of comments raised

---

[4]We received a comment letter signed by four members of the United States Senate in response to our second *Federal Register* Notice. Two of the Senators who submitted a comment letter in response to our first *Federal Register* Notice submitted this comment letter, along with two other Senators. The Senators stated their views that GAO should use the Fund's payment percentage for purposes of lump sum catch-up payments and that GAO should exclude offsets from claimants' net eligible claims.

[5]Some comments fell into multiple categories and are included in all applicable categories.

concerns about the Fund's policy on eligibility. Many commenters expressed concern about the effect of the Fund's position that claimants who previously applied to the Fund and were found eligible, could not submit applications during the statutory application time frame in order to apply for lump sum catch-up payments. We received comments from or on behalf of at least 232 of the 274 Beirut barracks and Khobar Towers bombing victims who had received prior eligibility determinations from the Fund and did not apply for lump sum catch-up payments (or about 85 percent of those individuals). These commenters stated that they were dissuaded from filing successive applications because of information they received from the Fund. For instance, two attorneys representing 225 claimants with prior eligibility determinations commented that they did not submit applications for lump sum catch-up payments because Fund officials told them the claimants were not eligible, and that any duplicate applications submitted would not be accepted. According to a comment from one of these attorneys, two of their clients only received a fourth-round distribution from the Fund, which amounted to a payment percentage of 0.4047 percent. Commenters asked GAO to recommend that the Fund take action to address this issue, such as notifying claimants of the error, opening a new application period for lump sum catch-up payments, and providing updated data to GAO for revised lump sum catch-up payment estimates. Comments also asked GAO to revise its lump sum catch-up payment calculations to include 1983 Beirut barracks bombing victims and 1996 Khobar Towers victims who had a claim on file with the Fund before December 29, 2022.

GAO's Response: One of the requirements under the Fairness Act to be able to receive a lump sum catch-up payment is that claimants must have "submitted applications" between December 29, 2022 and June 27, 2023.[6] In our interpretation of the Comptroller General's mandate under the Fairness Act, claimants who previously applied to the Fund and were found eligible could still apply for lump sum catch-up payments. Because such claimants are able to receive these payments, we have included them in our payment calculations that are to be used by the Fund to provide lump sum catch-up payments. However, the Fairness Act does not permit GAO to include claimants who did not submit applications during the statutory application time frame in our determination of lump sum catch-up payments, given the Fairness Act's application submission requirement. According to Fund officials, the statute and Fund procedures

---

[6]Pub. L. No. 117-328, div. MM, § 101(b)(3)(B)(iii), 136 Stat. 6106, 6108 (2022) (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(D)(i)).

Appendix III: Summary of Public Comments on
Federal Register Notices

together prevent the Fund from accepting successive applications from existing eligible claimants because each claimant to the Fund may only submit one application per claim.[7] The Special Master has the authority to grant a claimant, for good cause, a reasonable extension of the application submission deadlines.[8] However, according to Fund officials, the Special Master cannot grant an application deadline extension to an existing eligible Beirut barracks or Khobar Towers claimant who did not re-apply during the Fairness Act's application time frame because the Special Master cannot accept successive applications. In other words, because only new claimants can submit applications during the Fairness Act's application time frame, there is no basis for an application deadline extension from the Special Master, according to Fund officials. In addition, Fund officials have stated that this "good cause" provision by its terms does not apply to provisions of the Fairness Act related to lump sum catch-up payments.[9] As such, after receiving requests to grant such a deadline extension from existing eligible Beirut barracks or Khobar Towers claimants, the Special Master informed those claimants that their duplicate claims would be administratively closed and did not grant any deadline extensions. In light of this issue, which, if left unresolved will mean some 274 otherwise eligible victims will not receive lump sum catch-up payments, our report includes a matter for congressional consideration. In particular, we state that Congress should consider amending the Justice for United States Victims of State Sponsored Terrorism Act (Victims Act) to direct the Special Master to make lump sum catch-up payments to claimants who did not apply for those payments because of Fund guidance. Amending the statute would place affected claimants in the same position as if the Fund had not provided

---

[7]DOJ also refers to these as "duplicative filings" or "duplicative claims." U.S. Victims of State Sponsored Terrorism Fund, *Frequently Asked Questions*, https://www.usvsst.com/Home/Faq (last accessed Aug. 14, 2024) (Frequently Asked Question (FAQ) 7.1 What are lump sum catch-up payments?); U.S. Victims of State Sponsored Terrorism Fund, Duplicate Claim Notice.

[8]34 U.S.C. § 20144(c)(3)(B) (applying to deadlines under (c)(3), including the statutory application time frame under (c)(3)(A)(ii)(II) for certain 1983 Beirut barracks and 1996 Khobar Towers bombing victims to submit applications in order to apply for lump sum catch-up payments).

[9]Fund officials further stated that the good cause exception relates to the 90-day deadline to submit an application after the date of obtaining a final judgment, or the 90-day deadline described in 34 U.S.C. § 20144(c)(3)(A)(i).

**Appendix III: Summary of Public Comments on
Federal Register Notices**

Eligibility Criteria for a Lump
Sum Catch-up Payment:
Responsibility for Determining
who is a Claimant in the Fund

guidance contrary to GAO's interpretation of the Comptroller General's mandate in the Fairness Act.[10]

One comment responded to the information GAO provided in its second *Federal Register* Notice that the Fund was, at the time we issued that Notice, reviewing the eligibility of 14 victims of the 1983 Beirut barracks bombing and the 1996 Khobar Towers bombing. The comment, submitted by an attorney, stated that GAO, not the Fund, should determine whether these victims fall within the statutory definitions of 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims.[11]

GAO's Response: Under the Victims Act, the Special Master has the authority to determine whether a claim is an eligible claim.[12] Section 101 of the Fairness Act directed the Comptroller General to propose lump sum catch-up payments to the 1983 Beirut barracks bombing victims and the 1996 Khobar Towers bombing victims who have submitted applications in accordance with 34 U.S.C. § 20144(c)(3)(A)(ii)(II).[13] As a precondition for receiving lump sum catch-up payments, the Fund must have deemed a victim eligible to participate in the Fund. The language in the Comptroller General's mandate does not alter the Special Master's authority for determining whether a victim submitted an eligible claim that would allow the victim to participate in the Fund, and does not confer such authority on the Comptroller General. As such, GAO is not able to make a determination about whether any of the victims it identified in its second *Federal Register* Notice as potentially eligible are, in fact, eligible to participate in the Fund.

---

[10]The appropriations for these lump sum catch-up payments will continue to be available for a certain amount of time after GAO issues its report on these payments. The Special Master is required to authorize lump sum catch-up payments as identified by GAO not earlier than 90 days after the Comptroller General submits GAO's report on these payments, and not later than 1 year after that date. 34 U.S.C. § 20144(d)(4)(D)(iv)(II). "[N]ot later than 1 year after the Special Master disperses all lump sum catch-up payments" from the reserve fund the reserve fund is to terminate; all amounts remaining in the reserve fund in excess of proposed lump sum catch-up payments shall be deposited into the Fund. *Id.* § 20144(d)(4)(D)(iv)(IV).

[11]*Id.* § 20144(j)(15)-(16).

[12]*Id.* § 20144(c)(1) (providing that "[f]or the purposes of [the Victims Act], a claim is an eligible claim if the Special Master determines that" specified requirements are met).

[13]Pub. L. No. 117-328, § 101(b)(3)(B)(iii), 136 Stat. at 6108 (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(D)(i)).

**Appendix III: Summary of Public Comments on
Federal Register Notices**

| Request to Use the Fund's Payment Percentage | GAO received comments about the use of the Fund's payment percentage for our estimation of lump sum catch-up payments. For example, commenters suggested that GAO add the payment percentages calculated by the Fund in the first through fourth rounds to determine the percentage needed for catch-up payments. Commenters also stated that the Comptroller General's mandate was designed to generate over one billion dollars in lump sum catch-up payments. |
|---|---|

GAO's Response: We responded to similar comments in our second *Federal Register* Notice, and direct individuals to that response.[14] The following response supplements that earlier response.

GAO is taking an approach that is consistent with its approach in conducting a similar audit pursuant to the Sudan Claims Resolution Act. The language used in the Fairness Act to describe the percentage resulting from the receipt of lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims is the same as the pertinent language in the Sudan Claims Resolution Act, which directed us to estimate lump sum catch-up payments to 9/11 victims, spouses, and dependents.[15] In other words, Congress used the same language on calculating the payment percentage for both GAO audits, both of which are provisions of the Victims Act.[16] Identical words

---

[14]See Notice of Estimated Lump Sum Catch-Up Payments to Eligible 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims and Planned Methodology, 89 Fed. Reg. 56,376, 56,379-80 (July 9, 2024).

[15]See Pub. L. No. 116-260, div. FF, tit. XVII, § 1705(b)(2), 134 Stat. 3291, 3293-94 (2020) (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(C)(i) ("[T]he Comptroller General of the United States shall conduct an audit and publish in the Federal Register a notice of proposed lump sum catch-up payments to 9/11 victims, 9/11 spouses, and 9/11 dependents who have submitted applications in accordance with subparagraph (B) in amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of 9/11 victims, 9/11 spouses, and 9/11 dependents received from the Fund being equal to the percentage of the claims of 9/11 family members received from the Fund, as of [December 27, 2020].")).

[16]*Id.* § 1705(b), 134 Stat. at 3293 (amending the Victims Act); Pub. L. No. 117-328, § 101(b), 136 Stat. at 6106 (same).

used in different parts of the same statute are presumed to have the same meaning.[17]

In conducting its earlier audit pursuant to the Sudan Claims Resolution Act, GAO did not use the Fund's payment percentage in calculating lump sum catch-up payments.[18] As a result, the percentage calculation by GAO (5.8573 percent) was lower than the Fund's payment percentage (17.8516 percent). These respective calculations reflected different approaches. For the two payment rounds at issue, GAO identified the overall percentage of the claims that 9/11 family members received from the Fund. This approach took into account that some claimants only received second round payments, while others received payments in both rounds.[19] The Fund calculates a payment percentage for each distribution round separately, and does not calculate a weighted average percentage among claimants who are found eligible across different payment rounds.[20] As a result, GAO could not use the Fund's approach to satisfy its statutory mandate. These differences contributed to a GAO percentage calculation that was lower than the Fund's payment percentage. In the Fairness Act—which also contains GAO's mandate to calculate lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims—Congress appropriated lump sum catch-up payments to 9/11 victims, spouses, and dependents in amounts consistent with GAO's payment percentage calculation.[21]

As with that earlier audit, the percentage calculation by GAO (16.0353 percent) is lower than the Fund's payment percentage in the first through third rounds (23.6901 percent). As with that earlier audit, these

[17]This principle is sometimes referred to as the "presumption of consistent usage" or the "presumption of statutory consistency." Valerie C. Brannon, Cong. Rsch. Serv., R45153, Statutory Interpretation: Theories, Tools, and Trends 55 (2023) (citing, *inter alia*, *Robers v. United States*, 572 U.S. 639, 643 (2014)) [hereinafter CRS Report on Statutory Interpretation].

[18]GAO, *U.S. Victims of State Sponsored Terrorism Fund: Estimated Lump Sum Catch-Up Payments*, GAO-21-105306 (Washington, D.C.: Aug. 11, 2021) (see Enclosure II for further discussion of the Fund's payment percentage and GAO's percentage calculation).

[19]Generally, once claimants are found eligible, they continue to receive Fund payments in future distribution rounds.

[20]For more information on the Fund's calculation of the payment percentage for each of its distributions, see the Fund's Payment Calculation Explanations and its Payment Report, available on the Fund's website.

[21]Pub. L. No. 117-328, § 101(b)(3)(B)(ii), 136 Stat. at 6107-08.

calculations reflected different approaches. For the three payment rounds at issue, GAO identified the overall percentage of the claims that non-9/11 victims of state sponsored terrorism received from the Fund. This approach took into account that some non-9/11 claimants only received second and third round payments (and not first round payments), and that some non-9/11 claimants only received third round payments (and not first or second round payments). The Fund calculates a payment percentage for each distribution round separately, and does not calculate a weighted average percentage among claimants who are found eligible across different payment rounds. As a result, GAO could not use the Fund's approach to satisfy its statutory mandate. Consistent with the outcome of that earlier audit, given these methodological differences, GAO's percentage calculation is lower than the Fund's payment percentage. While GAO acknowledges that commenters have cited the statements of individual Members of Congress, some of whom were involved in developing the Fairness Act, the statute tasked GAO with determining amounts of proposed lump sum catch-up payments pursuant to the terms of the statute.

**Offsetting Eligible Claims with Compensation from Other Sources for Lump Sum Catch-up Payments**

GAO received comments regarding our approach of offsetting potentially eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims' net eligible claims by compensation from other sources. Some commenters advocated for the final lump sum catch-up payment estimates provided by GAO to not be offset by compensation from other sources for this population. These commenters stated that 34 U.S.C. § 20144(d)(3)(A) does not provide authority for GAO to use "sources other than this Fund" as an offset; that GAO ignores portions of 34 U.S.C. § 20144(d)(3)(A); that GAO's interpretation does not reflect congressional intent; and that GAO's approach is not consistent with the one it took in estimating lump sum catch-up payments to 9/11 victims, spouses, and dependents.

GAO's Response: We responded to similar comments in our second *Federal Register* Notice, and direct individuals to that response.[22] The following response supplements that earlier response.

Section 101 of the Fairness Act requires GAO to conduct this audit "in accordance with clauses (i) and (ii) of [34 U.S.C. § 20144(d)(3)(A)]."[23]

[22]See 89 Fed. Reg. at 56,380-81.

[23]Pub. L. No. 117-328, § 101(b)(3)(B)(iii), 136 Stat. at 6108 (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(D)(i)).

Case 1:26-cv-01262-JRR    Document 14-13    Filed 06/03/26    Page 55 of 75

**Appendix III: Summary of Public Comments on
Federal Register Notices**

Clause (ii) involves the application of individual and family statutory caps, which we applied in calculating claimants' net eligible claims. Clause (i) generally provides direction to the Special Master on how to divide and allocate funds among 9/11 and non-9/11 victims.[24] While clause (i) generally imposes requirements on the Special Master rather than the Comptroller General, in order to give meaning to the language in GAO's mandate that it conduct this audit in accordance with clause (i), there must be language in clause (i) applicable to GAO.[25] Of the three provisions in clause (i), the first and third relate to 9/11 victims and therefore are not relevant to GAO's audit. The second provision of clause (i) describes an aspect of making pro rata payments to non-9/11 related victims of state sponsored terrorism. Under that provision, the Special Master is directed to make these payments "based on the amounts outstanding and unpaid on eligible claims, until such amounts have been paid in full or the Fund is closed."[26] Given this language, and to give effect to the reference to clause (i) in our mandate, we determined lump sum catch-up payments "based on the amounts outstanding and unpaid on eligible claims."[27]

This aspect of the provision does not include any terms that are defined in subsection (j) of the statute. Absent a statutory definition, we apply the ordinary meaning of this phrase.[28] In applying that interpretive approach, we are mindful that this provision does not include any limiting language, such as verbiage stating that it only applies to amounts outstanding and unpaid by the Fund on eligible claims. As a result, we construe it to mean amounts paid on eligible claims, i.e., recoveries from other sources that have been paid on claimants' final judgments. Not all compensation from other sources necessarily counts as an offset for this purpose. We obtained from the Fund compensation from other sources that the Fund

---

[24]34 U.S.C. § 20144(d)(3)(A)(i).

[25]See CRS Report on Statutory Interpretation, *supra* note 17, at 30-31 (describing the rule against surplusage, which "requires courts to give each word and clause of a statute operative effect, if possible").

[26]34 U.S.C. § 20144(d)(3)(A)(i)(II).

[27]The receipt of lump sum catch-up payments will not result in any claims being "paid in full."

[28]See CRS Report on Statutory Interpretation, *supra* note 17, at 21. Because the text of the statute answers, in the affirmative, the question of whether GAO should apply offsets here, we do not need to consider pre-enactment or post-enactment legislative history regarding it. See *id.* at 39. Commenters have put forward differing versions of the legislative history related to the enactment of this lump sum catch-up payment provision.

**Appendix III: Summary of Public Comments on
Federal Register Notices**

would offset from its awards under its calculation methodology.[29] We then confirmed with the Fund, or plaintiffs' counsel as applicable, that all of these amounts were recoveries paid on claimants' final judgments.[30] We then subtracted these amounts from the claimants' net eligible claims to produce the amount "outstanding and unpaid" on their claims for purposes of determining lump sum catch-up payments.

This approach is consistent with the one GAO took in estimating lump sum catch-up payments to 9/11 victims, spouses, and dependents.[31] Like the Fairness Act, the Sudan Claims Resolution Act required GAO to conduct its audit "in accordance with clauses (i) and (ii) of [34 U.S.C. § 20144(d)(3)(A)]."[32] In conducting that audit, GAO recognized that if Congress authorized lump sum catch-up payments for 9/11 victims, spouses, and dependents, such payments would vary based on, among other things, compensation received by individuals from other sources, such as payments already made on a claimant's judgment.[33] These payments would take into account compensation received by individuals from other sources, in part to comply with the Victims Act's requirement that payments from available funds be made "based on the amounts outstanding and unpaid on eligible claims."[34] However, that population did not have qualifying compensation from other sources—in other words, we did not identify payments already made on any of those claimants' judgments. As a result, even though we took the same approach as we

[29]Under the Fund's procedures, the Fund relies on claimants to provide information regarding sources of compensation other than the Fund and, according to Fund officials, has requested this information in each iteration of the Fund's application form since the Fund's inception. Claimants are required to certify under the penalty of perjury that the information they provide the Fund is true and accurate. According to Fund officials, the Fund also frequently reminds claimants of their ongoing obligation to update claim information, including compensation from sources other than the Fund.

[30]See 89 Fed. Reg. at 56,381 n.50. We obtained information on qualifying compensation from other sources from counsel representing the 78 conditional claimants who were judgment creditors in *Peterson v. Islamic Republic of Iran.*

[31]GAO's approach is different than the calculation methodology used by the Fund in its four general distribution rounds.

[32]Pub. L. No. 116-260, § 1705(b)(2), 134 Stat. at 3294.

[33]GAO, *U.S. Victims of State Sponsored Terrorism Fund: Estimated Lump Sum Catch-Up Payments*, GAO-21-105306 7-8 (Washington, D.C.: Aug. 11, 2021).

[34]*Id.* at 8 n.25.

are taking in the current audit, there was nothing for GAO to offset for eligible 9/11 victims, spouses, and dependents in that prior work.

**Calculation of Lump Sum Catch-up Payments**

GAO received a comment stating that GAO should apply its calculated percentage to a claimant's judgment after subtracting payments that a claimant already received or is entitled to or scheduled to receive outside the Fund.

GAO Response: To identify a claimant's lump sum catch-up payment, the calculated GAO percentage of 16.0353 percent will be applied to the claimant's net eligible claims offset by qualifying compensation from other sources—i.e., recoveries from other sources that have been paid on claimants' final judgments. Under this approach, GAO is applying its calculated percentage to a claimant's net eligible claims after subtracting qualifying compensation from other sources. Here is a calculation illustrating this approach, presuming that an individual claimant has a compensatory damages award in a final judgment of $1,000,000 and qualifying compensation from other sources of $384,638.01:[35]

- $1,000,000[36] – $384,638.01 = $615,361.99. This represents a claimant's net eligible claim offset by qualifying compensation from other sources. This is the amount outstanding and unpaid on the claim for purposes of determining lump sum catch-up payments.

- $615,361.99 x 16.0353 percent = $98,675.14.

- We will next subtract any amount of money a claimant had previously received from the Fund to determine their lump sum catch-up payment.

---

[35]The illustration is for an individual with no family statutory cap.

[36]This amount is lower than the individual statutory cap of $20,000,000. See 34 U.S.C. § 20144(d)(3)(A)(ii)(I).

**Appendix III: Summary of Public Comments on
Federal Register Notices**

This approach is different than the Fund's approach to calculating regular distribution payments.[37] Given the terms of the Victims Act, as amended by the Fairness Act, certain claimants who received compensation from sources other than the Fund may receive a lump sum catch-up payment, but not receive payment in the Fund's standard statutory distributions.[38]

**Meaning of "1983 Beirut Barracks Bombing Victim" and "1996 Khobar Towers Bombing Victim"**

GAO received comments about the meaning of the terms "1983 Beirut barracks bombing victim" and "1996 Khobar Towers bombing victim," which were included in the Fairness Act. Several comments raised concerns that GAO was interpreting these terms to consist solely of a judgment creditor in Peterson v. Islamic Republic of Iran (Peterson) or a Settling Judgment Creditor in In Re 650 Fifth Avenue and Related Properties (In Re 650). Another comment raised concerns that GAO was interpreting these terms to include anyone other than a judgment creditor in Peterson or a Settling Judgment Creditor in In Re 650.

GAO's Response: GAO is including all 1983 Beirut barracks and 1996 Khobar Towers bombing victims who meet applicable requirements, not just Peterson judgment creditors or In Re 650 Settling Judgment Creditors. Section 101 of the Fairness Act requires GAO to determine lump sum catch-up payments to 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who submit eligible applications for those catch-up payments.[39]

Under the statute, the term "1983 Beirut barracks bombing victim"

A. means a plaintiff, or estate or successor in interest thereof, who has an eligible claim under subsection (c) that arises out of the October 23, 1983, bombing of the United States Marine Corps barracks in Beirut, Lebanon; and

---

[37]In addition, the claimant used as an example above would be excluded from the Fund's payment calculations because their offset exceeds 30 percent of their compensatory damages amount. The Victims Act outlines minimum payments requirements in which any applicant with an eligible claim who has received, or is entitled or scheduled to receive, any payment that is equal to, or in excess of, 30 percent of the total compensatory damages owed on the applicant's claim from any source other than the Fund shall not receive any payment from the Fund until all other eligible applicants generally have received from the Fund an amount equal to 30 percent of the compensatory damages awarded to those applicants pursuant to their final judgments (referred to as the "30 percent rule"). *Id.* § 20144(d)(3)(B)(i).

[38]*Id.* § 20144(d)(3)(B)(iii).

[39]Pub. L. No. 117-328, § 101(b)(3)(B)(iii), 136 Stat. at 6108 (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(D)(i)).

B.  includes a plaintiff, estate, or successor in interest described in subparagraph (A) who is a judgment creditor in the proceedings captioned Peterson v. Islamic Republic of Iran, No. 10 Vic. 4518 (S.D.N.Y.), or a Settling Judgment Creditor as identified in the order dated May 27, 2014, in the proceedings captioned In Re 650 Fifth Avenue & Related Properties, No. 08 Vic. 10934 (S.D.N.Y. filed Dec. 17, 2008).[40]

Under the statute, the term "1996 Khobar Towers bombing victim"

A.  means a plaintiff, or estate or successor in interest thereof, who has an eligible claim under subsection (c) that arises out of the June 25, 1996 bombing of the Khobar Tower housing complex in Saudi Arabia; and

B.  includes a plaintiff, estate, or successor in interest described in subparagraph (A) who is a judgment creditor in the proceedings captioned Peterson v. Islamic Republic of Iran, No. 10 Vic. 4518 (S.D.N.Y.), or a Settling Judgment Creditor as identified in the order dated May 27, 2014, in the proceedings captioned In Re 650 Fifth Avenue & Related Properties, No. 08 Vic. 10934 (S.D.N.Y. filed Dec. 17, 2008).[41]

Given the use of the verb "includes," instead of language indicating that both conditions must be met, we conclude that those identified in 34 U.S.C. §§ 20144(j)(15)(B) and 20144(j)(16)(B) are illustrative applications of those who qualify as 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims, respectively.[42] Even if someone does not fit within subparagraph (B) of either definition, they would still be considered a 1983 Beirut barracks bombing victim or a 1996 Khobar Towers bombing victim if they fit within subparagraph (A) of either definition.[43] GAO has applied this interpretation in estimating lump sum catch-up payments for eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims.

Meaning of "Final Judgment"

---

[40]34 U.S.C. § 20144(j)(15).

[41]*Id.* § 20144(j)(16).

[42]Usage of the verb "to include" in a statute is presumed to connote a nonexclusive illustrative application of a general principle. CRS Report on Statutory Interpretation, *supra* note 17, at 55.

[43]See *Christopher v. SmithKline Beecham, Corp.*, 567 U.S. 142, 145 (2012).

**Appendix III: Summary of Public Comments on
Federal Register Notices**

GAO received comments from attorneys representing four 1983 Beirut barracks bombing victims who asserted that these individuals satisfied the requirements for lump sum catch-up payments, in part because they received final judgments before December 29, 2022.

GAO Response: Under 34 U.S.C. § 20144(d)(4)(D)(i), individuals are entitled to lump sum catch-up payments if they "submitted applications in accordance with subsection (c)(3)(A)(ii)(II) on or after December 29, 2022." That subsection, in describing the application-submission deadline, permits a 1983 Beirut barracks bombing victim to apply for lump sum catch-up payments if their final judgment was awarded before December 29, 2022.[44] In determining whether a 1983 Beirut barracks bombing victim was awarded a final judgment before December 29, 2022, the following statutory definition of that term applies:

> The term "final judgment" means an enforceable final judgment, decree or order on liability and damages entered by a United States district court that is not subject to further appellate review, but does not include a judgment, decree, or order that has been waived, relinquished, satisfied, espoused by the United States, or subject to a bilateral claims settlement agreement between the United States and a foreign state. In the case of a default judgment, such judgment shall not be considered a final judgment until such time as service of process has been completed pursuant to [28 U.S.C. § 1608(e)].[45]

We confirmed with the Fund that it has also applied the definition of "final judgment" in the Victims Act when assessing the eligibility for all claims.

**Issue Related to the Methodology of Prior Fund Distributions**

One comment expressed concern about the Special Master's methodology for making regular Fund distributions to claimants after the first round. It stated that in making those regular payment distributions, the Special Master divided available funds in a way that resulted in overpayments to non-9/11 related victims of state sponsored terrorism. According to the comment, the commenters raised this issue in order to ensure that all Fund claimants are treated fairly and equitably and given it might impact GAO's lump sum catch-up calculations.

GAO Response: Under the Comptroller General's mandate, we are to calculate lump sum catch-up payments for eligible claimants based on amounts that the Fund already distributed. The mandate does not provide

---

[44]34 U.S.C. § 20144(c)(3)(A)(ii)(II).

[45]*Id.* § 20144(j)(4).

for GAO to revisit the methodology used by the Special Master to distribute regular distribution payments to non-9/11 victims of state sponsored terrorism. Section 101 of the Fairness Act requires GAO to determine lump sum catch-up payments for eligible 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims in "amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of such victims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of [December 29, 2022]."[46]

---

[46]Pub. L. No. 117-328, § 101(b)(3)(B)(iii), 136 Stat. at 6108 (pertinent portion codified at 34 U.S.C. § 20144(d)(4)(D)(i)).

# Appendix IV: Comments from the Department of Justice

---



**U.S. Department of Justice**

Criminal Division

_Money Laundering and Asset Recovery Section_                     _Washington, D.C. 20530_

10/3/2024

**MEMORANDUM**

**TO:**                    Triana McNeil
                          Director, Homeland Security & Justice
                          Government Accountability Office
                          Comptroller General

                          Nagla'a El-Hodiri
                          Director
                          International Affairs and Trade
                          Government Accountability Office
                          Comptroller General

**FROM:**                  Margaret A. Moeser
                          Chief, Money Laundering and Asset Recovery Section
                          Criminal Division
                          Department of Justice

**SUBJECT:**               Department of Justice Response to Government
                          Accountability Office Draft Report, _U.S. Victims of State
                          Sponsored Terrorism Fund: 1983 Beirut Barracks and 1996
                          Khobar Towers Bombing Claimants Due $612 Million_

          The Department of Justice (Department) and the Criminal Division appreciate the
opportunity to review the Comptroller General, Government Accountability Office's (GAO) draft
report, _U.S. Victims of State Sponsored Terrorism Fund: 1983 Beirut Barracks and 1996 Khobar
Towers Bombing Claimants Due $612 Million_ (draft _Report_), and to provide this response
regarding GAO's audit, draft _Report_, and calculation of lump sum catch-up payments (LSCUPs)
for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims.

          The Department and Special Master emphasize that while compensation can never replace
what the victims of these acts of state-sponsored terrorism and their families have lost, we hope the
lump sum catch-up payments provide them some small measure of justice and peace.

**Appendix IV: Comments from the Department
of Justice**

The Special Master administers the U.S. Victims of State Sponsored Terrorism Fund (Fund) and implements the terms of its governing statute as enacted by Congress. Within the Criminal Division, professionals in the Money Laundering and Asset Recovery Section (MLARS) support the Fund. The Department supports the Fund's administration in accordance with the statute, and, together with the Special Master, is committed to serving the Fund's growing claimant population and will continue to process and pay claims promptly, accurately, and consistently with the statute's requirements. Since establishing the Fund in 2015, Congress has amended the Fund's statute several times, including by providing appropriations and conditions for LSCUPs to certain groups of Fund claimants. The Department and Special Master pay claimants in accordance with the statute and take no position on whether and how particular groups of victims should be compensated.

As outlined below, the Fund identified and implemented application procedures for victims of the 1983 Beirut barracks and 1996 Khobar Tower bombings consistent with the Fund's long-standing procedures for Fund applications and eligibility for all claimants, and provided information to claimants through the Fund's website, including updates related to the LSCUPs. The GAO first publicly indicated that it would require application and eligibility standards different from those of the Fund for LSCUPs for victims of the 1983 Beirut barracks and 1996 Khobar Towers bombings in its July 2024 Federal Register notice. The GAO has provided further information on its approach to LSCUPs in its draft *Report*. The draft *Report* outlines a number of issues, including but not limited to the eligibility for LSCUPs of 274 claimants who did not submit a successive application but for whom the GAO calculated LSCUP amounts and whether an extension to the application deadlines for those claimants is appropriate. Fund staff continues to study the draft *Report* and will review the GAO's final report when issued in the context of the statute as a whole to ensure payments to claimants are consistent with the statute. Fund staff cannot fully assess these issues until the GAO issues its final report.

The Special Master will authorize LSCUPs as outlined in the statute within the statutorily mandated time period. 34 U.S.C. § 20144(d)(4)(D). The Fund will then begin issuing LSCUPs on a rolling basis.

I.      **Fund Application Procedures**

Congress established the Fund in 2015 by enacting the Justice for United States Victims of State Sponsored Terrorism Act, 34 U.S.C. § 20144[1] (2015) (the "Act"). The Act mandates that the Fund Special Master determines whether a claim is eligible. 34 U.S.C. § 20144(c)(1). The Act required that the Special Master publish in the Federal Register and on a website "a notice specifying the procedures necessary for United States persons to apply and establish eligibility for payment, including procedures by which eligible United States persons may apply by and through their attorney." *Id.* § (b)(2)(A). In compliance with the statute, the Special Master published a notice in the Federal Register on July 14, 2016, that set forth the application procedures claimants must follow to establish eligibility for payment. This notice states in Part II, "[o]nly one

---

[1] Formerly codified at 42 U.S.C. § 10609 (2015).

**Appendix IV: Comments from the Department of Justice**

Department Response to GAO Draft *Report*                                                                 Page 3

application may be submitted for each claim."[2]  81 Fed. Reg. 45535, 45526 (July 14, 2016).  The Special Master determines the eligibility of each claim's application once.  An applicant may request a review hearing before the Special Master if their claim is denied.  The Special Master's determination as to eligibility is final and nonreviewable.  *See id.* § (b)(4).  The application procedures allow for orderly, efficient administration of the Fund by the Special Master and the five full-time-equivalent Department employees who assist the Special Master in her duties.  *See id.* § (b)(1)(B).  Successive or duplicative claims are administratively closed.

**II.      The Fairness for 9/11 Families Act Amended the Fund's Governing Statute**

The Fairness for 9/11 Families Act (Fairness Act), enacted on December 29, 2022, amended the Act in several ways.  It made two separate appropriations, the first providing funds for LSCUPs to certain 9/11 victims, 9/11 spouses, and 9/11 dependents (the "9/11 LSCUPs"), as earlier calculated by GAO pursuant to a direction in the Sudan Claims Resolution Act.  34 U.S.C. § 20144(d)(4)(C)(iv).  The second appropriation was for a reserve fund, from which LSCUPs will be paid to certain victims of the 1983 Beirut barracks bombing and the 1996 Khobar Towers bombing.  *Id.* § (d)(4)(D)(iv)(III).

The Fairness Act required the Special Master to "update, as necessary as a result of the enactment of such Act," Fund procedures and other guidance previously issued by the Special Master, and to make any such updates not later than 30 days after the enactment of the Fairness Act.  *Id.* § (b)(2)(A).  In compliance with this mandate, the Special Master made no changes to the longstanding application procedures set forth in the Fund's July 14, 2016 Federal Register Notice.  The Special Master and the Fund added a section on LSCUPs to the frequently asked questions section of the Fund's website.[3]

The Fairness Act did not amend the statutory provisions authorizing the Special Master to make eligibility determinations on claimants' applications.

a)  *LSCUPs to Certain 9/11 Victims, 9/11 Spouses, and 9/11 Dependents*

The Fairness Act's appropriation for 9/11 LSCUPs followed earlier related amendments.  The United States Victims of State Sponsored Terrorism Fund Clarification Act in 2019 changed an application deadline to allow the Special Master to accept Fund applications from 9/11 victims, 9/11 spouses, and 9/11 dependents, pursuant to deadlines in subsection (c)(3), until 90 days after November 21, 2019, or February 19, 2020.  *Id.* § (d)(4)(B).  The Clarification Act also removed an earlier provision that precluded payments to these victims.[4]

---

[2] The Fund also published the application procedures, including answers to frequently asked questions (FAQs), on its website, www.usvsst.com.  FAQ 4.4, which has been included since the initial iteration of the Fund's FAQs, has always stated that claimants do not need to re-apply to the Fund to be included in future authorized rounds of payments.
[3] *See* Fund FAQ Section 7, "Lump Sum Catch-Up Payments," available at https://www.usvsst.com/Home/Faq.
[4] These claimants could have applied to the Fund earlier, in time for the Fund's first or second distribution, but would not have been able to receive payments, even if their claims were found eligible.  Some claimants nevertheless applied, and the Special Master found their claims eligible, but a separate statutory provision meant they could not receive payments in the Fund's first two rounds of distributions.  These claimants who applied in the first or second round

Department Response to GAO Draft *Report*                                                    Page 4

Then, the Sudan Claims Resolution Act, enacted on December 27, 2020, amended the Act to mandate that GAO conduct an audit and calculate LSCUPs for 9/11 victims, 9/11 spouses, and 9/11 dependents "who submitted applications [during that time period] in amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of 9/11 victims, 9/11 spouses, and 9/11 dependents received from the Fund being equal to the percentage of the claims of 9/11 family members received from the Fund, as of December 27, 2020." *Id.* § (d)(4)(C)(i).

The Sudan Claims Resolution Act mandated the audit but did not provide any funding for the 9/11 LSCUPs. That came in the Fairness Act, along with the provisions governing the LSCUPs for certain victims of the 1983 Beirut barracks bombing and the 1996 Khobar Towers bombing. The Fairness Act appropriated the funds for the Special Master to authorize and the Fund to issue the 9/11 LSCUPs, in amounts equal to the amounts calculated by GAO, in accordance with the audit GAO had already completed. *Id.* § (d)(4)(C)(iv).

In compliance with the statute, the Special Master determined Fund eligibility, pursuant to her statutory authority, for 9/11-related claimants who submitted applications in accordance with Fund procedures during the statutory time period. *See id.* § (d)(4)(B)-(C). GAO requested and the Fund provided GAO data on those applications, and on earlier claims from 9/11 victims, 9/11 spouses, and 9/11 dependents. GAO identified and calculated LSCUPs for the population of claimants eligible to receive them, without the need for further information. The Special Master authorized the 9/11 LSCUPs in April 2023, and issued over 90 percent of the payments within one month.

*b)  LSCUPs to victims of the 1983 Beirut barracks bombing and 1996 Khobar Towers bombing*

The Fairness Act mandated that GAO "shall conduct an audit and publish in the Federal Register a notice of proposed lump sum catch-up payments to the 1983 Beirut barracks bombing and the 1996 Kohar Towers bombing victims who have submitted applications in accordance with subsection (c)(3)(A)(ii)(II) on or after such date of enactment, in amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of such victims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of December 29, 2022." *Id.* § (d)(4)(D)(i). Subsection (c)(3)(A)(ii)(II) established a window for victims of the 1983 Beirut barracks bombing or 1996 Khobar Towers bombing who received a judgment before December 29, 2022, to apply within 180 days from December 29, 2022, resulting in a deadline of June 27, 2023.[5]

The Fund complied with the statutory provisions relating to LSCUPs for victims of the 1983 Beirut barracks bombing and the 1996 Khobar Towers bombing in the same manner as the 9/11 LSCUPs. The Special Master determined eligibility, pursuant to her statutory authority, for

_____

could receive payments beginning with the Fund's third distribution, when Congress removed that provision. They were also included in GAO's calculations of 9/11 LSCUPs – based on their earlier applications. These claimants did not submit successive applications, which the Fund would have administratively closed.

[5] As was the case with 9/11 LSCUPs, the Special Master had already made eligibility determinations for certain other 1983 Beirut barracks bombing victims and 1996 Khobar Towers victims who applied before this window. *See* discussion in section II(c), *infra.*

Department Response to GAO Draft *Report*　　　　　　　　　　　　　　　　Page 5

the applications of a defined class of victims (1983 Beirut barracks bombing victims and 1996 Khobar Towers victims), submitted between December 29, 2022 and June 27, 2023. There were no separate or distinct eligibility or applications procedures for these LSCUPs. The Fund provided GAO data on those eligible claims.[6] Pursuant to long-standing Fund procedures, the Fund administratively closed any successive or duplicate applications submitted by victims of the 1983 Beirut barracks bombing or the 1996 Khobar Towers bombing who had already been found eligible by the Special Master before the enactment of the Fairness Act. The Fund treated the provisions in the statute relating to these LSCUPs the same way as it treated the analogous language in the statute relating to the 9/11 LSCUPs.

　　*c)　GAO's Requirement of an Additional Application for an LSCUP*

　　As explained above, GAO calculated 9/11 LSCUPs using data provided by the Fund for eligible claims, based on each claimants' sole application to the Fund. GAO did not require further information. In December 2023, GAO published a notice in the Federal Register of its proposed methodology for Beirut barracks bombing or Khobar Towers bombing claimants. In that notice, the GAO did not indicate that it would deviate from the Fund's long-standing approach to application and eligibility procedures.

　　However, in its July 2024 Federal Register notice, the GAO for the first time publicly interpreted the Fairness Act to add a new application procedure and requirement that applied to only 786 of the Beirut barracks bombing or Khobar Towers bombing claimants. These claimants, who the Special Master found had eligible claims before the Fairness Act passed, were not eligible to make a successive application to the Fund during the Fairness Act application window pursuant to long-standing Fund procedures. However, in July 2024, over one year after the application window closed, the GAO indicated that these claimants were required to make an affirmative "submission" during the Fairness Act application window to preserve eligibility for an LSCUP.

　　GAO's affirmative "submission" requirement contravened long-standing Fund procedures and LSCUP procedures set by the Special Master. As noted above, the Fund has procedures for applications, in place since the Fund's inception, that are public and well-known to claimants and their counsel. The Fairness Act did not mandate or set new application procedures for LSCUPs, but left Fund application procedures and eligibility determinations in the discretion of the Special Master. Instead of following the existing Fund procedures—the same procedures that were also followed when calculating 9/11 LSCUPs—GAO independently determined that the procedures the

---

[6] GAO requested information and comments from the Fund over 20 times, from approximately October 2023 through September 2024. The Fund responded to each of these requests. GAO published its first notice in the Federal Register on December 28, 2023. *See* Notice of Planned Methodology for Estimating Lump Sum Catch-Up Payments to Eligible 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims; Request for Comment, 88 Fed. Reg. 89693 (Dec. 28, 2023). The Fund continued providing timely responses as GAO's audit continued into July 2024, when GAO published a second notice in the Federal Register on July 9, 2024. *See* Notice of Estimated Lump Sum Catch-Up Payments to Eligible 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims and Planned Methodology; Request for Comment, 89 Fed. Reg. 56376 (July 9, 2024). The Fund has continued to provide additional information GAO has requested since the GAO's second notice, as well.

Department Response to GAO Draft *Report*                                                    Page 6

Special Master set were not applicable in this instance and required new application procedures, which GAO did not make public until nearly a year after the application window.[7]

> i) The Fairness Act and Fund procedures do not encompass a separate application process for LSCUPs.

In its draft *Report*, GAO states that the Department's "guidance may have discouraged up to 274 eligible Beirut barracks and Khobar Towers bombing victims from applying for lump sum catch-up payments." GAO further states that the Fund "takes the view" that the 786 claimants whom the Special Master already found to be eligible based on an application submitted before the Fairness Act's statutory application window cannot file successive, duplicate, or subsequent applications. Draft *Report* at 1, 10.

The Fund's procedures have remained the same throughout the life of the Fund. The Fairness Act itself did not mandate or establish separate application procedures for these or other LSCUPs. When administratively closing the successive "applications" submitted by 512 of the 786 existing eligible claimants, the Fund followed its own long-standing, publicly available procedures, initially set forth in the July 14, 2016 Federal Register Notice and unchanged by the Fairness Act. These long-standing procedures, with which the Fund's claimants and their counsel are well familiar, have always set forth only a single application and eligibility determination for each claim. At the outset of the Fund, the Act itself required the Special Master to delineate the procedures "necessary" to apply to and be found eligible for payment by the Fund. *See* 34 U.S.C. § 20144(b)(2)(A). The July 14, 2016 Federal Register Notice sets forth those required application procedures, which remained in place for all of the Fund's distributions, including distributions of LSCUPs. The Notice and its procedures do not "provide guidance" on the application process and procedures, as GAO's *Report* states—they *are* the Fund's application process and procedures, set forth in the sole discretion of the Special Master. *See* draft *Report* at 10.

> ii) GAO created a procedure without notice to claimants and unevenly applied its own, non-public requirements for an application for LSCUPs.

In its draft *Report*, the GAO found that 512 of the 786 claimants each submitted a successive, duplicate, or subsequent "application" during the Fairness Act's application window that the GAO determined made these claimants eligible for LSCUPs. Draft *Report* at 10, 13-14. The Special Master had already determined, before the Fairness Act's application window, that each of these claimants was eligible for the Fund. GAO made this assessment without guidance to claimants as to the GAO's successive application requirements, and without regard to the form or content of the successive application, the Fund's assessment of the same, or the Special Master's determination of eligibility related to these claimants. For example, the GAO identified no parameters for successive applications, and the "applications" the GAO deemed eligible took many

---

[7] *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-21-105306, U.S. VICTIMS OF STATE SPONSORED TERRORISM FUND: ESTIMATED LUMP SUM CATCH-UP PAYMENTS (2021).

Department Response to GAO Draft *Report*                                                Page 7

forms, including the form of a successive Fund application form, a partially completed successive Fund application form, or even an "expression" of the intent to apply for an LSCUP.[8]

Unlike the Special Master, who did publicly provide application procedures as required by the statute and did update public Fund FAQs, GAO never published any "submission" or "application" procedure in any Federal Register notice in advance of the application window's closing. Claimants had no notice that a new and separate process would be created.[9] Nor did claimants know what GAO might deem an appropriate "submission" or "application" because GAO independently required a procedure that is separate and distinct from the Special Master's application procedures, which are set forth in the Fund's July 14, 2016 Federal Register Notice, and Fund FAQs. GAO did not provide any information about what form a submission should take, but rather made *post hoc* decisions about whether claimants had made a submission. And indeed, GAO did not provide any public information about the GAO's application procedure until July 2024, a year *after* the Fairness Act application window closed.

Moreover, GAO calculated LSCUPs for all of the 786 claimants it determined not only had, but *could have* sent an additional application or "submission," including the 274 who made no affirmative "submission" at all. *See* draft *Report* at 10, 14. The GAO's calculations are based on information the Fund provided from its records of the claims, each of which had already been found eligible by the Special Master. Based on the long-standing application procedures, the Special Master had made an eligibility determination and GAO was able to calculate an LSCUP even for the 274 claimants who did not make a successive application pursuant to GAO's non-public procedures.

In contrast, the Fund followed its own, public procedures in complying with the Fairness Act. Those procedures, including that one application may be submitted for each claim, have been in place since the Fund's inception and published in the Federal Register and described on the Fund's website. In the Special Master's discretion, these procedures did not change in light of the Fairness Act for these LSCUPs or for the 9/11 LSCUPs. The Special Master determined the eligibility of new claims submitted during the Fairness Act application timeframe,[10] and administratively closed successive or duplicate applications submitted in violation of Fund procedures, as the Fund does when it receives successive or duplicate applications from any other claimants.

The GAO notes that the "Special Master has the authority to grant a claimant, for good cause, a reasonable extension of the application submission deadlines." Draft *Report* at 15. As the

---

[8] Notice of Estimated Lump Sum Catch-Up Payments to Eligible 1983 Beirut Barracks Bombing Victims and 1996 Khobar Towers Bombing Victims and Planned Methodology; Request for Comment, 89 Fed. Reg. 56376, 56379 n. 32 (July 9, 2024).

[9] GAO did not inquire with the Fund regarding these LSCUPs until October 2023, more than two months after the close of the Fairness Act application window, and more than seven months after the Fund published the "necessary" updates to the Fund website pursuant to the Fairness Act. *See* 34 U.S.C. § 20144(b)(2)(A).

[10] The Fund adjudicated claims from victims of the 1983 Beirut barracks bombing and the 1996 Khobar Towers bombing, as well as other claims submitted in this time period. GAO calculated LSCUPs for claimants who filed applications with the Fund during application window; GAO did not require additional procedures for these claimants and similarly relied on information in their sole application to the Fund. These claimants did not make, nor did GAO require, any separate indication that they were applying for LSCUPs. As with the other claimants, GAO did not need any information beyond Fund claim records to calculate their LSCUPs.

**Appendix IV: Comments from the Department
of Justice**

Department Response to GAO Draft *Report*                                                                    Page 8

Fund outlined to the GAO, where the Special Master deems a claim eligible, there is no need to grant an extension of application submission deadlines because the claim has already received an eligibility determination. The GAO appears to suggest that the Special Master may grant an extension of the application deadlines to the 274 claimants who made no affirmative submission during the application window, but for whom the GAO calculated LSCUPs pursuant to its own application procedures. Fund staff continue to study the draft *Report* and the GAO's July 2024 Federal Register notice, which was the first announcement to claimants of the GAO's decision to deviate from the Fund's long-standing application procedures with respect to LSCUPs for the Beirut barracks and Khobar Tower victims. Fund staff will assess the GAO's final report when issued, along with information the GAO provided publicly to claimants, in the context of the statute as a whole, to ensure the Fund appropriately implements the statute.

**III. Results of GAO's Requirements and Calculation Methodology**

In the Fairness Act, Congress appropriated $3 billion for a reserve fund, to be used to pay the GAO-determined LSCUPs for victims of the 1983 Beirut barracks bombing and 1996 Khobar Towers bombing. *See supra.* The Act mandates that amounts remaining in the LSCUP reserve fund "in excess of the amounts" determined for LSCUPs then be deposited into the general Fund. 34 U.S.C. § 20144(d)(4)(D)(iv)(IV)(bb). This deposit of the reserve fund's remaining amounts represents only the second time Congress has directed appropriated funds for the Fund's general distributions. Congress provided an initial appropriation of over $1 billion to establish the Fund, and has not otherwise appropriated funds to claimants, except for LSCUPs. As of the Fund's fourth distribution, more than $107 billion in compensatory damages remained unpaid on eligible claims.[11] As detailed below, GAO's methodology and calculations of these LSCUP amounts affect the "rollover" amount that could be used in general distributions.

    *a)  Inclusion of Claimants Found Eligible before the Fairness Act*

GAO's draft *Report* estimates the LSCUPs to total about $612 million, without specifically defining the estimates for the 1,564 claimants who submitted new applications during the Fairness Act window and the 512 claimants whom the Special Master had already found eligible and who submitted successive applications in some form during the Fairness Act window. *See* draft *Report* at 8, 13-14. The draft *Report* does not set forth the specific effect of including the latter 512 claimants, which decreases the "excess" funds that will be deposited, or "rolled over," into the general Fund. GAO did identify how much more the "rollover" amount would decrease should GAO include the population of 274 claimants who were already found eligible by the Special Master and did not submit successive applications in some form during the Fairness Act window— GAO estimates their LSCUPs would total $120 million. *See* draft *Report* at 14.

GAO also stated its intent to include 78 conditional claimants who were *Peterson* judgment creditors among the 512 claimants who were already found eligible by the Special Master and submitted successive applications in some form during the Fairness Act window. A final judgment

---

[11] There were 15,769 eligible claims as of the Fund's fourth distribution. The Special Master authorized payments for the fourth distribution by the statutory deadline of January 1, 2023. As of July 19, 2024, the number of eligible claims has grown to 18,846. *See* United States Victims of State Sponsored Terrorism Fund – Special Master's Report to Congress Regarding the Fourth Distribution (Jan. 2023), available at https://www.usvsst.com/Home/News. *See also* the Distributions and Payments page, available on the Fund website at https://www.usvsst.com/Home/Payments.

Department Response to GAO Draft *Report*                                          Page 9

in favor of the plaintiffs in *Peterson* was entered in 2016 with distributions from that case commencing that same year.  Under the statutory provisions for conditional claims these conditional claimants did not and have not received payments from the Fund in prior rounds, nor were they included in any award calculations.[12]  The statutory provisions regarding *Peterson* were not amended by the Fairness Act.  If these claimants had elected to participate in the Fund, receiving Fund payments on the same terms as other eligible claimants, instead of filing as conditional claimants, they would have been required to assign their interests in the assets at issue in the *Peterson* proceedings to the Fund, meaning any payments they received in those proceedings would be directed to the Fund, for the benefit of the entire claimant pool.  GAO's decision to permit "successive" applications ignores the statutory choice these claimants were required to and did make at the inception of the Fund.  This GAO decision results in 78 *Peterson* conditional claimants' receiving LSCUPs, but with no requirement to turn over their *Peterson* recoveries to the Fund for the benefit of all claimants.

Ultimately, the statute directs the GAO to include in its final report a determination of the amount of the proposed lump sum catch-up payment "for each" 1983 Beirut barracks bombing victim and 1996 Khobar Towers bombing victim.  34 U.S.C. § 20144(d)(4)(D)(iii).  Having reviewed the draft *Report*, the Fund notes GAO's view that "some potentially eligible claimants did not submit claims."  *See* draft *Report* at 8, 10, 14.  The GAO has assessed that these claimants are potentially eligible for LSCUPs consistent with its interpretation of the statute's terms regarding applications, despite the Special Master's implementation of the statute.  The GAO states that it "does not have the authority to include the 274 claimants in the determination of lump sum catch-up payments because individuals must have submitted an application to be eligible for those payments under the Fairness Act."  Draft *Report* at 14.  But the GAO nevertheless has calculated the LSCUPs for these claimants and included that amount in the draft *Report*.  *Id.*  Fund staff are assessing the draft *Report* in the context of the statute as a whole.  When the GAO issues its final report, Fund staff will similarly assess it in the context of the statute as a whole, including the statute's requirements related to GAO's final report on the "amount of the proposed [LSCUPs] for each …victim," and to the Special Master's authorization of payments.  *Id.* (d)(4)(iii)-(iv).

b)  *GAO's offset calculation methodology for victims of the 1983 Beirut barracks bombing or 1996 Khobar Towers bombing*

GAO's LSCUP calculation methodology, particularly its use of offsets, diverges from that of the Fund's long-standing, publicly available calculation methodology.[13]  GAO's draft *Report* indicates that qualifying offset amounts are deducted from the compensatory damages amount determined after applying individual and family caps, followed by the application of GAO's LSCUP payment percentage and deduction of prior-round payments from the Fund.  Draft *Report* at 43.  This manner of applying offsets will result in payments of LSCUPs to claimants who have already recovered large percentages of their compensatory damages amounts from sources of compensation other than the Fund.  More than 65 percent of the population of claimants GAO has identified as eligible for these LSCUPs have recovered more than 30 percent of their compensatory

---

[12] *See* Supplemental Report to Congress from the Special Master, United States Victims of State Sponsored Terrorism Fund (Aug. 2017), available at https://www.usvsst.com/Home/News.
[13] *See* Fund Payment Calculation Explanations for all distributions, available at https://www.usvsst.com/Home/Payments.

**Appendix IV: Comments from the Department of Justice**

Department Response to GAO Draft *Report*                                                                 Page 10

damages awards from qualifying offsets.  An additional approximately three percent of GAO's LSCUP-eligible population have recovered more than 50 percent of their compensatory damages awards via offsets.  Payments to these claimants, who have already recovered amounts in excess of the Fund's total payment percentage for non-9/11-related claimants of 24 percent,[14] further decrease the funds that will "rollover" for the benefit of all claimants.

The Fund will continue to apply offsets in the same manner as stated in its Payment Calculation Explanations, when making general Fund distributions to the entire claimant pool. Under existing Fund calculations, the payment percentage is applied to the compensatory damages amount determined after applying individual and family caps, resulting in a maximum payment amount from the Fund.  That amount is then reduced by offsets and prior-round payments from the Fund.  This calculation methodology has long ensured that claimants are treated equitably whether they receive their compensation from the Fund or an outside source, as opposed to GAO's independent calculation methodology discussed above.  The differences in calculation methodology will result in certain claims receiving LSCUPs, but not receiving payments in the Fund's standard distributions because the claimants have already recovered more in total than the Fund's payment percentage.

In its draft *Report*, GAO presents an example of a claimant with a compensatory damages award of $1,000,000, a qualifying offset amount of $384,638.01, and no applicable individual or family cap.  GAO explains that under their methodology, this claimant would receive an LSCUP of $98,675.14, despite the recovery of more than 35% of their compensatory damages amount from sources other than the Fund, far exceeding the Fund's overall payment percentage.  Under the Fund's methodology, this claimant's payment amount would be $0.00 as shown in the sample methodology comparison chart below:

---

[14] *See* U.S. Victims of State Sponsored Terrorism Fund, Payment Calculation Explanation for Non-9/11-Related Claims, Fourth Distribution – December 2022, at 5.  The Fund statute contains a separate provision that claimants who have already received 30 percent or more of their compensatory damages from sources other than the Fund will not receive any payment from the Fund until all other eligible Fund claimants' payments from the Fund have reached at least 30 percent of their compensatory damages.  *See* 34 U.S.C. § 20144(d)(3)(B)(i).

**Appendix IV: Comments from the Department
of Justice**

Department Response to GAO Draft *Report*                                                    Page 11

| Payment Methodology[15] | | |
|---|---|---|
| *Sample* | **GAO Report LSCUP Calculation** | **Fund Standard Distribution Calculation** |
| GAO Claim Amount and Fund Gross Compensatory Damages after applying individual and family caps | $1,000,000 | |
| Qualifying compensation from other sources ("offset") | ($384,638.01) | APPLIED IN LATER STEP |
| Claim Amount after Offset | $615,361.99 | |
| GAO LSCUP payment percentage | 16.0353% | |
| | | |
| Fund Maximum potential payment amount due from the Fund (GAO LSCUP payment percentage applied to the gross compensatory damages amount after caps) | N/A | $160,353.00 |
| Less: amounts already received in prior-round Fund distributions | $0 | |
| Less: any offsets | APPLIED IN EARLIER STEP | ($384,638.01) |
| Calculation Explanation | $615,361.99 x 16.0353% | $384,638.01 > $160,353.00 |
| **LSCUP Amount** | **$98,675.14** | **$0.00** |
| Total Recovery | $483,313.15 | $384,638.01 |
| Percentage Recovery | 48.3% | 38.5% |

---

[15] This table is for illustrative purposes only.  The Special Master will authorize and issue LSCUPs to victims of the 1983 Beirut barracks bombing and 1996 Khobar Towers bombing consistent with the statute and GAO's final report.

**Appendix IV: Comments from the Department
of Justice**

Department Response to GAO Draft *Report*                                                    Page 12

As demonstrated, GAO's application of offsets results in an LSCUP for claimants who have already received in excess of the total Fund payment percentage, thereby reducing the "rollover" amount that will be available to all eligible claimants.

c) *GAO's proposed legislative change*

The GAO calculated the LSCUPs for the population of 274 claimants who did not submit successive applications in some form during the Fairness Act window and in its draft *Report* also recommended a legislative change to the Fund's governing statute to direct the Special Master to issue LSCUPs to that population. As stated above, GAO estimated LSCUPs for this population of claimants to be about $120 million. *Report* at 14.

GAO implies that the $120 million would be available from the $3 billion appropriated to the LSCUP reserve fund and "will continue to be available for a certain amount of time after GAO issues its report on these payments." *Id.* at 15, n. 49. The statute, however, does not give the Fund authority to "set aside" monies. On the contrary, the statute directs that "the Special Master shall authorize lump sum catch-up payments … in amounts equal to the amounts described" in the GAO final report. As a result, once the LSCUP reserve fund terminates, there will be no funding available to pay additional LSCUPs without future appropriations.

**IV. Conclusion**

The Department and Special Master respect the courage and perseverance of victims of state-sponsored terrorism and their families, who have suffered losses that no amount of money can address. The Department, through the Criminal Division, appreciates the opportunity to engage in technical discussions with GAO about the LSCUPs for victims of the 1983 Beirut barracks bombing and 1996 Khobar Towers bombing and to provide this response to the draft *Report*. When the GAO issues its final report, the Fund will assess it in the context of the statute as a whole. The Special Master will authorize the LSCUPs in amounts calculated by GAO, consistent with the statute. The Department and Criminal Division hope these payments provide some measure of comfort to the victims and families who were forever changed by the 1983 bombing of the barracks in Beirut, Lebanon, and the 1996 bombing of the Khobar Towers in Saudi Arabia.

# Appendix V: GAO Contacts and Staff Acknowledgement

| | |
|---|---|
| **GAO Contacts** | Triana McNeil, (202) 512-8777 or McNeilT@gao.gov and Nagla'a El-Hodiri, (202) 512-7279 or ElHodiriN@gao.gov. |
| **Staff Acknowledgments** | In addition to the contacts named above, David Lutter (Assistant Director), Kim Frankena (Assistant Director), James Lawson (Analyst-in-Charge), David Ballard, John Karikari, Amanda Miller, Lisa Motley, Kevin Reeves, Bolko Skorupski, Janet Temko-Blinder, and Christopher Zubowicz made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, X, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet: Website: https://www.gao.gov/about/what-gao-does/fraudnet Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Sarah Kaczmarek, Managing Director, KaczmarekS@gao.gov, (202) 512-4800, U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.