**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ELVIS J. RUSNAK,

Petitioner,

v.

JOSHUA M. AMBUSH, LLC, and
JOSHUA M. AMBUSH,

Respondents,

Civil Action No. 26-cv-01262 (JRR)

**REDACTED**

**REPLY IN SUPPORT OF MOTION TO CONFIRM ARBITRATION AWARD**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii
INTRODUCTION ........ 1
ARGUMENT ........ 2
I. Ambush's Challenges to the Award Are Time Barred. ........ 2
II. Respondents' Vacatur Arguments Fail on the Merits. ........ 5
A. The Arbitrator Acted Within Her Authority. ........ 5
B. The Arbitrator Did Not Consciously Disregard Clearly Defined Legal Principles. ........ 9
CONCLUSION ........ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Catler v. Arent Fox, LLP*,
212 Md. App. 685 (2013) ....13

*Cent. Cab Co., Inc. v. Clarke*,
259 Md. 542 (1970) ....13

*Craddock v. LeClairRyan*,
2019 WL 2437460 (E.D. Va. June 11, 2019) ....11

*Denison v. Horsey Denison Landscaping, LLC*,
2026 WL 1595425 (D. Md. June 4, 2026) ....5

*Dewan v. Walia*,
544 F. App'x 240 (4th Cir. 2013) ....11

*Dist. 17, United Mine Workers of Am. v. Island Creek Coal Co*.,
179 F.3d 133 (4th Cir. 1999) ....10

*Fishow v. Simpson*,
55 Md. App. 312 (1983) ....12

*Halligan v. Piper Jaffray, Inc*.,
148 F.3d 197 (2d Cir. 1998) ....11

*Int'l Longshoremen's Ass'n, Loc. No. 1624 v. Hampton Rds. Shipping Ass'n*,
1995 WL 19321 (4th Cir. Jan. 19, 1995) ....8

*Jones v. Dancel*,
792 F.3d 395 (4th Cir. 2015) ....8

*Jones v. Maryland*,
425 Md. 1 (2012) ....13

*Lawson-Jackson v. Rosenhaus*,
2017 WL 4063800 (D. Md. Sep. 13, 2017) ....3

*Oxford Health Plans LLC v. Sutter*,
569 U.S. 564 (2013) ....7

*Remmey v. PaineWebber, Inc*.,
32 F.3d 143 (4th Cir. 1994) ....5, 11

*Stevens v. Jiffy Lube International, Inc.*,
911 F.3d 1249 (9th Cir. 2018) ....................................................................................3

*Taylor v. Nelson*,
788 F.2d 220 (4th Cir. 1986) ....................................................................................2–5

*Upshur Coals Corp. v. United Mine Workers of Am., Dist. 31*,
933 F.2d 225 (4th Cir. 1991) ....................................................................................10

*Wachovia Sec., LLC v. Brand*,
671 F.3d 472 (4th Cir. 2012) ....................................................................................10

*Wallace v. Buttar*,
378 F.3d 182 (2d Cir. 2004)......................................................................................11

*Williamson Farm v. Diversified Crop Insurance Services*,
917 F.3d 247 (4th Cir. 2019) ....................................................................................8

**Statutes**

9 U.S.C. § 10(a)(4)......................................................................................................7

9 U.S.C. § 12...............................................................................................................2

34 U.S.C. § 20144(d)(4) ..............................................................................................6

**Other Authorities**

AAA Commercial Rule 35(a) ......................................................................................12

Fed. R. Civ. P. 81(a)(6)(B) ..........................................................................................2

## INTRODUCTION

Petitioner Elvis J. Rusnak respectfully submits this Reply in Support of his Motion to Confirm Arbitration Award ("Motion"), ECF 14. Respondents' challenge to the Arbitration Award ("Award") fails before the Court ever reaches its merits. The Federal Arbitration Act ("FAA") imposes a mandatory three-month deadline for seeking vacatur. Respondents missed that deadline. They then compounded that defect by advancing in their brief new vacatur theories that were never asserted in their already dilatory petition or in the underlying arbitration. Settled Fourth Circuit precedent bars such untimely arguments. That alone requires confirming the Award and denying Ambush's Contingent Cross-Petition to Vacate Arbitration Award ("Cross-Petition"), ECF 12.

Even considering Ambush's arguments on the merits, they fail. First, Ambush implies that informal guidance he received from the U.S. Victims of State Sponsored Terrorism Fund ("Fund") was binding. This argument is premised on a wrong understanding of the Fairness for 9/11 Families Act ("Fairness Act"). The Fairness Act expressly provides that, as to catch-up payments, the Special Master's role was only to execute—on a nondiscretionary basis—the payments as determined by the Government Accountability Office ("GAO"), acting for the Comptroller General. The record confirms the GAO's authority. When the Special Master and GAO took different views, the GAO's interpretation controlled: claimants who submitted applications consistent with the GAO's view received payments. Ambush's arguments ignore this reality.

Second, Ambush misconstrues what it means for an Arbitrator to exceed her powers under the FAA. An arbitrator exceeds her powers only when she acts outside the bounds of the parties' arbitration agreement, which did not occur here. Ambush attempts to use inapposite caselaw to recast the Arbitrator's decision as one that contravenes agency authority made binding on her. This is plainly incorrect. The Award rests on the Arbitrator's determination that, confronted with

arguably unclear statutory language and informal guidance that even the Fund disclaimed as unreliable, reasonably prudent attorneys would have taken (and in fact did take) steps to preserve valuable claims for their clients—or at least obtained informed client consent. That conclusion reflects the application of ordinary malpractice principles, not usurpation of agency authority.

Finally, under the guise of manifest disregard, Ambush attempts to relitigate the malpractice claims already determined in arbitration. The record shows that the Arbitrator identified and applied the governing Maryland malpractice framework to the evidence before her. Ambush's arguments challenge the merits of the Award, including on the basis of theories never even presented in arbitration. Because manifest disregard is reserved for the rare case in which an arbitrator knowingly flouts controlling law, and not for cases where a losing party simply disagrees with the outcome, that doctrine has no application here. The Award should be confirmed.

## ARGUMENT

### I. Ambush's Challenges to the Award Are Time Barred.

FAA § 12 provides that "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. The Fourth Circuit treats Section 12's three-month deadline as mandatory and not subject to exception. In *Taylor v. Nelson*, 788 F.2d 220 (4th Cir. 1986), the Fourth Circuit noted that due diligence and tolling exceptions "are not implicit in the language of the statute, and cannot be described as common-law exceptions because there was no common-law analogue to enforcement of an arbitration award." *Id.* at 225. This rigidity serves the FAA's core purpose of promoting finality in arbitration.

By serving the Cross-Petition after the expiration of the three-month period, Respondents foreclosed their ability to challenge the award. Ambush disputes the untimeliness of the Cross-

Petition, despite clear authority to the contrary. However, Rule 6(a), which governs the computation of time under the FAA, *see* Fed. R. Civ. P. 81(a)(6)(B), establishes that Respondents' deadline to seek vacatur expired on May 20, 2026. In *Stevens v. Jiffy Lube International, Inc.*, 911 F.3d 1249 (9th Cir. 2018), the Ninth Circuit held that a petition to vacate filed on December 15 was an untimely attempt to vacate a September 14 arbitration award based on the three-step calculation required by Rule 6(a). At the first step, the day of the triggering event—here, February 20—is excluded from the calculation. Second, three calendar months are measured. "[A] month beginning on the fifteenth concludes on the fourteenth of the following month—just as the month beginning January 1 concludes on January 31, not February 1." *Id.* at 1252. Here, a month beginning on February 21 concludes on March 20, and so on. Thus, the measure of three months from the Award date was May 20, 2026. At the third step, the deadline is extended only if it falls on a weekend or legal holiday. Because May 20, 2026 was a Wednesday, no extension applies. Courts in this District applying Section 12 have employed the same approach. *See, e.g.*, *Lawson-Jackson v. Rosenhaus*, 2017 WL 4063800, at *3 (D. Md. Sep. 13, 2017) (holding that a petition filed on December 20, 2016, exactly three months after a September 20, 2016 award, was filed on "the last day of the three-month limitation period").

Respondents did not file and serve their Contingent Cross-Petition to Vacate until May 21, 2026, one day after the expiration of Section 12's three-month deadline. Because that deadline is mandatory, the Cross-Petition is untimely. The untimeliness of the Cross-Petition also forecloses Respondents from raising vacatur arguments in opposition to confirmation.[1] The *Taylor* court held

[1] Respondents' brief abandons several arguments asserted in the Cross-Petition, including that the Arbitrator "refused to hear pertinent and material evidence," rendered an award that was "completely irrational," and disregarded that "an attorney who acts according to the explicit instructions of a government agency . . . does not violate a standard of care under Maryland law," and that Rusnak's "prior litigation positions undermine the Arbitrator's causation finding." Cross-Petition at § IV(B), ¶¶ 21–22, 24.

unequivocally that once the three-month period has expired, "an attempt to vacate an arbitration award could not be made even in opposition to a later motion to confirm." 788 F.2d at 225. The court warned that "if a party opposing confirmation were always permitted to seek a vacatur in opposition to a petition to confirm, the three-month limit would have little practical effect." *Id.* at 225 n.2. This Court should therefore reject arguments opposing confirmation on this basis alone.

Respondents' filing of a since-dismissed Petition to Vacate in D.C. ("D.C. Petition"), No. 26-CV-1247 (D.D.C. Apr. 14, 2026), ECF 1, does not alter this conclusion. Respondents acknowledged the need to preserve their rights within the statutory period when they filed their contingent Cross-Petition in this Court "*solely to preserve Ambush's right to seek vacatur of the Award* within the ninety-day period prescribed by Section 12 [of the FAA]." Cross-Petition at 1 (emphasis added). Respondents' own words evidence an understanding that filing the Cross-Petition within the statutory period was necessary to preserve their rights. Respondents erred in filing a day late. Even assuming the now-dismissed D.C. Petition could somehow be considered in this action, the grounds for vacatur advanced in Respondents' Opposition ("Opp."), ECF 33, were not asserted there. Respondents did not argue in their D.C. Petition (or in their Maryland Cross-Petition) that the Arbitrator exceeded her authority because she "substituted her own interpretation of the Fairness Act" and "fail[ed] to adhere to [an] agency's binding determination," Opp. at 20; they did not argue that Rusnak was required to present expert testimony on the standard of care specific to attorneys representing terrorism victims before the USVSST Fund; and they did not raise an intervening-cause theory asserting that the GAO's report broke the chain of proximate causation. These are entirely new theories advanced for the first time in opposition to confirmation.

Respondents' additional suggestion that Section 12 merely requires "notice of [an] intent to pursue vacatur," Opp. at 18, leaving a party free to devise new theories after the deadline has

expired, is incompatible with both the FAA's text and the cases interpreting it. Section 12 requires a motion to vacate, not a placeholder preserving the opportunity to formulate additional challenges later. Under the FAA, confirmation proceedings are intended to be summary in nature. *Taylor*, 788 F.2d at 225. Allowing a party to raise new arguments beyond those contained in a timely-filed petition would transform an opposition to confirmation into a vehicle for an untimely motion to vacate. *See Remmey v. PaineWebber, Inc.*, 32 F.3d 143, 146 (4th Cir. 1994) ("Opening up arbitral awards to myriad legal challenges would eventually reduce arbitral proceedings to the status of preliminary hearings. Parties would cease to utilize a process that no longer had finality.").

Ambush claims *Denison v. Horsey Denison Landscaping, LLC*, 2026 WL 1595425, at *16 (D. Md. June 4, 2026), shows this Court has previously disregarded timeliness objections to reach a vacatur challenge's merits. Opp. at 18. This grossly misrepresents *Denison*. Contrary to Ambush's portrayal, this Court found the challenge there *untimely*, holding that "Respondents failed to meet their burden to clearly establish one of the grounds for vacating the [arbitration] award within the statutory time period" and, as a result, "the court is bound to confirm the arbitration award pursuant to the FAA." *Denison*, 2026 WL 1595425, at *16. This Court addressed the vacatur arguments only "for the sake of completeness." *Id.* at *17. It concluded that "*even had they mounted their disputes in a timely basis*, Respondents fail to meet their 'heavy burden' to demonstrate any ground for vacatur…." *Id.* at *20 (emphasis added). Far from supporting Ambush, *Denison* reinforces that an award must be confirmed in the face of untimely challenges.

## II. Respondents' Vacatur Arguments Fail on the Merits.

Even if the Court were to consider the merits of Respondents' Cross-Petition, each argument fails for the reasons set forth below.

### A. The Arbitrator Acted Within Her Authority.

Ambush contends the Arbitrator exceeded her powers when she purportedly "substituted her own interpretation of the Fairness Act" for what Ambush characterizes as the Special Master's "controlling interpretation" of the statute. Opp. at 20. That characterization is incorrect.

*First*, Ambush's argument is premised on an erroneous description of the Fairness Act. Congress established the USVSST Fund to compensate victims of international state-sponsored terrorism. The Fund is administered by a Special Master, who determines general eligibility. In addition to regular periodic distributions, Congress has, on occasion, directed that certain claimants receive special "lump sum catch-up payments." The Fairness Act is one such example. Under the Fairness Act, Congress directed the Comptroller General to make a "determination" and report to the Special Master lump sum catch-up payment amounts for "each 1983 Beirut barracks bombing victim" and "each 1996 Khobar Towers bombing victim." 34 U.S.C. § 20144(d)(4)(D)(iii). Congress further provided that the Special Master "shall authorize" catch-up payments in the amounts decided by the Comptroller General. *Id*. § 20144(d)(4)(D)(iv)(II). Thus, unlike regular Fund distributions, which are calculated by the Special Master, the Fairness Act catch-up payments were determined by the Comptroller General. *See* 34 U.S.C. §§ 20144(d)(4)(C)(iv)(I), (D)(iv)(II). Despite Ambush's protestations to the contrary, the statute leaves no doubt that the Comptroller General, acting through the GAO, was responsible for determining Fairness Act catch-up payments, while the Special Master's role was to implement that determination.

The actual administration of the Fairness Act resolves any doubts. The Special Master "took the view that…existing claimants could not submit a separate or 'successive' application in order to apply for catch-up payments." GAO, *U.S. Victims of State Sponsored Terrorism Fund: 1983 Beirut Barracks and 1996 Khobar Towers Bombing Claimants Due $614 Million*, GAO-25-107564, at 1 (2024) ("GAO Report"), ECF 14-13. The GAO, however, reached the opposite

conclusion, determining that "[e]xisting claimants who did submit timely applications are eligible for catch-up payments." *Id.* Faced with competing views, it was the GAO's decision that controlled. The clearest proof is what happened next: all 512 terrorism victims who (unlike Ambush's clients)[2] submitted additional Fund applications during the catch-up payment eligibility period were awarded Fairness Act payments. GAO Report at 17–18. Had the Special Master's interpretation governed, none of those claimants would have been paid. Nor is it "undisputed," as Ambush falsely claims, that this occurred because the Special Master *voluntarily* changed course. The record shows instead that the Special Master was statutorily required to abide by the GAO's determination. As the GAO Report explains, "[a]ccording to Fund officials, *as provided by the Fairness Act*, the Special Master will authorize catch-up payments in amounts as determined by GAO." *Id*. (emphasis added); *see also* Ex. R25 (reflecting USVSST Fund's acknowledgment that "[e]ligibility for lump sum catch-up payments" is "determined by the Comptroller General, Government Accountability Office"). The record disproves Ambush's claim that the Special Master possessed "exclusive authority to interpret the Fairness Act." Opp. at 19. The Arbitrator thus cannot have exceeded her authority (or manifestly disregarded the law).

*Second*, Respondents misconstrue what it means for an arbitrator to "exceed[] their powers." 9 U.S.C. § 10(a)(4). Vacatur is warranted only when "the arbitrator act[s] outside the scope of his contractually delegated authority," such that the award reflects the arbitrator's "own notions of [economic] justice" rather than "draw[ing] its essence from the contract." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (citation modified). Put differently, an arbitrator

[2] Ambush claims that "[o]ther lawyers, representing other victims who had applied to the Fund prior to December 29, 2022, also did not submit successive applications during the 180-day window, understanding that their clients were not entitled to lump sum catch-up payments. *See, e.g.*, *Christie v. United States of America*, 25-cv-00932 (D.D.C.)." Opp. at 9. The only victims who did not submit applications for catch-up payment were victims represented by Ambush and counsel in *Christie*. It is misleading to describe Ambush's inaction as replicated by other lawyers (in the plural) and use an "*e.g.*" signal when the *only* other non-compensated victims were *Christie* plaintiffs.

exceeds her authority only when she disregards the arbitration agreement, for instance, by ignoring express limitations on her power, deciding issues not submitted for arbitration, or granting relief not requested by the parties. The Fourth Circuit has repeatedly rejected attempts to expand § 10(a)(4) into a vehicle for substantive review of arbitral decisions. *See Int'l Longshoremen's Ass'n, Loc. No. 1624 v. Hampton Rds. Shipping Ass'n*, 1995 WL 19321, at *6 (4th Cir. Jan. 19, 1995) ("[A] party may not use § 10(a)(4) merely as a second attempt to obtain review on the merits."); *Jones v. Dancel*, 792 F.3d 395, 405 (4th Cir. 2015) (rejecting a § 10(a)(4) challenge where the plaintiffs did "not argue that the arbitrator failed to observe any limitations on his authority imposed by the relevant arbitration provisions" but merely repackaged arguments that the arbitrator misapplied the law).

Respondents do not identify any contractual limitation that the Arbitrator disregarded; nor do they contend she decided issues not submitted or awarded relief beyond the scope of the parties' submissions. Respondents simply disagree with the Arbitrator's analysis and conclusions. That disagreement does not establish that the Arbitrator exceeded her authority. *See Jones*, 792 F.3d at 405. Respondents' sole purported authority for their claim that the Arbitrator exceeded her authority under 9 U.S.C. § 10(a)(4) is *Williamson Farm v. Diversified Crop Insurance Services*, 917 F.3d 247 (4th Cir. 2019). But Respondents distort the decision's holding. *Williamson Farm* concerned an insurance policy administered by the Federal Crop Insurance Corporation ("FCIC"). Critically, the arbitration agreement expressly required arbitrators to obtain and follow FCIC interpretations of ambiguous policy provisions. *Id.* at 256. The Fourth Circuit thus held that an arbitrator exceeded her authority when she failed to obtain the required FCIC interpretation before deciding policy questions and awarded damages that binding FCIC guidance expressly prohibited. *Id.* at 257. In other words, the arbitrator disregarded contractual limitations on her authority.

*Williamson Farm* bears no resemblance to the arbitration here. The arbitration agreement at issue here does not reference (much less require obedience to) outside agency determinations. This arbitration involved a legal malpractice claim governed by Maryland law. The Arbitrator was tasked with assessing the standard of care in light of a statute that afforded potential compensation to a client, whether Ambush adequately advised his client of the risks and available options, and whether Ambush took reasonable steps to protect his client's interests. Those are classic malpractice questions that fell squarely within the arbitrator's authority.

*Third*, the Arbitrator was not called to, and did not, resolve a dispute concerning the Fairness Act's meaning. Rather, she evaluated whether Ambush acted reasonably in the face of uncertainty on the availability of catch-up payments and whether he adequately protected his client's interests. The question before the Arbitrator was not which interpretation of the Fairness Act was right. It was whether competent counsel, confronted with uncertainty and the possibility of a substantial financial benefit to the client, should have counseled the client or filed a protective application. The Arbitrator answered that question in the affirmative. In doing so, she did not reject a controlling agency interpretation; she applied settled malpractice principles to determine whether counsel acted reasonably. Nor did the Arbitrator exceed her authority by concluding that, had Ambush timely submitted an application for Rusnak, he would have received a catch-up payment. That conclusion is consistent with the uncontroverted evidence that similarly situated claimants who timely applied actually received payments. Respondents' disagreement with these determinations does not transform them into an excess of arbitral authority.

**B. The Arbitrator Did Not Consciously Disregard Clearly Defined Legal Principles.**

Respondents' remaining arguments attempt to improperly relitigate the malpractice claims that were fully litigated and decided in arbitration. But dissatisfaction with the Arbitrator's

conclusions is not a basis for vacatur, and Respondents' effort to recast routine merits disputes as "manifest disregard" should be rejected.

At the outset, several of the arguments Respondents now advance were never presented to the Arbitrator and are thus waived. *See Dist. 17, United Mine Workers of Am. v. Island Creek Coal Co.*, 179 F.3d 133, 140 (4th Cir. 1999) ("[W]hen a party consents to arbitration it cannot attack the award on grounds not raised before the arbitrator."). Respondents did not argue that Rusnak was legally required to present a standard of care expert who had represented clients before the USVSST Fund or that the GAO Report constituted a superseding intervening cause.

Ambush's arguments also fail on the merits because they cannot satisfy the extraordinarily demanding manifest disregard standard. To do so, a party seeking vacatur must establish *both* "(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrator[] refused to heed that legal principle." *Wachovia Sec., LLC v. Brand*, 671 F.3d 472, 483 (4th Cir. 2012) (citation modified). Critically, manifest disregard is "not an invitation to review the merits of the underlying arbitration." *Id.* An arbitration award remains enforceable even if it rests on a legal error, faulty reasoning, or an erroneous conclusion. *See Upshur Coals Corp. v. United Mine Workers of Am., Dist. 31*, 933 F.2d 225, 229 (4th Cir. 1991). Vacatur is available only when the arbitrator correctly states controlling law but *consciously* disregards it. *Id.*

Ambush initially reiterates his flawed assertion that he cannot have breached the standard of care because he relied on the Special Master's view of the Fairness Act. As discussed at length, *see supra* Section II.A, it was GAO, not the Special Master, who had authority to determine catch-up payments for claimants like Rusnak. The Special Master was instead tasked with authorizing payments consistent with those determinations. Ambush tries to get around this fact—including the reality that payments were made to claimants who submitted applications irrespective of the

Special Master guidance—by depicting the Special Master as abruptly changing her mind and doing so in such a manner that Ambush could not have possibly predicted. This is false.

*First*, that the Special Master eventually made catch-up payments does not show she "changed her mind." On the contrary, it demonstrates that the Special Master recognized she was statutorily required to defer to the GAO. *Second*, contrary to Ambush's suggestion that a "crystal ball" was needed to anticipate that his clients were eligible for catch-up payments, Opp. at 22, the record shows that virtually every other attorney representing similarly situated claimants *did anticipate* that their clients were likely eligible and submitted timely applications accordingly. GAO Report at 17–18. *Third*, Respondents ignore that the Arbitrator's findings did not rest solely on whether Ambush actually submitted a catch-up application for Rusnak. She also addressed whether a reasonable attorney should have advised his client on the option to submit an application and sought informed consent. The Arbitrator found that Ambush breached his duty to Rusnak by, "failing to counsel his clients that, in light of the ambiguities Ambush identified in the Fairness Act, they could protect their interests by filing an additional application for catch-up payments," among several other reasons. Award at 9. Respondents do not even address this fact.[3]

[3] Respondents cite three cases for the proposition that the Arbitrator "disregarded the Special Master's contemporaneous controlling interpretation . . . in favor of the GAO's" and that constituted the type of "disregard for the governing law" that warrants vacatur. Opp. at 25. Respondents' authorities are, once again, unavailing. In *Dewan v. Walia*, 544 F. App'x 240, 248 (4th Cir. 2013), an employee had signed a release of claims against his former employer. In arbitration, the arbitrator found that the release was enforceable yet proceeded to adjudicate the released claims and award relief to the employee. Unsurprisingly, the Fourth Circuit determined that "holding the Release valid and enforceable but nevertheless arbitrating [the employee's] counterclaims" was a manifest disregard of the law. *Id.* That outcome has no bearing here. Nor are Respondents aided by their remaining authorities. Apart from being nonbinding authority, *Halligan v. Piper Jaffray, Inc*., 148 F.3d 197, 204 (2d Cir. 1998), the Second Circuit itself has cautioned that its holding is confined to the particular circumstances of that case. *See Wallace v. Buttar*, 378 F.3d 182, 192 (2d Cir. 2004) ("Our later cases, however, have cautioned against an over-broad reading of *Halligan*. In *GMS Group*, we noted that *Halligan* confronted 'the unique concerns at issue with employment discrimination claims.'" (quoting *GMS Grp., LLC v. Benderson*, 326 F.3d 75, 79 (2d Cir. 2003)). Finally, *Craddock v. LeClairRyan*, 2019 WL 2437460 (E.D. Va. June 11, 2019), another nonbinding case, concerned the unique question of whether the arbitrator disregarded the law when she enhanced a party's attorney's fee by 25% after losing on multiple claims. None of Respondents' citations alter binding precedent holding that "a court's belief that an arbitrator misapplied the law will not justify vacation of an arbitral award." *Remmey*, 32 F.3d at 149.

Respondents argue that Ambush's actions did not contribute to Rusnak's damages because the Special Master found that successive applications were legally meritless. Beyond failing to identify a clearly established legal principle that the Arbitrator recognized and intentionally disregarded, Respondents rely on a misplaced comparison to *Fishow v. Simpson*, 55 Md. App. 312 (1983). Unlike the claim at issue in *Fishow*, Rusnak's underlying claim here was not meritless. The Fairness Act expressly provided for catch-up payments to eligible Khobar Towers victims and similarly situated claimants who filed timely applications received those payments. The record therefore reflects not merely a *theoretical* possibility of recovery, but *actual* recoveries by otherwise identically situated claimants who preserved their rights by timely filing applications. Indeed, it cannot be disputed that, had Ambush timely filed a successive application for Rusnak, as counsel for hundreds of other similarly situated claimants did, Rusnak would have received a catch-up payment. Nor is it disputed that if consulted, Rusnak would have instructed Ambush to file an application on his behalf. Hearing Tr. (Nov. 12, 2025) at 114:6-17, ECF 14-3.

Respondents' remaining manifest disregard arguments fare no better. Respondents argue Rusnak's standard of care expert needed specific experience with the Fund. Not only did Respondents never make this argument in their Petitions to Vacate, they also never made it in the underlying arbitration proceedings. To the contrary, Respondents stated during the arbitration that they "have no objection that [Rusnak's expert] is considered as an expert in the matters that [counsel] indicated." Hearing Tr. (Nov. 13, 2025) at 27:8-24, 31:16-20, ECF 14-4. Tellingly, Ambush's own standard of care expert lacked the expertise Ambush now claims is essential.

In addition to being waived, the argument is not supported. Respondents' authorities stand at most for the proposition that an expert may *sometimes* be needed when a lay jury is not otherwise capable of understanding the issues. Opp. at 24-25. But such evidentiary rules do not apply in the

arbitration context. *See* AAA Commercial Rule 35(a) ("Conformity to legal rules of evidence shall not be necessary."). Nor was the arbitrator a lay juror: her decades of relevant professional experience included resolving malpractice cases as a Maryland Supreme Court Justice. Ambush's citations to cases involving *medical* malpractice are inapposite. And, even in the lay jury context, "expert testimony is unnecessary to calibrate the exact standard of care owed by the defendant" when, as here, the fact finders are capable of using their "common knowledge or experience to recognize a breach of a duty." *Jones v. Maryland*, 425 Md. 1, 27 (2012); *see also Cent. Cab Co., Inc. v. Clarke*, 259 Md. 542, 551 (1970) (no expert testimony required in malpractice case when the breach was a lawyer's failure to inform his client he was terminating representation).

Respondents' argument also fails for the more fundamental reason that Rusnak *did* present expert testimony on the standard of care. That expert, Hilary Gerzhoy, was qualified as an expert in legal ethics and malpractice matters. Her extensive testimony included explaining that Maryland law recognizes that its ethics rules (including duties to communicate with a client and obtain informed consent before forgoing a course of action affecting client rights) inform the standard of care. *See, e.g.*, Hearing Tr. (Nov. 13, 2025) at 40:1-42:2, ECF 14-4; *id*. at 187:3-189:6. Ambush quibbles that Gerzhoy had not represented clients before the Fund (nor had Ambush's standard of care expert). But nothing in Ambush's authorities suggests that an otherwise qualified expert must practice in the precise niche at issue to opine on core professional obligations. *See Catler v. Arent Fox, LLP*, 212 Md. App. 685, 720–22 & n.45 (2013) (reversing lower court's exclusion of experts it found to lack the right "practical experience"). This is especially true here where the fundamental duties at issue, including advising a client and obtaining informed consent, are not unique to Fund practice. The Arbitrator heard competing expert opinions, assessed their credibility, and credited Rusnak's expert evidence, along with fact testimony and documentary evidence establishing that

Ambush was aware of the uncertainty surrounding applications yet failed to take reasonable steps to counsel his client or protect his interests.[4] Courts are not permitted to second guess an arbitrator's weighing of such evidence as part of her fact-finding role.

Respondents next ask this Court to entertain in the first instance their theory that the GAO's November 1, 2024 report constituted a superseding intervening cause severing any connection between Ambush's conduct and Rusnak's loss. During the arbitration, Respondents argued generally that the Fund was responsible for any alleged harm. They did not contend that the GAO Report operated as an independent superseding cause under Maryland law. This new argument also fails on the merits. The GAO Report did not cause Rusnak's loss because it was not a reason that Rusnak *failed* to receive catch-up payments. To the contrary, the GAO Report recognized that had Ambush timely filed an application, Rusnak *would have* received compensation. Nor were the GAO's conclusions unforeseen, as Ambush contends. Congress expressly directed the Comptroller General to determine catch-up payment amounts.[5] Hundreds of other qualifying victims and their attorneys foresaw the GAO's determination as evidenced by their timely applications. Consequently, the GAO Report could not reasonably be characterized as a superseding cause.

Respondents finally argue that the damages award is speculative and *might someday* result in an impermissible double recovery. Neither assertion comes close to establishing manifest

[4] Hearing Tr. (Oct. 29, 2025) at 90:7-91:7, ECF 14-2 ("[Braun] Q. Did you tell your clients during this time period, 'Hey, we've got a vague act. There's a lot of uncertainty here, and I can't get a definitive interpretation on whether I'm allowed to submit a successive application during the application period. Do you want us to take the protective step of submitting an application so that you can potentially qualify for hundreds of thousands of dollars in payments?' Did you ever tell that to your clients or ask that –…[Deponent:] The words that you used, I did not do…[Braun] Q. Did you ever ask them under any wording – 'do you want me to submit a successive application during the catch-up payment?' I'm sorry – 'during the catch-up payment eligibility period, just in case?' A. No.").

[5] Ambush's claim that the GAO engaged in "advocacy" that caused the Special Master to "reverse" her prior interpretation misstates what occurred. Opp. at 3. The GAO did not "advocate" for any result, and the Special Master did not independently reverse course; rather, acting pursuant to the authority Congress vested in the Comptroller General, the GAO determined the amounts and eligibility for catch-up payments, and the Special Master had no discretion to countermand that determination.

disregard. With respect to the first issue, Respondents argue the Arbitrator disregarded the law by "accepting Rusnak's representation" that he suffered $685,442.38 in damages. To the contrary, the Fund itself calculated Rusnak's catch-up payment under the GAO methodology at precisely $685,442.38. *See* ECF 14-16. These damages were thus hardly speculative.[6] The evidence also overwhelmingly showed that Rusnak is unlikely to ultimately recover the entirety of his judicially awarded damages from the Fund. The Fund sunsets in 2039, and distributions depend on the availability of sufficient funds. Hearing Tr. (Oct. 29, 2025) at 137:3-5. In the six years since obtaining his judgment, Rusnak recovered only 8.5% of his awarded damages. *Id.* at 136:21-137:2. Indeed, Ambush himself admitted in client letters and testimony that it was [redacted] Ex. J52; *see also* Hearing Tr. (Oct. 29, 2025) at 136:9-14, ECF 14-2. Ambush's expert too acknowledged the "great risk of non-payment," *Id.* at 176:2-24, ECF 14-2, calling the Fund's funding "anything but clear," *id.* The missed catch-up payment thus did not merely delay Rusnak's recovery; it permanently diminished it.

Respondents' double-recovery argument is similarly baseless. The evidence showed that Rusnak has not and is unlikely to ever fully recover from the Fund or any other source. Moreover, even in theory, no double recovery is possible because Rusnak will comply with Fund rules by reporting any recovery he receives from Ambush. Considering these same arguments, the Arbitrator determined there was no double recovery issue. These arguments thus provide no basis to vacate the arbitration award.

**CONCLUSION**

For these reasons, Petitioner requests that the Court confirm the Award in its entirety.

---

[6] In an aside, Ambush asserts that Rusnak did not present a damages expert. This new argument is waived, and Ambush cites no authority showing that any clearly established legal principle required Rusnak to employ a separate damages expert, particularly where the damages amount was readily determinable and reflected in a Fund document.

Dated: August 5, 2026

Respectfully submitted,

*/s/ Robert A. Braun*
Robert A. Braun (D. Md. Bar No. 22059)
**COHEN MILSTEIN SELLERS & TOLL LLP**
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
RBraun@cohenmilstein.com

*Counsel for Petitioner Elvis J. Rusnak*